IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST PENN ALLEGHENY HEALTH SYSTEM, INC., | : : : | CIVIL ACTION NO. |
| v. | : : : | |
| UPMC and | : : | |
| HIGHMARK, INC. | : | |

## COMPLAINT

### Introduction

1.      Plaintiff, West Penn Allegheny Health System, Inc. ("West Penn Allegheny"), hereby brings this action against Defendants, UPMC and Highmark, Inc. ("Highmark") in order to vindicate its and the community's rights protected under the Sherman Act, 15 U.S.C. §§ 1 and 2.

2.      At least since 2002, Pittsburgh's dominant hospital system, UPMC, and its dominant health insurer, Highmark, have conspired to reduce competition and raise prices at the expense of the community's employers, consumers, and patients.  During that period, Highmark and UPMC have conspired to protect one another from competition.  UPMC has agreed neither to contract on reasonable terms with any competing health insurer nor to sell its health insurance affiliate to any competing health insurer, thus relegating companies such as United and Aetna to marginal participation (at best) in the Pittsburgh market.  In exchange, Highmark has agreed to shutter its low-cost Community Blue product and to pay inflated reimbursement rates to UPMC while depressing rates for UPMC's competitors, especially the West Penn Allegheny.  Highmark has in turn passed on the costs of UPMC's rates to employers, consumers, and patients by

charging higher premiums.  Since the conspiracy's formation in 2002, and at least through 2007, UPMC and Highmark have enjoyed record profits – and an increasingly exploited Pittsburgh community has suffered skyrocketing health care costs.

3.      One of the conspiracy's aims was to destroy West Penn Allegheny, the sole surviving competitor to UPMC in sophisticated tertiary and quaternary care.  Ever since West Penn Allegheny rose from the ashes of the bankruptcy of the Allegheny Health, Education, and Research Foundation ("AHERF") – an effort pushed hard by community leaders precisely to counter the danger that a dominating UPMC would raise prices – UPMC has pursued a relentless campaign to drive West Penn Allegheny out of business.  Indeed, UPMC CEO Jeffrey Romoff has stated publicly that competition in health care does not work and that West Penn Allegheny has no future.  *See* "Romoff Questions West Penn's Long-Term Viability," *Pittsburgh Business Times* (October 21, 2002).

4.      In the early 2000's, UPMC sought to destroy West Penn Allegheny by unlawfully raiding key physicians from West Penn Allegheny's hospitals through excessive compensation levels and land purchases at inflated values, as well as by deliberately spreading false information to the investment community about West Penn Allegheny's finances.  Despite UPMC's repeated resort to such unlawful tactics, West Penn Allegheny has been able to continue to fight back because it has provided what the community needed – highly sophisticated, top flight medical care for far less than UPMC's inflated prices.

5.      In pursuit of its goal to destroy West Penn Allegheny, UPMC offered, in Summer 2002, a secret deal to Highmark:  UPMC agreed to ensure Highmark's continued dominance in the health insurance sector with the prospect of being able to raise premiums.  In

exchange UPMC not only wanted its own bottom line fattened with higher payment rates but also demanded that Highmark join in the campaign to eliminate its sole viable competitor, West Penn Allegheny.

6.      Even though Highmark, recognizing the benefits of hospital competition for the community and itself, had originally supported West Penn Allegheny with a $125 million loan, it now reversed course.  As part of its conspiracy with UPMC, Highmark systematically tilted the playing field against West Penn Allegheny.  Despite West Penn Allegheny's clear cost advantages over UPMC, Highmark's "truce" with UPMC led to Highmark's withdrawal of Community Blue, Highmark's low-cost insurance product that directed care to, among other providers, West Penn Allegheny to keep premiums down and health care affordable.  *See* "Highmark Pulling Plug on Lower Cost Health Plan," *Pittsburgh Post-Gazette* (March 27, 2003). As the dominant insurer, Highmark also forced West Penn Allegheny to accept artificially depressed reimbursement rates with the purpose of furthering UPMC's plan to drive West Penn Allegheny out of business and deny it access to the resources needed to invest in new facilities, technology, and equipment.  Highmark's depressed reimbursement rates to West Penn Allegheny allowed Highmark to subsidize its overpayments to UPMC.  Still not satisfied, UPMC insisted – and Highmark agreed – that Highmark would refuse to cooperate with any restructuring of West Penn Allegheny's finances, including Highmark's loan, even when there was no added cost to Highmark.  And at the same time UPMC has continued its campaign of unlawfully raiding physicians and disparaging West Penn Allegheny to the investment community.

7.      The conspiracy has taken a severe toll upon West Penn Allegheny. Despite providing equal or better care than UPMC at a lower cost to the community, Highmark agreed to depress reimbursement to West Penn Allegheny.  Moreover, the conspirators have

artificially blocked and stunted West Penn Allegheny's natural growth as the high-quality and low-cost leader, resulting in lost patient volume, growth, and earnings to West Penn Allegheny. Those earnings would have been used by West Penn Allegheny to further its charitable mission of improving the extent, scope, and quality of health care available to the Pittsburgh community. Meanwhile, as a result of the conspiracy between UPMC and Highmark, UPMC has posted profits that are dramatically disproportionate to its size. For example, for fiscal year 2006, UPMC's profits were $512 million, while West Penn Allegheny's net income was $21 million. While UPMC is five times as large as West Penn Allegheny, its profits were 25 times those of West Penn Allegheny's. Similarly, Highmark's surplus rose from $2.8 billion in 2005 to $3.5 billion in 2007.

8.     The effects of the illegal conspiracy have continued to the present day.

9.     In Fall 2005, Highmark's Board Chairman admitted point blank to West Penn Allegheny that what Highmark had done with UPMC was "probably illegal."

**Parties**

10.     Plaintiff West Penn Allegheny is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.

11.     Defendant UPMC is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.

12.     Defendant Highmark, Inc. is Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.

-4-

**Jurisdiction and Venue**

13.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a).

14.     Supplemental jurisdiction over West Penn Allegheny's claims under state law is conferred by 28 U.S.C. § 1367.

15.     Venue is proper in the Western District of Pennsylvania by virtue of 28 U.S.C. §139l(b) because all parties reside in the Western District of Pennsylvania.

**Facts**

**The Hospital Market in the Pittsburgh Area**

16.     Hospital services in the Pittsburgh metropolitan area are dominated by UPMC.  In the 1990's, UPMC began to acquire smaller, independent hospitals.  UPMC currently owns 20 tertiary, specialty, and community hospitals and employs approximately 50,000 individuals.  UPMC's key facilities include:

- UPMC-Presbyterian, UPMC-Shadyside, and UPMC-Mercy, the only other tertiary and quaternary care facilities in Pittsburgh besides West Penn Allegheny's Allegheny General Hospital and Western Pennsylvania Hospital.

- Children's Hospital of Pittsburgh, the only specialized pediatric inpatient facility in the Pittsburgh area.

- Magee Women's Hospital of UPMC, the largest obstetrical care facility in Western Pennsylvania.

17.     With the exception of burn treatment, UPMC possesses a market share in excess of 50% in every tertiary and quaternary care service line in the six-county Pittsburgh

metropolitan region.  UPMC's oncology share, including its joint ventures and satellite cancer centers, is approximately 80%.

18.    Besides UPMC and West Penn Allegheny, there are several small community hospital systems in Allegheny County and the adjoining counties:  Excela Health, a four-hospital system; Heritage Valley Health System, a two-hospital system; Butler Health System, which owns Butler Memorial Hospital; St. Clair Hospital; Ohio Valley General Hospital; Armstrong County Memorial Hospital; Jefferson Regional Medical Center; and The Washington Hospital.

19.    None of these systems offers sophisticated tertiary and quaternary care and none poses any threat to UPMC's dominance.  None of the community hospital systems registers above single digit market shares in any service line in the six-county metropolitan area.

20.    Nevertheless, in order to ensure that even these minor competitors are under its thumb, UPMC has established a series of joint ventures with these community hospitals (most notably in oncology) and/or located a UPMC cancer center within the community hospital's facility.  Nearly every hospital in Allegheny County except West Penn Allegheny has either a UPMC joint venture or a UPMC cancer center.  The joint ventures and cancer centers cannot contract with any health insurer without UPMC's approval and UPMC exerts significant control over their operation.  As no health insurer will contract with a community hospital unless it can access the services provided by the joint venture and/or cancer center at reasonable rates, this web of joint ventures and cancer centers allows UPMC to control the contracting decisions of virtually every hospital in the Pittsburgh region except West Penn Allegheny's hospitals.

-6-

**The Health Insurance Market in the Pittsburgh Area**

21.     Similarly, the Pittsburgh health insurance sector is dominated by Highmark, the Blue Cross and Blue Shield licensee in Western Pennsylvania.  Highmark's commercial health insurance market share in the six-county Pittsburgh metropolitan region exceeds 60%.  Indeed, former UPMC Executive Vice President John Paul has stated publicly that Highmark is "an insurer that clearly dominates 70-80% of the commercial market" and "it's pretty obvious they control finance of health care in western Pennsylvania."  *See* "UPMC's Battle Against Highmark's Role in the Allegheny Bailout," *Physician's News Digest* (May 1999).

22.     The largest competitor to Highmark is UPMC Health Plan, a health insurance affiliate of UPMC.  UPMC Health Plan has a roughly 20% commercial market share, although it ceased actively competing against Highmark for commercial business after UPMC and Highmark entered into their conspiracy.  UPMC Health Plan lacks access to a national network of providers and thus cannot compete for the business of large employers with multi-state operations, although it could handle the needs of smaller employers.  UPMC Health Plan refuses to contract with West Penn Allegheny.

23.     The remaining commercial market is divided between United, Aetna, Coventry, and CIGNA.  Even though these are major national companies with strong track records of success in many markets, none of them has been able to crack even a 10% market share in Pittsburgh.

**West Penn Allegheny's Emergence From the AHERF Bankruptcy**

24.     West Penn Allegheny was formed by a combination in August 2000 of The Western Pennsylvania Healthcare System, comprised of The Western Pennsylvania Hospital ("West Penn") and Suburban General Hospital, and the Pittsburgh-based hospitals formerly affiliated with AHERF, including Allegheny General Hospital ("AGH"), Allegheny Valley Hospital (now the Alle-Kiski Medical Center), Forbes Regional Hospital (now The Western Pennsylvania Hospital – Forbes Regional Campus), and Canonsburg General Hospital.  AGH was the flagship hospital of AHERF and is a highly sophisticated tertiary and quaternary care teaching hospital.  At the time of the merger, West Penn was a smaller tertiary care facility.

25.     The merger arose from AHERF's bankruptcy in 1998.  The West Penn Board of Directors, including some large area employers, sought to preserve AGH as a strong competitor because of concern that, if AGH failed, there would be few healthcare options for consumers.

**UPMC Engages in Predatory Conduct to Thwart the Emergence of West Penn Allegheny**

26.     From the outset, UPMC attempted to sabotage the formation and operation of West Penn Allegheny.  A vice president for UPMC told physicians that it intends to turn AGH into a "parking lot."

27.     The campaign began when UPMC Board members and employees unsuccessfully lobbied AGH Board members and local officials to oppose the West Penn-AGH merger.

28.     Stymied in these informal, private lobbying efforts, UPMC attempted unsuccessfully to intervene in the Orphans' Court proceedings regarding the creation of West

-8-

Penn Allegheny. Similarly, UPMC filed a frivolous lawsuit against the Pennsylvania Department of Insurance to block Highmark from providing financial assistance to West Penn Allegheny.

29. UPMC also interfered with West Penn Allegheny's initial bond offering. UPMC, which had no role in the offering, retained its own consulting firm, Reynolds & Co., to develop a competing analysis of the West Penn-AGH merger that predicted the new West Penn Allegheny system would fail on the basis of numerous false and misleading statements about West Penn Allegheny's finances. UPMC disseminated this report to potential purchasers of West Penn Allegheny bonds and to credit rating agencies, as well as to the news media. *See* "UPMC Study Sees Big Risks in Merger," *Pittsburgh Post-Gazette* (June 16, 1999). UPMC officials also took the extraordinary step of meeting personally with potential investors to try to dissuade them from investing in West Penn Allegheny bonds. West Penn Allegheny's investment bankers advised West Penn Allegheny that they had never before seen a competitor engage in a "reverse road show" of this kind.

30. UPMC was able to stop Vanguard, a money management firm, from purchasing any West Penn Allegheny bonds by threatening to cut off all of its business ties with Vanguard. UPMC also dissuaded Scudder, another money management firm, from buying $30 million of West Penn Allegheny bonds. Nevertheless, West Penn Allegheny was eventually able to place its bond offering.

31. UPMC further tried to disrupt the formation of West Penn Allegheny and to destroy AGH by unlawfully raiding key members of the AGH medical staff. AGH, like all hospitals, relies on physicians on its medical staff to direct patients to its facilities for their

services.  Put differently, the primary way that a hospital distributes its services to consumers is through a physician's admission of a patient.  Given the high fixed costs of hospitals and the consequent need to maintain a steady volume of patients to remain financially afloat, the role of a physician in sending patients to a facility is absolutely crucial.

32.     From 1999-2001, UPMC engaged in a campaign to "cherry pick" the key physicians who provided most of AGH's profits through a campaign of bribes and inducements:

- In September 1999, UPMC hired Dr. Joseph Maroon, AGH's Chief of Neurosurgery, and four other neurosurgeons.  UPMC lured Maroon by offering a substantially higher salary and by agreeing to purchase two parcels of land from Dr. Maroon for in excess of $6 million, even though their market value was well below this number (Maroon had purchased the properties for less than $300,000 in 1988 and 1991).

- UPMC hired AGH chief oncologist Dr. Stanley Marks and the remaining thirty medical and radiation oncologists who practiced at AGH.  UPMC offered extremely large salaries to the Marks group, and further agreed to pay $2 million for certain land owned by Marks – again well above fair market value.  UPMC's offer was contingent upon the oncologists switching hospitals before West Penn Allegheny completed its financing – a clear sign that the entire purpose of hiring Marks and paying excessive amounts for his real estate holdings was designed for one purpose alone, the destruction of AGH.  AGH could not afford to match UPMC's offer, and suffered a severe setback in its oncology program.

- UPMC raided AGH's hand surgeons, who generated 2,000 to 3,000 admissions per year.

- UPMC raided invasive cardiologists on the AGH Medical Staff.  UPMC paid one of these physicians in excess of $1 million per year, even though the MGMA median salary for invasive cardiologists in the Pittsburgh area at that time was less than $400,000.

33.     Moreover, UPMC raided multiple gastroenterologists, pulmonologists and primary care physicians from the AGH Medical Staff.  The purpose of these raids, and the enormous costs that UPMC incurred in paying inflated salaries and overpaying for real estate, was to run AGH out of business.

-10-

34.     UPMC required that each raided AGH physician agree to become a UPMC employee, even though certain of these physician previously operated their own practices.  Turning formerly independent physicians into employees tightened UPMC's control over their future conduct.

35.     During this raiding activity, UPMC repeatedly informed AGH physicians that UPMC intended to "bury" AGH and to turn it into a nursing home.  UPMC bluntly told AGH physicians that UPMC wanted to hire them in order to damage AGH.

36.     Indeed, upon information and belief, UPMC hired AGH's physicians in order to choke off AGH's access to patients from these admitting physicians and thus to cripple AGH financially and to destroy it as a competitor.

37.     Upon information and belief, the amount of reimbursement that UPMC received for these physicians was below the cost of the inflated compensation packages used to lure them away from the AGH Medical Staff.  This money-losing strategy could only be in UPMC's self-interest if UPMC hoped to recoup these losses by driving AGH out of business.

38.     In fact, by July 2001, UPMC's physician division was "losing about $1 million a week."  *See* "UPMC Health Plan Grows Amid Feuding," *Pittsburgh Tribune-Review* (July 1, 2001).

39.     Upon information and belief, UPMC intended to bid physician compensation levels up to artificially inflated levels solely in order to prevent West Penn Allegheny from being able to recruit and retain qualified physicians.

-11-

40.     Nor was UPMC's predatory conduct limited to AGH.  At approximately this same time, UPMC raided the entire oncology department of West Penn Allegheny's Alle-Kiski Medical Center ("AKMC") and the practice of a primary care physician with strong ties to AKMC.  Again, the reason for these raids, in which UPMC paid exorbitant compensation far above market levels, was to try to kill West Penn Allegheny as a competitor.

41.     The most outrageous instance of physician raiding occurred in early 2002 when UPMC attempted to close AGH by poaching its entire anesthesiology staff.  Without qualified anesthesiologists, a hospital cannot perform surgical procedures, maintain an emergency department, or treat inpatients who might require surgery.  Thus, if UPMC could steal all of AGH's anesthesiology staff, it would close AGH.

42.     At that time, AGH was a party to an exclusive contract for anesthesiology services with Allegheny Anesthesia Associates ("AAA").  AAA employed all of AGH's 37 anesthesiologists and 60 certified registered nurse anesthetists ("CRNA's").  UPMC approached AAA and offered to hire away the entire group for a substantial increase in salary, above not only their reimbursement from AGH but also well above what UPMC paid its own anesthesiologists.  UPMC offered a guaranteed three-year contract with salaries in excess of $400,000 to each of the AAA anesthesiologists, regardless of their experience or qualifications, even though UPMC paid its own anesthesiologists between $200,000 and $350,000.

43.     This offer was made despite the fact that UPMC did not have sufficient operating room volume to absorb these new anesthesiologists.  UPMC's own internal analysis showed that this raid on AGH's anesthesiology staff would be unprofitable.  Several physicians

told AGH management that UPMC's Tony Detre, Vice President Business Development, had said to them that UPMC's raid on AAA was designed solely to run AGH out of business.

44.     UPMC was forced to raise all of its existing anesthesiologist salaries (at a cost of $8 million), without sufficient volume to keep its now excessive anesthesiology staff fully employed.  The AAA group subsequently fractured and its various members left UPMC.

45.     UPMC has a history of successfully using predatory physician raids as a means to drive out competitors.  For example, in 2000, UPMC acquired the Russellton Medical Group and forced those physicians to resign their staff privileges at Citizens General Hospital, for which they were a key source of patients.  This raid was a key factor in Citizens General's closure in November 2000.

46.     Similarly, UPMC precipitated the 2002 closure of St. Francis Medical Center through predatory raiding of key members of that hospital's medical staff.

47.     These predatory hiring and recruitment practices have been unique to UPMC in the Pittsburgh area.  No other hospital system has attempted systematically to deprive West Penn Allegheny of vital physicians, much less to do so by offering sharp and unusual salary increases or by hiring in practice areas where the extra staffing was unnecessary and unprofitable (as in the AAA transaction).

**Highmark's Initial Support of West Penn Allegheny**

48.     Before the Summer of 2002, West Penn Allegheny had a strong relationship with Highmark.  As the region's dominant health insurer, Highmark was understandably concerned about the potential failure of AGH in the wake of the AHERF

bankruptcy. The loss of a key hospital competitor in Pittsburgh would dramatically increase UPMC's negotiating leverage over Highmark, forcing Highmark to offer increased compensation to UPMC.

49.     Consistent with its self-interest, Highmark provided a $125 million subordinated loan to West Penn Allegheny to help finance the West Penn-AGH merger in 2000.

50.     Similarly, in early 2002, Highmark provided a $42 million grant to West Penn Allegheny.

51.     Indeed, in the late 1990's and early 2000's, Highmark and UPMC were at loggerheads over reimbursement rates. Frustrated with UPMC's intransigence and demands, Highmark formed the Community Blue product in the late 1990's, a managed care product whose limited provider network sent business to AGH and other non-UPMC hospitals. UPMC did not participate in the Community Blue network. In pleadings filed in 2001 in the Children's Hospital merger litigation discussed below, UPMC represented that "West Penn Allegheny serves as the core of Highmark's narrow network products." Community Blue was marketed as a low-cost insurance option to appeal to small employers who lacked the resources to self-insure. Community Blue grew to over 200,000 members.

52.     UPMC in turn launched the UPMC Health Plan, a competing health insurance company. Former UPMC Executive Vice President John Paul stated that UPMC formed its own health insurance arm because of its inability to negotiate what he deemed a "fair rate" with Highmark. Mr. Paul expressed UPMC's desire not to be "at the mercy of Highmark." *See* "UPMC's Battle Against Highmark's Role in the Allegheny Bailout," *Physician's News Digest* (May 1999).

-14-

53. UPMC Health Plan's network focused on UPMC's own facilities. To this day, UPMC Health Plan has refused to include the West Penn Allegheny hospitals in its network of participating providers, although UPMC Health Plan has permitted every other hospital in Allegheny County to participate in its network. Moreover, UPMC Health Plan has repeatedly and improperly refused to pay West Penn Allegheny for out-of-network, medically necessary emergency care services provided by West Penn Allegheny to UPMC Health Plan members.

54. True to form, UPMC resorted to unlawful tactics to attack Highmark's Community Blue product. Fed up, in 2001, Highmark successfully sued UPMC for false and misleading advertising about Community Blue. *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001).

55. One of the misleading advertising claims was that Community Blue did not afford access to two "world-renowned physicians" raided from AGH, Drs. Marks and Maroon.

56. The mutual antagonism between Highmark and UPMC in the early 2000's was also starkly displayed in Highmark's 2001 lawsuit to enjoin UPMC's acquisition of Children's Hospital of Pittsburgh as a violation of federal antitrust law. *See generally Highmark, Inc., et al. v. UPMC Health System*, Civ. A. No. 01-1114 (W.D. Pa.) (the "Merger Litigation").

57. In its Complaint in the Merger Litigation, Highmark predicted that UPMC would impose inflated prices by bundling pediatric services with non-pediatric services because "[UPMC] presently holds leading or dominant positions in virtually all segments of the market for hospital services, with the exception of pediatric services. To provide coverage for pediatric services in Allegheny and surrounding counties, it is essential for health plans to provide access

-15-

to Children's.  With control of Children's, [UPMC] can insulate its non-pediatric services from competition by tying or bundling them together with services from Children's."

58.     Highmark concluded in its Complaint that "[UPMC] is likely to use its market power, arising from the Takeover, to raise prices and reduce health care choice in Allegheny and surrounding counties."

59.     It is clear that Highmark was arguing from its own experience of UPMC's predatory tactics.  Highmark expressly pointed out in its Complaint that UPMC's behavior for the five years preceding the Merger Litigation "demonstrates a specific intent and willingness by [UPMC] to exploit market power whenever possible."

60.     UPMC struck back by accusing Highmark of anticompetitive conduct.  In its Answer and Affirmative Defenses in the Merger Litigation, UPMC alleged that:

> Highmark is a monopolist in the health care financing market in Western Pennsylvania and a monopsonist in the health care services market in Western Pennsylvania.  Highmark uses its powers as a monopolist and a monopsonist to dictate prices for health care providers (like [UPMC]) in all relevant markets.

61.     In particular, UPMC alleged that Highmark's promotion of its low-cost Community Blue product constituted "predatory pricing" because Highmark had the temerity to demand discounts from UPMC so it could offer the community a low-priced, affordable health insurance option.

62.     Highmark and UPMC ultimately settled the Merger Litigation.

**The Highmark-UPMC "Truce" and the Conspiracy to Entrench One Another's Market Power**

63.     As early as 1998, UPMC CEO Romoff had told the press that UPMC had offered a "truce" to Highmark:  "'Let's call a truce,' Romoff recalled UPMC saying to Highmark officials during the board meetings in January.  'You delay putting Community Blue out and we will not sign an agreement with an outside insurer.'"  (*Pittsburgh Business Times*, Sept. 21, 1998).

64.     In a brief filed on September 17, 2001 in the Merger Litigation, Highmark likewise acknowledged UPMC's proposal of a "truce":

> Defendant [UPMC] asserts that the Takeover is justified because Highmark has allegedly engaged in anticompetitive behavior. Remarkably, as an example of such behavior, Defendant cites Highmark's rejection of Defendant's overtures to attempt to form a "super" monopoly for the provision of health care in Western Pennsylvania in which UPMCHS, the leading provider of hospital services, and Highmark, the leading health insurer, would combine forces.

65.     In the Summer of 2002, Highmark finally agreed to Romoff's proposal to eliminate competition and create a "super monopoly."  The two parties entered into a new multi-year participating provider agreement, with highly favorable reimbursement rates for UPMC.  In addition, Highmark agreed to provide just over $230 million to UPMC to build a new hospital facility for UPMC's Children's Hospital of Pittsburgh, $70 million of which was a grant while the remainder was a low-interest loan.

66.     Highmark also agreed with UPMC to stop providing assistance and support to West Penn Allegheny, to tilt the playing field unfairly in UPMC's favor through discriminatory reimbursement and grant-making, and to discontinue Community Blue.

-17-

67.     All of these actions were contrary to what normally would be in Highmark's self-interest as a health insurer.  Absent the conspiracy, it was not in Highmark's interest to pay higher reimbursement rates to UPMC, either directly or indirectly through special grants and subsidies.  As shown by its pre-conspiracy conduct, Highmark recognized that, to the contrary, it had a strong interest in preserving hospital competition and preserving West Penn Allegheny to act as a counterweight to UPMC.

68.     The *quid pro quo* for Highmark's agreement was that UPMC agreed to protect Highmark from competition in the health insurance sector by (1) agreeing not to grow or market the UPMC Health Plan, including UPMC Health Plan's refusal to pursue large group contracts that have been Highmark's traditional mainstay; (2) refusing to contract at competitive rates with non-Highmark health insurance plans; and (3) refusing to sell the UPMC Health Plan to any potential competitor of Highmark.

69.     UPMC fulfilled its role in this conspiracy.  Lacking a competitive contract with UPMC, no major national health insurance provider, including Aetna, United, Coventry, and CIGNA, has been able to crack 10% commercial market share in the six-county Pittsburgh metropolitan area.

70.     UPMC has blocked the entry and growth of several large national health insurers because it is extremely difficult for a new market entrant to build an adequate and marketable provider network without reasonable access to UPMC's cooperation and facilities, especially in oncology, obstetrics, and mental health.  Employers in the Pittsburgh area typically require their health plans to provide access to UPMC facilities.  Without a competitive contract

-18-

with UPMC, Highmark rivals like United have great difficulty offering an attractive health insurance product to employers.

71.     UPMC's refusal to contract at competitive rates with any other health insurer can only be explained by its illegal conspiracy with Highmark.  Such contracting would normally be in UPMC's self-interest, both to ensure that multiple insurers competed for access to UPMC facilities (thus improving UPMC's bargaining power) and to attract whatever incremental volume these plans could offer.

72.     UPMC has also allowed its commercial health insurance business to languish since Summer 2002.  This refusal to compete with Highmark only makes sense in return for Highmark's increased and discriminatory reimbursement rates for UMPC and its assistance to UPMC in its campaign to cripple West Penn Allegheny.

73.     As part of the conspiracy, Highmark discontinued the Community Blue product effective January 1, 2004.  Ken Melani, President and CEO of Highmark, attempted to conceal the real reason for this action by falsely telling the press that Highmark needed to cut administrative costs.  Dr. Melani also erroneously claimed that Community Blue did not save employers money.  *See* "Highmark Pulling Plug on Lower Cost Health Plan," *Pittsburgh Post-Gazette* (March 27, 2003).  Indeed, Dr. Melani's statement about Community Blue after Highmark entered into its conspiracy with UPMC was in direct conflict with his pre-conspiracy testimony in the false advertising litigation that a "key feature" of Community Blue was "that a group of hospitals have agreed to take additional discounts which allow us to price the product cheaper in the marketplace than many of our other products."

-19-

74.     Not only did Dr. Melani's statements contradict Highmark's previous, multi-year marketing campaign for Community Blue as a low-cost alternative, but small business groups in the region expressed their dismay at losing a low-cost health insurance option.  In fact, the *Pittsburgh Post-Gazette* reported that "family coverage at companies with coverage through Community Blue and with employees averaging 40 years of age will rise roughly 40 percent." *See* "Highmark Pulling Plug on Lower Cost Health Plan," *Pittsburgh Post-Gazette*, March 27, 2003.

75.     Highmark's decision to end the then-growing, low-cost Community Blue product, which gave Highmark a competitive advantage over the UPMC Health Plan and other health insurers in pursuing the business of cost-conscious employers, can only be explained as necessary to achieve the benefits of the conspiracy with UPMC.  In fact, upon information and belief, Highmark engaged in no internal discussion or analysis that led to the closing of Community Blue.  Highmark's senior management simply announced to its employees managing Community Blue, without any prior warning or explanation, that the product would be discontinued.

76.     Contrary to the deeply discounted Community Blue network agreements between Highmark and West Penn Allegheny, UPMC's charges are quite high.  For example, a study released by the Pennsylvania Health Care Cost Containment Council in June 2007 found that, for admissions in 2005, UPMC Presbyterian and UPMC Shadyside received an average of $34,803 for coronary artery bypass graft surgery, while AGH received only $23,715 on average. The same study found, though, that AGH performed better than UPMC's hospitals, with a lower readmission rate.  *See* "Hospital Chief 'Shocked' at Disparity in Payments," *Pittsburgh Post-Gazette* (June 17, 2007); *see also* "UPMC Was Paid Thousands More for Cardiac Surgery,"

-20-

*Pittsburgh Post-Gazette* (June 14, 2007); "Health Care Costs Report Illustrates Disparities, Could Lead to Change," *The Butler Eagle* (June 20, 2007).

77.     Highmark was confident that it could pass on these higher costs to its customers without fear that employers and consumers could turn to other, lower-cost insurers – a result guaranteed by UPMC and Highmark's agreement to effectively exclude rival insurers from the Pittsburgh market.

78.     Highmark's conspiracy with UPMC does not stop with discriminatory reimbursement, but extends to discrimination in "grants" awarded to health care providers for the ostensible purpose of improving the quality of health care.  For example, in 2006, Highmark established an e-prescribing initiative that provided $7,000 per physician, with a maximum of $500,000 for any one health care provider.  The only providers with sufficiently large operations to be limited by this cap were West Penn Allegheny and UPMC.  Highmark waived the cap for the 2006 program for UPMC and provided $8 million.  West Penn Allegheny, on the other hand, remained limited to $500,000 under the 2006 program.

79.     Upon information and belief, as part of Highmark's conspiracy with UPMC, Highmark has also improperly denied West Penn Allegheny proper reimbursement for emergency care services.  After the closure of Citizens General Hospital, AKMC opened the Citizens Ambulatory Care Center on the Citizens General site to continue operation of the Citizens General emergency room.  This was done at the request of community residents concerned about the lack of nearby emergency services.  Highmark, however, refused to reimburse this care at ER rates.  At one point Highmark urged AKMC to apply for a grant from

the Highmark Foundation to offset this improperly low reimbursement, but then Highmark

denied the grant application in its entirety.

80.     Highmark also publicly supported UPMC's 2006 acquisition of Mercy

Hospital, another action contrary to its self-interest, as the merger strengthened UPMC's

bargaining leverage and reduced hospital competition.  The Mercy transaction also shifted

thousands of Mercy employees and their dependents from Highmark's insurance products to

UPMC's Health Plan, which covers all UPMC employees.  Highmark's response to the Mercy

transaction was in marked contrast to Highmark's reaction to UPMC's acquisition of Children's

Hospital of Pittsburgh in 2001, when Highmark sued to stop the transaction.  In fact, in 2006,

Highmark declined to provide Mercy Hospital any assistance to maintain Mercy as an

independent competitor.  This again contrasted with Highmark's behavior before the conspiracy,

when it extended significant assistance to preserve AGH as a counterweight to UPMC.

81.     Highmark and UPMC have both become significantly more profitable

since Summer 2002.  From 2000 through 2002 – when Community Blue competed against

UPMC Health Plan's UPMC-centered health insurance product – both UPMC and Highmark

saw their net income drop precipitously.

82.     Beginning in mid-2002 both companies' earnings soared.  UPMC's net

income rose from $23 million in 2002 to over $618 million by 2007.  In fact, between 2003 and

2004 (the first full year of the conspiracy), UPMC's net income soared by more than 300%.  By

2006, UPMC CEO Jeffrey Romoff was earning in excess of $3 million per year and UPMC had

an eight-figure advertising budget.  *See* "Nonprofit Hospitals, Once for the Poor, Strike It Rich,"

*The Wall Street Journal* (April 4, 2008); *see also* "UPMC Earning Nearing New High,"

-22-

*Pittsburgh Post-Gazette* (May 9, 2007); "UPMC Posts Record $618 Million Profit," *Pittsburgh Post-Gazette* (August 24, 2007).

83.     Highmark saw a similar rapid growth in profits, as its net income increased from less than $50 million in 2001 to approximately $398 million in 2006.  By the end of 2005, Highmark's surplus (*i.e.*, assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2007, it exceeded $3.5 billion.

84.     These profits were made on the backs of the region's increasingly overcharged employers.  In 2004, Highmark raised premiums overall by as much as 15%, and many small business' premiums increased by over 20%.  Indeed, in May 2004, Highmark increased health insurance premiums for Allegheny County's employees by a whopping 75%.

85.     In fact, Highmark's financial statements attributed its approximately 200% jump in net income between 2003 and 2004 to an approximately $265 million increase in premium revenue.

86.     These premium increases were well above national averages.  The *Pittsburgh Post-Gazette* reported that health care industry consultants "said increases in this market are higher than the national average, as much as 20 percent this year, partly because of a new contract between Highmark Blue Cross Blue Shield and UPMC Health System, the region's largest hospital group."  *See* "Can't Afford to Be Sick; More Workers Pinched as Firms, Facing Soaring Health-Care Costs, Shift Some of the Burden onto Employees," *Pittsburgh Post-Gazette* (June 8, 2003).

-23-

87. Indeed, after the conspiracy went into effect and Highmark shuttered the low-cost Community Blue product, small employers in the Pittsburgh area found their premiums rising to the point that their health insurance costs were as much as 25 percent above the national average. *See* "Employers' Health Premiums Rose 11.2 Percent in 2004, Survey Shows," *Pittsburgh Post-Gazette* (September 10, 2004).

88. By the end of 2007 Highmark's surplus assets had grown to an astounding $3.5 billion.

89. UPMC knew full well that, by entering into the conspiracy and protecting Highmark from competition, Highmark would ratchet up health care premiums to employers and consumers. In pleadings filed in the Merger Litigation in the year before the conspiracy was formed, UPMC admitted that "[w]ithout competition, Highmark has had no incentive to pass on to consumers the significant discounts it extracts from providers in the form of less expensive health benefit plans. Instead, Highmark is free to, and does, charge inflated premiums to consumers for its broad network products."

90. Despite its status as nonprofit, UPMC knowingly conspired with Highmark to inflate health care costs so that it could enjoy the benefits of inflated profits.

**The Impact of the Illegal Conspiracy Upon West Penn Allegheny**

91. UPMC demanded as part of the conspiracy that Highmark stop providing support to West Penn Allegheny. Highmark used its dominant position (protected by UPMC) to force West Penn Allegheny to accept below-market, depressed reimbursement rates, which Highmark used to subsidize the overpayments to UPMC. This rate discrimination was a double bonanza for the conspirators: Highmark enjoyed large profits by holding payments to West Penn

-24-

Allegheny at depressed levels while it raised premiums to consumers and employers, and UPMC saw its competitive position improved as its only viable rival was slowly starved of resources needed to grow and thrive.

92. Since the conspiracy's formation, the cumulative amount of Highmark's rate discrimination has exceeded $100 million.

93. Unsurprisingly, Highmark's decision to fatten UPMC with inflated reimbursement led to UPMC's net income rising from $23 million in 2002 to over $618 million by 2007 and to West Penn Allegheny struggling to break even.

94. Moreover, as part of the conspiracy, in the years since 2002, Highmark repeatedly obstructed West Penn Allegheny's efforts to refinance its subordinated loan from Highmark, even though Highmark would incur no or minimal additional costs under the refinancing proposals.

95. In 2003, Highmark refused West Penn Allegheny's request to restructure Highmark's loan to provide for level debt service and to reduce the rising interest rate to 5%, based upon unspecified supposed concerns of Highmark's legal counsel. This explanation was pretextual and false and designed to conceal the real basis for Highmark's decisions, which were now being driven by its illegal conspiracy with UPMC.

96. In 2004, West Penn Allegheny asked Highmark to restructure the loan to eliminate West Penn Allegheny's debt service obligation through 2010, when West Penn Allegheny's bonds were callable, in order to free up cash. Highmark refused again, falsely

-25-

stating that Highmark's loan to West Penn Allegheny was on the same terms as Highmark's loans to UPMC and to Jameson Health System.

97.     In April 2005, West Penn Allegheny proposed to issue $125 million of new bonds to be purchased by Citigroup. The proceeds would have been used to pay off the Highmark loan, and the interest and payment terms on the bonds would have been more favorable to West Penn Allegheny than the terms of the Highmark loan. Citigroup, as owner of the new bonds, would have had the right to "put" these bonds back to Highmark in the event of a breach of certain financial covenants by West Penn Allegheny. Highmark would have received an annual fee in exchange for the put right. Highmark would have incurred no additional financial exposure, although its consent was required.

98.     Highmark refused to consent to the proposal. Highmark executives told West Penn Allegheny that Highmark rejected West Penn Allegheny's restructuring proposals out of fear of retaliation by UPMC. Highmark said that if it did anything that is perceived to be helpful to West Penn Allegheny, UPMC would either sign a provider agreement with rival health insurer United or sell its health plan to United. Highmark further told West Penn Allegheny that it was under a "constant barrage" from UPMC, and that UPMC's CEO was "obsessed" with driving West Penn Allegheny out of business.

99.     In September 2005, West Penn Allegheny proposed to issue $35 million of subordinated debt on parity with Highmark's loan to West Penn Allegheny. While this proposal required Highmark's consent, it would result in no change to the terms of the loan and no financial detriment to Highmark. Despite initially supporting this proposal, Highmark refused to provide the necessary consent out of fear of retaliation by UPMC.

-26-

100.     In a September 27, 2005 telephone call with West Penn Allegheny, Dr. Melani, Highmark's Chief Executive Officer, said that he had just received a letter from UPMC describing all the ways that West Penn Allegheny may seek assistance from Highmark, including forgiveness of Highmark debt or the issuance of additional debt on parity with Highmark. According to Dr. Melani, UPMC told Highmark to not accommodate West Penn Allegheny and again raised the threat of United's potential entry into the market and potential relationships between UPMC and United.

101.     The next day Dr. Melani informed West Penn Allegheny that Highmark declined to consent to the proposed restructuring because any adjustment of the loan would lead UPMC either to contract with United or sell the UPMC Health Plan to United.

102.     In November 2005, Robert Baum, Chairman of the Highmark Board of Directors, toured AGH.  During this visit, Mr. Baum praised AGH's operations but said that Highmark could not assist West Penn Allegheny because UPMC would respond by either selling the UPMC Health Plan or contracting with United.

103.     Mr. Baum even characterized Highmark's conduct as "probably illegal."

104.     In 2006 Highmark rejected another proposal to restructure the debt service on the loan to West Penn Allegheny.  Dr. Melani conceded this time, after years of misrepresentation, that Highmark's loans to UPMC and Jameson are on far more generous terms.

105.     As a result of Highmark's intransigence, West Penn Allegheny was not able to refinance any of its debt until Spring 2007.  In the meantime, it incurred artificially inflated financing costs.  Once more the net effect, and the payoff to UPMC, was that West Penn

-27-

Allegheny was artificially drained of resources that could have been used to grow its patient volume and to expand and improve its services to the community.

106. Highmark also leaked confidential information provided by West Penn Allegheny to UPMC. For example, in the Fall of 2006, Highmark leaked confidential financial information about West Penn Allegheny to UPMC, which in turn leaked a distorted version of the information to credit-rating agencies and to the business media in an attempt to reduce investor confidence in West Penn Allegheny.

**UPMC's Continued Predatory Conduct**

107. In Spring 2007, UPMC again disseminated false and defamatory information to potential purchasers of West Penn Allegheny bonds and to credit-rating agencies. Incredibly, UPMC went beyond its historic tactics of merely using a straightforward smear campaign and actually distributed a book of false and defamatory information about West Penn Allegheny's finances that was printed in a format designed to appear as if it were authored by West Penn Allegheny. West Penn Allegheny's investment bankers were shocked at this conduct, which they told West Penn Allegheny was a level of deceit and underhandedness beyond anything they had ever encountered.

108. UPMC also took the extraordinary and outrageous step of affirmatively meeting with potential West Penn Allegheny investors in a "reverse road show." Upon information and belief, UPMC attempted to dissuade investors from buying West Penn Allegheny debt by making false and defamatory representations about West Penn Allegheny's financial health.

-28-

109.     UPMC has also continued its raiding of West Penn Allegheny physicians, again with the intent of crippling West Penn Allegheny as a competitor.  In 2002 UPMC engaged in the following additional physician raiding activity:

- UPMC raided two cardiothoracic surgeons from AGH.

- UPMC raided multiple primary care and infectious disease physicians, orthopedists, OB/GYN physicians, and gastroenterologists on the AGH Medical Staff.

- To ward off a predatory raid of a cardiology group by UPMC, AGH was forced to drastically increase those physicians' compensation to levels well beyond those of a competitive market.  AGH was forced to take similar steps to repel UPMC's attempted raid of a urology group.

110.     In 2003, UPMC focused its campaign to destroy West Penn Allegheny on AKMC, raiding two key primary care practices.

111.     UPMC aggressively recruited West Penn Allegheny anesthesiologists and CRNAs during a 2005 contract dispute between West Penn Allegheny and its anesthesia group, Western Pennsylvania Anesthesia Associates ("WPAA").  In 2005, WPAA demanded higher reimbursement from Highmark, with whom WPAA had its own contract separate from West Penn Allegheny's contract with Highmark.  Highmark refused the request and insisted that WPAA should look solely to West Penn Allegheny for increased compensation under the terms of the WPAA-West Penn Allegheny contract for providing anesthesia services.  WPAA then demanded that West Penn Allegheny agree to exorbitant increases in compensation or else all of the anesthesiologists would quit within two weeks.  After filing an action for injunctive relief, West Penn Allegheny extended the termination period to ninety days.  During this time, UPMC aggressively recruited WPAA's anesthesiologists and CRNAs to prevent them from remaining

-29-

with or rejoining West Penn Allegheny.  After the dispute ended, Highmark increased its

anesthesia reimbursement rates.

112.    UPMC engaged in other physician raiding activity in 2005:

- UPMC raided a surgery group from West Penn Allegheny's Suburban General Hospital.

- West Penn was forced to pay excessive compensation to an endocrinology group to fend off an attempted UPMC raid and maintain its ability to offer endocrinology services.

113.    The raiding activity continued into 2006:

- UPMC raided a radiologist at West Penn.

- UPMC raided an orthopedic surgeon at West Penn.

- UPMC raided a cardiovascular surgeon at West Penn, and West Penn's entire Vascular Lab Department.

- UPMC attempted to raid a podiatrist who practiced at West Penn.  West Penn Allegheny was only able to retain him at increased cost.

- UPMC informed liver surgeons around the country whom AGH was recruiting that AGH's liver transplant program will never succeed.

114.    There were further physician raids in 2008:

- UPMC raided multiple cardiovascular surgeons in Summer 2008.

- UPMC raided multiple cardiologists in Fall 2008.

- UPMC raided eight primary care physicians in 2008.

115.    In April 2009, UPMC raided Dr. Joseph Colella, a bariatric surgeon at

AGH, by offering artificially inflated compensation to him.  Upon information and belief, the

purpose of this raid, as with the others, was to cripple West Penn Allegheny as a competitor.

-30-

116.    UPMC has continued to buy out potential rival hospitals, in particular Mercy Hospital in 2006.  Mercy was the only sophisticated tertiary care facility in Pittsburgh not owned by UPMC or West Penn Allegheny.  With the acquisition of Mercy, West Penn Allegheny is now the last remaining competitor for many of the most sophisticated and expensive hospital services.

117.    UPMC has also taken *de facto* control of nominally independent community hospital systems.  UPMC threatened these local community hospitals with the establishment of rival UPMC satellite facilities adjacent to them unless they consented to enter into "joint ventures" with UPMC or to have a UPMC cancer center established on their campus.  This tactic resulted in UPMC forming "joint ventures" with, or placing a UPMC cancer center within, nearly every community hospital system (except those owned by West Penn Allegheny) in the six-county Pittsburgh metropolitan area.

118.    Upon information and belief, UPMC controls the management of the joint ventures and cancer centers and, in particular, can veto the joint ventures' and cancer centers' participation in any health insurer's network.  The joint ventures and cancer centers thus strengthened UPMC's ability to exclude health insurers – and to coerce Highmark.

119.    UPMC also used the joint ventures and cancer centers to prevent West Penn Allegheny and the community hospitals at issue from launching programs together.  For example, before its 2004 merger with Latrobe Hospital, Westmoreland Hospital partnered with West Penn Allegheny to provide oncology services.  Because Latrobe is a party to a UPMC oncology joint venture, Westmoreland terminated its relationship with West Penn Allegheny after the merger.

-31-

### Government Investigations of UPMC and Highmark's Illegal Conduct

120.     UPMC has long been under investigation by federal and state antitrust regulators for its abuse of its dominant market position to hinder competition and reduce consumer choice.

121.     In May 2007, the Pennsylvania Attorney General sued to enjoin UPMC's acquisition of Mercy Hospital as a violation of federal antitrust law.  *See Commw. of Pennsylvania v. Catholic Health East, et al.*, Civ. A. No. 07-708 (W.D. Pa.).  In its Complaint, the Attorney General alleged that:

> Unless prevented, this combination is likely to substantially lessen or eliminate competition in the provision of tertiary Inpatient Acute Care hospital services, as well as the provision of medical and ancillary services associated with those hospitals.  Further, this combination would reduce the number of competitive alternatives available to health care consumers and enable UPMC to raise prices with no competitive constraint, resulting in higher prices for all Inpatient Acute Care hospital services in the Relevant Geographic Market [defined as "all or parts of the counties of Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland"].  These higher prices will be borne by health care purchasers, particularly Health Plans, employers, and unions, and will likely result in an increase in prices that individual consumers pay for health insurance coverage.  Health Plans currently have difficulty marketing a product in Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland Counties without at least some UPMC facilities in their network.  Post-acquisition, a Health Plan offering a product in Allegheny, Beaver, Butler, Fayette, Washington, and Westmoreland Counties will have only one choice of Tertiary Care Health Care Provider other than UPMC.  UPMC's dominance in primary and secondary Acute Care hospital services will also increase as a result of this acquisition, which will further reduce the ability to market a product without UPMC facilities.

122.     The Attorney General alleged that, in the "Relevant Geographic Market" it defined, in 2005 and 2006 UPMC possessed a 45% market share in all acute care inpatient

services and a 60% market share Tertiary Care services.  The Attorney General alleged that a

post-merger entity would have a 52% share in all acute care inpatient services and a 74% market

share in Tertiary Care services.

123.    The Attorney General explained that UPMC had denied access to tertiary

care facilities to all health insurers except Highmark:

> The availability or non-availability of key healthcare facilities,
> such as hospitals, has a significant effect on the viability of a
> Health Plan.  Access to certain hospitals is an important factor for
> employers choosing a Health Plan.  Within the Relevant
> Geographic Market, many Health Plans do not have access to
> UPMC Presbyterian/Shadyside and are only able to cover Tertiary
> Care services provided at [Mercy] and [West Penn Allegheny]. . . .
> The largest Health Plan in the Relevant Geographic Market does
> offer UPMC Tertiary Care services at UPMC
> Presbyterian/Shadyside, and enjoys a substantial market share
> advantage over the nearest competing Health Plan.

124.    UPMC settled the Attorney General's lawsuit through the entry of a

Consent Decree.

125.    Regulators have been similarly apprehensive regarding Highmark.  The

Pennsylvania Department of Insurance recently declined to approve Highmark's proposed

merger with Independence Blue Cross out of concern that a post-merger company would stifle

competition for health insurance in the Commonwealth of Pennsylvania.

126.    Since at least January 2007, the Antitrust Division of the United States

Department of Justice has conducted an investigation of UPMC and Highmark's illegal

conspiracy.  That investigation is ongoing.

#10626692 v12

127. Under the pressure of the Department of Justice investigation, Highmark agreed in 2008 to substantially narrow the reimbursement gap between West Penn Allegheny and UPMC by raising reimbursement rates for West Penn Allegheny.

**UPMC's Market Power**

128. The relevant product market for health care services is acute care inpatient services. In the alternative, the relevant product market is high-end tertiary and quaternary acute care inpatient services.

129. The relevant geographic market is Allegheny County. Approximately 95% of county residents stay within the county for acute inpatient care. There is accordingly a clear and unequivocal demand by county residents to access care locally.

130. The relevant geographic market is defined to be the area in which a dominant player can exercise market power by forcing consumers in that area to accept price increases against their will. If there is evidence that a dominant company was able to force a price increase upon a group of captive and unwilling customers, then the area in which those customers were exploited is the relevant geographic market.

131. Upon information and belief, UPMC has imposed such a price increase upon commercial health care payors (like United and Aetna) in Allegheny County since reaching its truce with Highmark in 2002.

132. In addition, Pennsylvania health insurance regulations provide that a health plan "shall provide for at least 90% of its enrollees in each county in its service area, access to covered services that are within 20 miles or 30 minutes travel from an enrollee's

-34-

residence or work in a county designated as a metropolitan statistical area (MSA) by the Federal Census Bureau . . . ." 28 Pa. Admin. Code § 9.679(d). There is no feasible way to comply with this regulation for Allegheny County residents without including UPMC in the plan's network of participating providers, especially given UPMC's dominance in certain service lines such as oncology, psychiatry, and behavioral health.

133. In fact, health insurers cannot create a marketable, adequate network of participating providers for employers in Allegheny County without reasonable access to UPMC's facilities because of UPMC's dominance in numerous specialties, including mental health and oncology, and because, as described above, UPMC controls the contracting decisions of almost every nominally independent community hospital in Allegheny County except those owned by West Penn Allegheny.

134. UPMC's successful exclusion of numerous health insurers from the Allegheny County market is proof of its market power.

135. UPMC's market share in Allegheny County, excluding government payors, exceeds 55% whether measured by bed capacity or admission volume. This is more than double West Penn Allegheny's market share, and no other hospital system in Allegheny County exceeds single digits. *See also* "UPMC, Highmark Head and Shoulders Above Other Local Health Care Institutions," *Pittsburgh Post-Gazette* (March 20, 2007); "UPMC Earning Nearing New High," *Pittsburgh Post-Gazette* (May 9, 2007); "UPMC Posts Record $618 Million Profit," *Pittsburgh Post-Gazette* (August 24, 2007).

136. This market share understates UPMC's true market power, as UPMC, through its joint ventures with nominally independent community hospitals, controls the

contracting decisions of almost every hospital in Allegheny County except those owned by West Penn Allegheny.

137. There are substantial barriers to entering the relevant market, including the large capital costs required to construct and continually maintain and upgrade a hospital, the need to recruit and pay a large medical staff, the need to negotiate contracts with third-party payors, and the need to mount a marketing campaign to draw patients already familiar with UPMC's facilities. These barriers are particularly daunting in light of Allegheny County's declining population.

138. Since the formation of West Penn Allegheny there has been no entry of a new competitor in the relevant market. By contrast, numerous competitors in that time have either folded or been acquired by UPMC.

**Highmark's Market Power**

139. Highmark likewise possesses market power. The relevant product market is health care financing and administration for private employers and individuals, including indemnity insurance, managed care products such as HMO, PPO, or POS plans, and third-party administration of employer self-funded health plans.

140. The relevant geographic market is Allegheny County. As noted above, health insurance companies are legally required to make services available within 20 miles or 30 minutes travel from an enrollee's residence or work, which necessitates the formation of localized networks of providers.

#10626692 v12

141.     In addition, as noted above, patients seeking medical care generally prefer to receive treatment close to where they work or live, and employers commonly require managed care companies to offer a network that contains a certain number of health care providers within a specified distance of each employee's home.  As a result, virtually all managed care companies establish provider networks in the localities where employees live and work, and they compete on the basis of their local provider networks.

142.     Highmark's market share in the relevant market has exceeded 60% continuously from the time period of January 1, 2000 to the present.

143.     With the exception of UPMC Health Plan, no competitor has achieved more than a 10% market share during this time period, including such major national companies as Aetna, United, CIGNA, and Coventry.

144.     Through its conspiracy with UPMC, Highmark has erected a substantial barrier to entering the market as rival health insurers cannot contract with UPMC at competitive rates.

145.     Upon information and belief, Highmark has imposed artificially inflated price increases upon private employers and individuals in the relevant market since reaching its truce with UPMC in Summer 2002.

**Damages to West Penn Allegheny**

146.     UPMC and Highmark's illegal and predatory conduct has inflicted severe damage upon West Penn Allegheny.

-37-

147.     As a result of the conspiracy between UPMC and Highmark, West Penn Allegheny's growth has been artificially stunted and its market share unduly restricted.  Absent the illegal conspiracy, West Penn Allegheny's market share would be substantially higher and it would have earned additional profit – profits which it could have reinvested back into its operations to improve the quality of health care in the community and to further its charitable mission.

148.     As a result of the conspiracy between UPMC and Highmark, West Penn Allegheny has been systemically underpaid by Highmark.  But for the illegal conspiracy West Penn Allegheny would have received millions of dollars in additional reimbursement from Highmark.  West Penn Allegheny's rates have been artificially depressed during the conspiracy in order to further UPMC's goal of destroying its key competitor and in order to help Highmark offset the inflated rates paid to UPMC.  In a competitive market Highmark would have paid UPMC far less and West Penn Allegheny more, with an end result of an overall lower health care cost to employers and individuals.  Moreover, receipt of competitive levels of reimbursement from Highmark would have permitted West Penn Allegheny to invest in further improvements in the quality of health care services.

149.     As a result of the illegal conspiracy, West Penn Allegheny's financing costs were artificially inflated.

## Causes of Action

## Count I – Violation of Section 1 of the Sherman Act (Against UPMC and Highmark)

150.     The allegations set forth in paragraph 1 through 149 above are incorporated herein by reference.

151.    UPMC and Highmark have entered into an illegal agreement to restrain trade by protecting and reinforcing one another's market power.  Under this agreement, UPMC has agreed to block the entry or expansion of rival health insurers in exchange for Highmark's agreement to favor UPMC with discriminatory reimbursement rates and grants – and no diminution in patient volume.  Highmark has agreed to protect UPMC from competition and to raise the costs for operation of UPMC's primary competitor, West Penn Allegheny.

152.    As UPMC and Highmark are horizontal competitors in the market for health care financing and administration for private employers and individuals, this is a *per se* unlawful market allocation agreement.

153.    In the alternative, this agreement is unlawful under the rule of reason.  It has raised prices and excluded competition in both of the relevant markets alleged above.  There are no procompetitive justifications or benefits for Highmark and UPMC's collusion.

154.    West Penn Allegheny has been damaged by this illegal conspiracy.  It has been forced to incur artificially inflated financing and operations costs, received discriminatory and depressed reimbursement rates, and lost market share and patient volume that in a competitive market would have accrued to West Penn Allegheny as the lower-cost, more efficient provider.

## Count II – Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act (Against UPMC and Highmark)

155.    The allegations set forth in paragraph 1 through 154 above are incorporated herein by reference.

156.     UPMC and Highmark agreed to work together to create two monopolies –
a monopoly for UPMC in the market for acute inpatient services and/or high-end tertiary and
quaternary acute care inpatient services in Allegheny County and a monopoly for Highmark in
the market for health care financing and administration for private employers and individuals in
Allegheny County.

157.     Both UPMC and Highmark have a specific intent to monopolize – an
intent that they acted on repeatedly.  Indeed, UPMC CEO Mr. Romoff has publicly stated his
belief that competition in health care does not work.  UPMC executives have also stated that they
want to turn AGH into a nursing home or a parking lot.

158.     UPMC has engaged in numerous overt acts in furtherance of the
conspiracy to monopolize, including, without limitation, refusing to contract on competitive
terms with competitors of Highmark, refusing to grow or sell its health insurance business,
creating a network of joint ventures with community hospitals in order to control those facilities'
ability to contract with rivals of Highmark, and engaging in predatory conduct designed to
eliminate West Penn Allegheny as a competitor.

159.     Highmark has also engaged in numerous overt acts in furtherance of the
conspiracy to monopolize, including, without limitation, discriminating in reimbursement rates
and grants in favor of UPMC and refusing to consent to West Penn Allegheny's requests to
restructure and/or refinance Highmark's loan to West Penn Allegheny.

160.     West Penn Allegheny has been damaged by this illegal conspiracy.  It has
been forced to incur artificially inflated financing and operations costs, received discriminatory
and depressed reimbursement rates and lost market share and patient volume that in a

-40-

competitive market would have accrued to West Penn Allegheny as the lower-cost, more efficient provider.

### Count III – Attempted Monopolization in Violation of Section 2 of the Sherman Act (Against UPMC)

161.    The allegations set forth in paragraph 1 through 160 above are incorporated herein by reference.

162.    UPMC has attempted to monopolize the market for acute inpatient services and/or high-end tertiary and quaternary acute care inpatient services in Allegheny County.

163.    UPMC has a specific intent to monopolize – an intent that it acted on repeatedly.  Indeed, UPMC CEO Mr. Romoff has publicly stated his belief that competition in health care does not work.  UPMC executives have also stated that they want to turn AGH into a nursing home or a parking lot.

164.    UPMC has engaged in predatory conduct in support of this goal, including, without limitation, entering into an illegal market allocation agreement with Highmark, engaging in a nearly decade-long pattern of predatory physician raiding, and interfering with West Penn Allegheny's attempts to secure financing for its operations.

165.    There is a dangerous probability that UPMC will achieve monopoly power.  Not only does UPMC possess substantial market share and market power, but West Penn Allegheny is its only viable competitor, especially in more sophisticated tertiary and quaternary care services.  Should West Penn Allegheny falter or weaken significantly, UPMC will achieve monopoly power.

-41-

166.     West Penn Allegheny has been damaged by UPMC's predatory conduct. It has been forced to incur artificially inflated financing and operations costs, and lost market share and patient volume, including, without limitation, lost patient admissions from physicians raided by UPMC to further its anticompetitive scheme.

### Count IV – Employee Raiding and Unfair Competition (Against UPMC)

167.     The allegations set forth in paragraph 1 through 166 above are incorporated herein by reference.

168.     For the past decade, UPMC has engaged in a systematic campaign to induce physician employees of West Penn Allegheny to switch their employment to UPMC.

169.     The intent of this campaign has been to cripple and destroy West Penn Allegheny as a competitor.

170.     This illegal campaign of employee raiding has resulted in substantial damages to West Penn Allegheny, including, without limitation, lost patient admissions from raided physicians and increased operational costs.

171.     UPMC's conduct is outrageous, malicious, wanton, willful, and oppressive.  West Penn Allegheny is therefore entitled to an appropriate award of punitive damages.

### Count V – Tortious Interference with Existing and Prospective Business Relations (Against UPMC)

172.     The allegations set forth in paragraph 1 through 171 above are incorporated herein by reference.

-42-

173. UPMC has tortiously interfered with West Penn Allegheny's existing and prospective contractual relations with both physicians and Highmark.

174. With respect to physicians, UPMC has interfered with West Penn Allegheny's employment contracts with numerous physician employees by inducing them to leave West Penn Allegheny for exorbitant, artificially inflated compensation. The sole purpose of this raiding activity was to weaken West Penn Allegheny as a competitor.

175. UPMC's physician raiding activities are without justification or privilege.

176. West Penn Allegheny has been damaged by UPMC's physician raiding. It has been forced to incur artificially inflated compensation costs, and lost market share and patient volume, including, without limitation, lost patient admissions from physicians raided by UPMC.

177. Moreover, West Penn Allegheny and Highmark have been parties to a series of participating provider agreements.

178. UPMC has interfered with the terms of these agreements by pressuring Highmark to provide discriminatorily low reimbursement rates to West Penn Allegheny. UPMC has used the threat of either expanding or selling its health insurance arm, or contracting on competitive terms with a Highmark competitor, as the means to coerce Highmark to depress West Penn Allegheny's reimbursement rates to artificially low levels.

179. This interference extended to indirect reimbursement rate discrimination, such as discriminatory grant-making by Highmark.

-43-

180.     West Penn Allegheny has been damaged by this conduct as it has received lower reimbursement than it would have but for UPMC's interference.

181.     UPMC also tortiously interfered with West Penn Allegheny's prospective business relationships with bond investors in Spring 2007.  UPMC made numerous false statements to potential investors about West Penn Allegheny's finances and circulated a defamatory fake financial report designed to appear as if written by West Penn Allegheny.

182.     This smear campaign was without privilege or justification.

183.     West Penn Allegheny was damaged by UPMC's conduct.

184.     UPMC's conduct is outrageous, malicious, wanton, willful, and oppressive.  West Penn Allegheny is therefore entitled to an appropriate award of punitive damages.

## Prayer for Relief

WHEREFORE, West Penn Allegheny prays:

1.     That UPMC and Highmark be enjoined from further predatory and anticompetitive conduct, as alleged herein;

2.     That Highmark be ordered to contract with West Penn Allegheny on fair and equitable terms, including the end of any discrimination in reimbursement (both direct and indirect) between UPMC and West Penn Allegheny;

3.     That UPMC be ordered to divest its health insurance affiliate and to discontinue its joint ventures with independent community hospitals;

4.     That West Penn Allegheny recover compensatory and treble damages;

5.    That West Penn Allegheny recover punitive damages;

6.    That West Penn Allegheny recover its costs for this suit, including reasonable attorneys' fees, as provided by law; and

7.    That the Court grant West Penn Allegheny such additional, further and different relief as may be deemed just and proper.

### **Demand for Jury Trial**

West Penn Allegheny demands a trial by jury on all issues triable by jury.

Respectfully submitted,


/s/ *Andrew K. Fletcher*
Andrew K. Fletcher
PEPPER HAMILTON LLP
One Mellon Center
500 Grant Street, 50th Floor
Pittsburgh, PA 15219
Telephone: (412) 454-5000
Facsimile: (412) 281-0717


Barbara W. Mather
Barbara Sicalides
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Phone: (215) 981-4000
Facsimile: (215) 981-4750

Attorneys for West Penn Allegheny Health System, Inc.

Dated:  April 21, 2009

#10626692 v12