IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WEST PENN ALLEGHENY HEALTH SYSTEM, INC., | Case No. 09-cv-480-AJS |
| Plaintiff, | JUDGE ARTHUR J. SCHWAB |
| v. | |
| UPMC and HIGHMARK INC., | *Electronically Filed* |
| Defendants. | |

**HIGHMARK INC.'S REPLY BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

DANIEL I. BOOKER
JEFFREY J. BRESCH
P. GAVIN EASTGATE
WILLIAM J. SHERIDAN

Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Phone:  (412) 288-3131
Facsimile:  (412) 288-3063

*Attorneys for Defendant
Highmark Inc.*

**TABLE OF CONTENTS**

**Page**

I. WPAHS'S ALLEGED LOST MARKET SHARE IS NOT THE SAME AS REDUCED OUTPUT IN THE HOSPITAL SERVICES MARKET AND IS NOT ANTITRUST INJURY. ...................................................................................1

II. THE RELIEF WPAHS SEEKS FROM HIGHMARK – BASED ON INCREASED PAYMENTS FOR ITS SERVICES – DOES NOT REFLECT ANTITRUST INJURY. ...................................................................................2

    A. Alleged Increased Health Insurance Premiums Cannot Cause WPAHS Antitrust Injury..................................................................................2

    B. Far From Being A Mischaracterization Or A "Straw Man," It Is Clear That WPAHS Seeks Higher Reimbursement Rates From Highmark, And It Wants This Court To Eliminate Price Competition Between UPMC And WPAHS.................................................................................3

    C. WPAHS's Rates Were Not Predatory. Therefore, WPAHS Has Not Suffered Antitrust Injury...........................................................................5

    D. Highmark's Denials of WPAHS's Requests To Restructure A Loan Cannot Constitute Antitrust Injury..........................................................6

III. WPAHS HAS NOT ALLEGED OVERT ACTS CAUSING ADDITIONAL INJURY WITHIN THE LIMITATIONS PERIOD.............................................7

IV. CONCLUSION.................................................................................................10

# **TABLE OF AUTHORITIES**

Page(s)

CASES

*Alberta Gas Chemicals Ltd. v. E.I. duPont de Nemours and Co.*,
   826 F.2d 1235 (3d Cir. 1987) .................................................................................. 1, 6

*Angelico v. Lehigh Valley Hospital, Inc.*,
   184 F.3d 268 (3d Cir. 1999) ......................................................................................... 4

*Atlantic Exposition Services Inc. v. SMG*,
   262 Fed. App'x 449 (3d Cir. 2008) .............................................................................. 7

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) .................................................................................................. 4, 5

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ...................................................................................................... 6

*Care Heating & Cooling, Inc. v. American Standard, Inc.*,
   2004 WL 5566569 (S.D. Ohio July 24, 2004) ............................................................. 1

*CBC Companies, Inc. v. Equifax, Inc.*,
   561 F.3d 569 (6th Cir. 2009) ........................................................................................ 3

*Clorox Co. v. Sterling Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997) ........................................................................................... 3

*Ehredt Underground, Inc. v. Commonwealth Edison Co.*,
   90 F.3d 238 (7th Cir. 1996) ..................................................................................... 2, 3

*Four Corners Nephrology Associates, P.C. v. Mercy Medical Center of Durango*,
   2009 WL 3085882,
    (10th Cir. Sept. 29, 2009) ..................................................................................... 4, 5

*Grand Rapids Plastics, Inc. v. Lakian*,
   188 F.3d 401 (6th Cir. 1999) ........................................................................................ 9

*Harold Friedman, Inc. v. Thorofare Markets, Inc.*,
   587 F.2d 127 (3d Cir. 1978) ......................................................................................... 9

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
   998 F.2d 1144 (3d Cir. 1993) ................................................................................ 9, 10

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ...................................................................................... 5

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) .......................................................................................................... 2

*Johnson v. University Health Services, Inc.*,
    161 F.3d 1334 (11th Cir. 1998) .................................................................................. 7

*LePage's, Inc. v. 3M Corp.*,
    324 F.2d 141 (3d Cir. 2003) .................................................................................... 4

*Mathews v. Lancaster Gen. Hosp.*,
    87 F.3d 624 (3d Cir. 1996) ...................................................................................... 1

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ............................................................................. 2, 6

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ............................................................................................ 1, 7

*Pool Water Products v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ................................................................................ 1

*Tetratec Corp. v. E.I. Dupont De Nemours & Co., Inc.*,
    1991 WL 30244 (E.D. Pa. March 5, 1991) .............................................................. 8

*Toledo Mack Sales & Services, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ......................................................................... 4, 9, 10

*Town of Concord v. Boston Edison Co.*,
    915 F.2d 17  (1st Cir. 1990) .................................................................................... 5

*United States Steel Corp., et al., v. Fortner Enterprises, Inc.*,
    429 U.S. 610 (1977) ................................................................................................ 7

## I. WPAHS'S ALLEGED LOST MARKET SHARE IS NOT THE SAME AS REDUCED OUTPUT IN THE HOSPITAL SERVICES MARKET AND IS NOT ANTITRUST INJURY.

WPAHS realizes that injury to a single entity is not antitrust injury and that its sought-after relief – payments equal to UPMC and lost profits damages resulting from lower prices paid to it by Highmark – is directly contrary to consumers' interests and the purposes of the antitrust laws. So, WPAHS now in its brief claims for the first time that the alleged conspiracy reduced output in the hospital services market. However, the Amended Complaint contains no allegation that less health care was available to patients in the Pittsburgh area because of the alleged conspiracy. Nor could WPAHS make such an unfounded claim.

WPAHS must allege and prove harm, not just to itself "but to the competitive process, *i.e.,* to competition." *NYNEX Corp. v. Discon, Inc*., 525 U.S. 128, 135 (1998). The WPAHS attempt to conflate its allegation that it lost market share to UPMC with a conclusion that this reflects reduced output in the hospital services market is a fundamental economic, and legal, error. An alleged shift in market share between two competitors is not injury to competition because it does not result in reduced output. *See Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (citing *Cargill Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 116 (1986)). Even if WPAHS lost market share to UPMC as alleged, this is not the same thing as reduced output <u>in the market</u>. *See Alberta Gas Chemicals Ltd. v. E.I. duPont de Nemours and Co.,* 826 F.2d 1235, 1240-47 (3d Cir. 1987); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996).[1]

---

[1] All that WPAHS has alleged in the Amended Complaint is that *it* lost market share to UPMC and *it* lost profits as a result. *See Am. Comp.* ¶¶ 202, 213. This is not antitrust injury. *Care Heating & Cooling, Inc. v. American Standard, Inc*., 2004 WL 5566569, *6 (S.D. Ohio July 24, 2004) ("Plaintiff alleges that the harm it suffered was the inability of its business to expand. This injury is personal to [Plaintiff] and does not allege injury to the market"), *aff'd*, 427 F.3d 1008, 1014-15 (6th Cir. 2005).

Moreover, the Amended Complaint makes clear that the number of admissions and the amount of care given to WPAHS patients (i.e., its output) is not controlled by the amount it is paid by Highmark for its services. As WPAHS has clearly alleged, physicians control hospital admissions, and WPAHS certainly would not claim that its patients received inferior care. WPAHS states that "the primary way that a hospital distributes its services to consumers is through a physician's admission of a patient. Given the high fixed costs of hospitals and the consequent need to maintain a steady volume of patients to remain financially afloat, <u>the role of a physician in sending patients to a facility is absolutely critical</u>." *Amended Complaint* ("*Am. Comp.*") ¶ 26 (emphasis added).[2] Based on WPAHS's own allegations, physicians, not reimbursement levels, determine a particular hospital's output.[3]

## II. THE RELIEF WPAHS SEEKS FROM HIGHMARK – BASED ON INCREASED PAYMENTS FOR ITS SERVICES – DOES NOT REFLECT ANTITRUST INJURY.

The antitrust laws are concerned with protecting consumers from higher prices, *see Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996), and the antitrust injury requirement "is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449-50 (6th Cir. 2007).

### A. ALLEGED INCREASED HEALTH INSURANCE PREMIUMS CANNOT CAUSE WPAHS ANTITRUST INJURY.

WPAHS has not alleged that it was injured by any increase in health insurance premiums

---

[2] Significantly, WPAHS contends it is unilateral conduct by UPMC – specifically "physician raiding" (*Am. Comp.* ¶¶ 237, 244, 250) – not a conspiracy involving Highmark, that has reduced WPAHS's patient admissions.

[3] The Supreme Court in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), recognized that physicians likely direct patients, *id.* at 30 n.50, and that "[i]f no forcing is present, patients are free to enter a competing hospital." *Id.* at 25. There is no allegation of forcing here.

that resulted from how much Highmark pays UPMC. Though it attempts to cloak itself in "the community's rights," (*Am. Comp.* ¶ 1), WPAHS has not alleged that *it* paid higher premiums as a result of Highmark's 2002 contract with UPMC. WPAHS has alleged that Highmark purportedly passed on the alleged increased costs of UPMC's supracompetitive rates to consumers. *Am. Comp.* ¶ 3, 84, 94, 120. Clearly, if Highmark overpaid UPMC, the alleged increased employer premiums did not cause antitrust injury to WPAHS because WPAHS "did not pay [the] higher prices as a consumer." *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996).

> B. **FAR FROM BEING A MISCHARACTERIZATION OR A "STRAW MAN," IT IS CLEAR THAT WPAHS SEEKS HIGHER REIMBURSEMENT RATES FROM HIGHMARK, AND IT WANTS THIS COURT TO ELIMINATE PRICE COMPETITION BETWEEN UPMC AND WPAHS.**

It is irrelevant that WPAHS has never sought the "illegally elevated rates that UPMC received as a result of its conspiracy with Highmark." Doc. 86 at 24. WPAHS is clearly seeking the benefit of prices paid to an entity it claims is a monopolist in making its prayer for relief that "Highmark be ordered to end any discrimination in reimbursement (both direct and indirect) between UPMC and West Penn Allegheny." *Am. Comp., Prayer for Relief* ¶ 2.[4]

WPAHS pleads that UPMC presently has, and had prior to 2002, monopoly power in hospital services in Western Pennsylvania. *Am. Comp.* ¶¶ 6, 42, 51, 74. Specifically, WPAHS

---

[4] In addition to seeking monopoly pricing, this demand by WPAHS directly contravenes the admonition that "antitrust law is not a negotiating tool for a plaintiff seeking better contract terms." *CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) . In *CBC Companies*, the plaintiff, a reseller of credit reports, claimed that Equifax had imposed fees which injured CBC's ability to compete in the reseller market. 561 F.3d at 571. CBC claimed antitrust injury in the form of higher costs and lost market share. In affirming the district court's dismissal for failure to allege antitrust injury, the Court of Appeals for the Sixth Circuit noted that "essentially, CBC disagrees with the price terms of the contract that Equifax proposed and CBC later signed." *Id.* at 573. Like CBC, WPAHS is simply unhappy with the bargain it struck with Highmark before the alleged conspiracy and is using the antitrust laws as a weapon to renegotiate that agreement. *See also Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 59 (2d Cir. 1997).

alleges that "health insurers cannot create a marketable, adequate network of participating providers for employers in Allegheny County without reasonable access to UPMC's facilities because of UPMC's dominance in numerous specialties…." *Am. Comp.* ¶ 183. WPAHS then contends that UPMC's 2002 provider agreement with Highmark resulted in UPMC receiving rates that were supracompetitive. *See Am. Comp.* ¶ 59. WPAHS now seeks to use this lawsuit to share in the monopoly power it alleges UPMC possesses.

As the Court of Appeals for the Tenth Circuit stated recently in an analogous setting, WPAHS "very well might be better off with such a shared monopoly, but there's no guarantee consumers would be. Whatever injury [WPAHS] may have suffered, then, it is not one the antitrust laws protect because 'a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.'" *Four Corners Nephrology Associates, P.C. v. Mercy Medical Center of Durango*, 2009 WL 3085882, *9 (10th Cir. Sept. 29, 2009) (quoting *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)).

None of the cases upon which WPAHS relies involve a seller of services demanding higher prices from its buyer.[5] By contrast, the cases cited by Highmark here and in Highmark's opening brief directly address the concern that the increased prices demanded WPAHS are directly adverse to the interests of consumers and are not consistent with antitrust injury.

---

[5] *LePage's* concerned patently different conduct – monopoly leveraging and bundling which had the effect of exclusive dealing. There is no such allegation of exclusivity here. Moreover, in *LePage's*, the plaintiff made no demand for equalized prices, and the *LePage's* decision pre-dates the Supreme Court's rulings in *Linkline* and *Trinko*. *See LePage's*, *Inc. v. 3M Corp.*, 324 F.2d 141 (3d Cir. 2003). Likewise, *Toledo Mack* involved an unlawful conspiracy between Mack and its dealers, and amongst the dealers themselves, to keep prices on Mack products artificially high. *Toledo Mack Sales & Services, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008). By contrast, WPAHS complains of lower prices, which benefit consumers, unless the prices are shown to be predatory. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) (hereinafter "*ARCO*"). Lastly, in *Angelico*, central to the Third Circuit's decision was the fact that "consumer[s] would be highly unlikely to sue …because Angelico's injury has not been passed along to others." *Angelico v. Lehigh Valley Hospital, Inc.*, 184 F.3d 268, 275 (3d Cir. 1999). Unlike the plaintiff in *Angelico*, WPAHS cannot stand in the shoes of the consumer because the relief it seeks – higher reimbursements – is directly contrary to their interests.

"Whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury.'" *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419 (7th Cir. 1989). "When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust." *Id.*

WPAHS's requested relief cannot be more offensive to consumers' interest and the purposes of the antitrust laws. First, WPAHS seeks higher payment for its services, which would only harm the very consumers the antitrust laws are designed to protect. Second, WPAHS uses the prices of an alleged monopolist as the benchmark for the increase it demands. Third, WPAHS seeks a court order eliminating any future price competition between WPAHS and UPMC Health System. In essence, WPAHS is asking this Court to play the role of price regulator and to fix prices in the hospital services market. However, "[t]he federal judiciary is not a price control agency," *Four Corners*, 2009 WL 3085882, at *9; *see also Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.) (listing numerous difficulties that "show why antitrust courts normally avoid direct price administration"), and granting WPAHS's demand for increased profits would turn the antitrust laws on their head.

### C. WPAHS'S RATES WERE NOT PREDATORY. THEREFORE, WPAHS HAS NOT SUFFERED ANTITRUST INJURY.

"Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *ARCO*, 495 U.S. at 340. WPAHS repeatedly ignores that its rates were set in a buyer-seller arms-length negotiation prior to the alleged conspiracy, but the law is not so heedlessly oblivious. WPAHS has not alleged that its pre-conspiracy contract, which fixed its rates for the entire period at issue, contained predatory rates. Nor can it. If the negotiated rates that WPAHS agreed to accept from Highmark <u>prior to the alleged conspiracy</u> "are not predatory,

any losses flowing from them cannot be said to stem from an anticompetitive aspect of [Highmark's] conduct." *NicSand*, 507 F.3d at 452 (quoting *ARCO*, 495 U.S. at 340-41). Moreover, WPAHS "cannot rely on quasi-'predatory' activities to establish antitrust injury under *Brunswick*." *Alberta Gas*, 826 F.2d at 1245.[6]

### D. HIGHMARK'S DENIALS OF WPAHS'S REQUESTS TO RESTRUCTURE A LOAN CANNOT CONSTITUTE ANTITRUST INJURY.

WPAHS's brief is not faithful to the facts in the Amended Complaint. Despite the fact that the Amended Complaint contains no reference to any "veto power" held by Highmark, the WPAHS brief contends that Highmark could "veto" any financing WPAHS sought from other lenders. *See* Doc. 86 at 26. The facts pled by WPAHS, and a review of the actual loan agreement incorporated in the Amended Complaint (*see* Doc. 48-22 through 48-27), demonstrate that this exaggeration is a complete fallacy. WPAHS in fact refinanced its debt in May 2007, and it certainly did not need Highmark's participation or approval to do so. *See Am. Comp.* ¶ 114.[7]

---

[6] "It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226-27 (1993).

[7] Not only does WPAHS fabricate the concept of "veto power," WPAHS mischaracterizes the April 2005 proposal involving CitiGroup by stating that it "was not asking Highmark for a loan." The Amended Complaint makes clear that the proposal involved Highmark taking the risk of the new bonds that CitiGroup proposed issuing. *Am. Comp.* ¶ 100. Thus, on the face of the Amended Complaint, WPAHS was asking Highmark to substitute the direct loan obligation WPAHS owed Highmark with bonds, which merely inserted CitiGroup as the middleman in a new bond issuance where Highmark still held the risk.

Similarly, the WPAHS brief claims that its September 2005 proposal involved issuing subordinate debt, Doc. 86 at 10 (citing *Am. Comp.* ¶ 102), and "asked only that Highmark not impede West Penn Allegheny's ability to seek funds from other investors." Doc. 86 at 27. In its desperate attempt to explain how denial of the refinancing requests caused antitrust injury, WPAHS is truly playing fast and loose with its own facts. The Amended Complaint at Paragraph 102 makes clear that WPAHS proposed to issue debt of $35 million "<u>on parity with Highmark's loan to West Penn Allegheny</u>." *Am. Comp.* ¶ 102 (emphasis added). It is elementary that any additional debt issued on parity with Highmark's loan dilutes Highmark's priority and degrades its chances of being repaid.

Moreover, WPAHS has not alleged any fact demonstrating an injury to the market as a whole as the result of any denied loan restructuring proposal. WPAHS complains that *it* has been injured in that its financing costs were higher than if Highmark had agreed to restructure its loan. However, again as noted previously, injury to a single entity is not antitrust injury. *NYNEX*, 525 U.S. at 134. WPAHS has failed to plead any facts demonstrating reduced output in the hospital services market. *See supra* at 1-2. Even if it had, WPAHS would be hard-pressed to explain how output in the hospital services market would be increased by WPAHS obtaining cheaper interest rates on a loan from Highmark.

As the Court of Appeals for the Eleventh Circuit explained in *Johnson v. University Health Services, Inc.*, 161 F.3d 1334 (11th Cir. 1998), Highmark's decision "not to [further] subsidize [WPAHS] is not the type of injury that the antitrust laws were intended to prevent." *Johnson*, 161 F.3d at 1338. Finally, as noted in its opening brief (Doc. 83 at 11), Highmark does not constitute its own relevant market for the provision of financing. *See United States Steel Corp., et al., v. Fortner Enterprises, Inc.*, 429 U.S. 610, 621-22 (1977); *Atlantic Exposition Services Inc. v. SMG*, 262 Fed. App'x 449 (3d Cir. 2008).

### III. WPAHS HAS NOT ALLEGED OVERT ACTS CAUSING ADDITIONAL INJURY WITHIN THE LIMITATIONS PERIOD.

No conspiratorial conduct alleged by WPAHS to have occurred after April 21, 2005 caused it more injury than had allegedly already been imposed by the purported conspiracy. While WPAHS provides a laundry list of allegations bearing dates post-April 21, 2005 (Doc. 86 at 9-11), its statute of limitations argument is entirely undermined by the pre-limitations period agreements between Highmark and WPAHS regarding reimbursement rates and loans because those agreements set a baseline against which WPAHS later realized no greater damages.

A close examination of plaintiff's list of limitations period allegations shows that each allegation regarding loan restructuring and reimbursement rates – the pillars of the alleged conspiracy – fundamentally fails to give rise to a fresh claim because WPAHS offers no facts to indicate that it received lower prices or paid higher financing costs than those that it agreed to prior to the alleged conspiracy or after the alleged conspiracy but prior to the limitations period:

- The hospital agreements containing the reimbursement rates at issue are agreements which WPAHS negotiated and executed prior to the limitations period. The only change in these rates within the limitations period (post-April 21, 2005) were increases contained in the July 2008 hospital agreement (Doc. 44, Exhibit 17), which WPAHS admits provided it with the increased capital to integrate West Penn and AGH. *Am. Comp.* ¶ 211. WPAHS also admits that the July 2008 contract established "competitive market rates." Doc. 79, Exhibit B. This act of increasing WPAHS's rates certainly did not cause WPAHS injury, let alone "accumulating" injury.

- Any refusal allegedly within the limitations period to restructure the Highmark loan had exactly the same impact as the several pre-limitations period refusals by Highmark to restructure the loan – i.e., in 2005, there was no new act causing "accumulating" injury. Any alleged harm that WPAHS suffered as a result of Highmark's denial was incurred when Highmark refused a loan restructuring in April 2003. Any subsequent denial was merely a reaffirmation of the prior decision. Moreover, WPAHS has not alleged any facts indicating that it paid more than the costs (i.e., interest rates) that it previously agreed to in the 2000 loan agreement.

Finally, WPAHS cannot escape the reality that it agreed with Highmark on rates and loans during what it admits was a period of "alliance" between the two organizations. *See* Doc. 53 at 5-7. Abiding by the terms of this "alliance" did not impose a new injury on WPAHS.[8]

---

[8] The other post-April 21, 2005 allegations WPAHS identifies are also deficient because they are unconnected to any injury suffered by WPAHS. WPAHS fails to allege any harm flowing from the 2006 "attempt" to "destroy investor confidence" in WPAHS. *See Am. Comp.* at ¶ 128. Similarly, no harm is alleged to have resulted from UPMC's 2006 "intent[ion]" to cancel rental network contracts, nor from Highmark's alleged 2006 public support of the Mercy acquisition. *See id.* at ¶¶ 85, 113. Further, WPAHS cannot allege that it was injured by a November 2005 grant provided by Highmark. *See id.* at ¶ 125. In addition, WPAHS suffered no injury from – and lacks standing to bring – its claims that UPMC refused "to contract on competitive terms with United" and that UPMC has refused to "grow its health insurance business." *See id.* at ¶ 71-78, 113, 171. WPAHS also identifies several allegations regarding statements and "instructions" given by UPMC to Highmark. *See Am. Comp.* at ¶¶ 103, 105-111, 113. But these allegations are merely reaffirmations of the alleged 2002 agreement, and WPAHS fails to tie these "instructions" to additional harm it suffered within the limitations period. *See Tetratec Corp. v. E.I. Dupont De Nemours & Co., Inc.*, 1991 WL 30244, *4 (E.D. Pa. March 5, 1991) ("[T]he need to allege timely overt acts in

Continued on following page

The Third Circuit cases WPAHS labels as controlling are plainly different from this case, and its reliance on them is misplaced. None of these cases involved pre-limitations period contracts between the parties that established prices and terms that are the precise sources of the harm allegedly suffered by the plaintiff. Unlike *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127 (3d Cir. 1978), *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993), and *Toledo Mack Sales & Services, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008), this case does not involve allegations of a new and independent injury or of a continuing conspiracy that worked accumulating harm on the plaintiff, but rather involves a claim that the full measure of harm allegedly inflicted before the limitations period was not <u>reduced</u> by any actions taken by the alleged conspirators during the limitations period.

In *Friedman*, an alleged conspiracy to reject a four-year lease extension, which forced the plaintiff to vacate its rental property, occurred within the limitations period. *See* 587 F.2d at 131. The court concluded that this "independent" and "injurious" act was distinct from the original pre-limitations period lease. *Id*. at 139. By contrast, Highmark's post-limitations acts did nothing to add to the alleged damages inflicted on WPAHS by pre-limitations period acts. For example, Highmark twice rejected WPAHS refinancing proposals *before* the limitations period, rendering any subsequent rejection a "reaffirmation of the previous act[.]" *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir. 1999).

*Toledo Mack* and *Lower Lake Erie* are clear cases of additional injury being inflicted in the limitations period, and each serves to highlight why WPAHS's allegations here fail to

―――――――――――――――――

Continued from previous page

furtherance of a conspiratorial agreement cannot be satisfied by the mere allegation that the agreement itself was renewed within the limitations period. An overt act in furtherance of an agreement must by its very nature have an existence which is independent of the underlying agreement") (including allegations of fraudulent concealment).

demonstrate such injury. In *Toledo Mack*, the plaintiff alleged horizontal price-fixing and market allocation agreements that affected price changes that occurred throughout the alleged conspiracy period, and there was no pre-limitations period contract between the plaintiff and the defendant that continued throughout the limitations period. *Toledo Mack*, 530 F.3d at 210. Similarly, in *Lower Lake Erie*, there was no pre-limitations contract that had already imposed on plaintiff the full injury that might be imposed by any refusal to deal that occurred within the limitations period.

## IV.   CONCLUSION

For the foregoing reasons, Counts I and II of the Amended Complaint fail to state a claim upon which relief could be granted. These claims should be dismissed as a matter of law.[9]

Dated: October 9, 2009

Respectfully submitted,

By:   s/ Daniel I. Booker
DANIEL I. BOOKER (PA 10319)
dbooker@reedsmith.com
JEFFREY J. BRESCH (PA 66777)
jbresch@reedsmith.com
P. GAVIN EASTGATE (PA 86061)
geastgate@reedsmith.com
WILLIAM J. SHERIDAN (PA 206718)
wsheridan@reedsmith.com

Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Phone: (412) 288-3131
Facsimile: (412) 288-3063

*Attorneys for Defendant
Highmark Inc.*

---

[9] Highmark also joins in the arguments made by UPMC in its Reply Brief.

## CERTIFICATE OF SERVICE

 The undersigned hereby certifies that a true and correct copy of **Highmark Inc.'s Reply Brief In Support Of Its Motion to Dismiss Plaintiff's Amended Complaint** was filed and served electronically on all parties via the Court's CM/ECF system.  Notice will be sent to:

| *Counsel for Plaintiff West Penn Allegheny Health System, Inc.* | *Counsel for Defendant UPMC* |
|---|---|
| ALEXANDER G. BOMSTEIN<br>BARAK A. BASSMAN<br>BARBARA W. MATHER<br>BARBARA T. SICALIDES<br>EMMETT M. HOGAN<br>Pepper Hamilton LLP<br>3000 Two Logan Square<br>Eighteenth & Arch Streets<br>Philadelphia, PA 19103<br><br>ANDREW K. FLETCHER<br>Pepper Hamilton LLP<br>One Mellon Bank Center, 50th Floor<br>500 Grant Street<br>Pittsburgh, PA 15219 | JONATHAN M. JACOBSON<br>Wilson Sonsini Goodrich & Rosati, P.C.<br>1301 Avenue of the Americas, 40th Floor<br>New York, NY 10019<br><br>SCOTT SHER<br>JACOB H. WOLMAN<br>Wilson Sonsini Goodrich & Rosati, P.C.<br>1700 K Street, N.W.<br>Washington, DC 20006<br><br>PAUL H. TITUS<br>Schnader Harrison Segal & Lewis LLP<br>120 Fifth Avenue, Suite 2700<br>Pittsburgh, PA 15222-3001<br><br>NILAM A. SANGHVI<br>Schnader Harrison Segal & Lewis LLP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103-7286 |

             s/ Daniel I. Booker
             DANIEL I. BOOKER  (PA 10319)
             dbooker@reedsmith.com
             Reed Smith LLP
             225 Fifth Avenue
             Pittsburgh, PA 15222
             Phone:  (412) 288-3131
             Facsimile:  (412) 288-3063