IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WEST PENN ALLEGHENY HEALTH
SYSTEM, INC.,

                Plaintiff,

     v.

UPMC and HIGHMARK, INC.,

                Defendants.

09cv0480

**ELECTRONICALLY FILED**

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

      This case involves allegations of various violations of the federal antitrust laws (Sections 1 and 2 of the Sherman Act), 15 U.S.C. §§ 1-2, attempted monopolization claims (Section 2 of the Sherman Act), and state law tortious interference and employee raiding claims, brought by West Penn Allegheny Health System, Inc. ("West Penn Allegheny") against the University of Pittsburgh Medical Center ("UPMC") and Highmark Inc. (a Blue Cross and Blue Shield licensee) ("Highmark"), and set forth in West Penn Allegheny's Amended Complaint (doc. no. 66). Before this Court are UPMC's Motion to Dismiss the Amended Complaint (doc. no. 78) and Highmark's Motion to Dismiss Counts I and II of Plaintiff's Amended Complaint (doc. no. 82), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that West Penn Allegheny has failed to state a claim upon which relief may be granted.  For the following reasons, said Motions to Dismiss will be GRANTED.

## II.  FACTUAL BACKGROUND AND ALLEGATIONS

### A.  The Parties

Plaintiff West Penn Allegheny is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.  Complaint, ¶ 10 (doc. no. 1); Amended Complaint, ¶ 14.[1]  Defendants UPMC and Highmark are also Pennsylvania nonprofit corporations with their principal places of business in Pittsburgh, Pennsylvania. Complaint, ¶¶ 11 and 12; Amended Complaint, ¶¶ 15 and 16.

### B.  Plaintiff's Allegations Re: The Hospital Market in Pittsburgh Area

According to the Amended Complaint, hospital services in the Pittsburgh metropolitan area are dominated by UPMC.  In the 1990's, UPMC began to acquire smaller, independent hospitals.  UPMC currently owns 20 tertiary, specialty, and community hospitals including certain "key facilities" such as:

- UPMC-Presbyterian, UPMC-Shadyside, and UPMC-Mercy, the only other tertiary and quaternary care facilities in Pittsburgh besides West Penn Allegheny's Allegheny General Hospital and Western Pennsylvania Hospital.
- Children's Hospital of Pittsburgh, the only specialized pediatric inpatient facility in the Pittsburgh area.
- Magee Women's Hospital of UPMC, the largest obstetrical care facility in Western Pennsylvania.

Complaint, ¶ 16; Amended Complaint, ¶ 174.

The Amended Complaint avers that "with the exception of burn treatment, UPMC possesses a market share in excess of 50% in every tertiary and quaternary care service line in the

---

[1]The Court has included all references to the Original and Amended Complaint, where applicable, for purposes of completeness.  In paragraphs where there are no references to the Original Complaint, the allegations are new to the Amended Complaint.  Of course, the allegations of the Amended Complaint are the only allegations that are before the Court as the filing of the Amended Complaint supersedes the Original Complaint.

six-county Pittsburgh metropolitan region.  UPMC's oncology share, including its joint ventures

and satellite cancer centers, is approximately 80%."  Complaint,  ¶ 17; Amended Complaint,

¶ 175.

In addition to UPMC and West Penn Allegheny, there are several small community

hospital systems in Allegheny County and the adjoining counties including: Excela Health, a

four-hospital system; Heritage Valley Health System, a two-hospital system; Butler Health

System, which owns Butler Memorial Hospital; St. Clair Hospital; Ohio Valley General

Hospital; Armstrong County Memorial Hospital; Jefferson Regional Medical Center; and The

Washington Hospital.  However, according to the Amended Complaint, none of these systems

offer sophisticated tertiary and quaternary care, and none poses any threat to UPMC's

dominance.  In fact, none of the community hospital systems registers above a single digit market

share in any service line in the six-county metropolitan area.  Complaint,  ¶¶ 18 & 19; Amended

Complaint, ¶¶ 176 & 177.

### C.  Plaintiff's Allegations Re: The Health Insurance Market in the Pittsburgh Area

According to the Amended Complaint, Highmark's market share in the relevant market

has exceeded 60% continuously since January 1, 2000.  Complaint,  ¶ 142; Amended Complaint,

¶ 194.  Plaintiff further avers that a former UPMC Executive Vice President publicly stated that

Highmark is "an insurer that clearly dominates 70-80% of the commercial market" and "it's

pretty obvious they control finance of health care in western Pennsylvania."  *See* "UPMC's Battle

Against Highmark's Role in the Allegheny Bailout," *Physician's News Digest* (May 1999).

Original Complaint, ¶ 21; Amended Complaint, ¶ 194.

The second-largest competitor to Highmark is UPMC Health Plan, a health insurance affiliate of UPMC, which holds approximately 20% of the commercial market.  Complaint, ¶ 22; Amended Complaint ¶ 194.  A significant portion of the enrollees of UPMC Health Plan are UPMC employees and their dependents who are automatically enrolled under the UPMC Health Plan.  Amended Complaint, ¶ 195.  Of the remaining commercial market for health care insurance, which is divided between health care insurers like United, Aetna, Coventry and CIGNA, Plaintiff alleges that none of these insurers have been able to achieve even a 10% market share.  Complaint,  ¶ 23; Amended Complaint, ¶ 196.

In the Amended Complaint, Plaintiff alleges that proof of the conspiracy between Highmark and UPMC is evidenced by the successful exclusion of United Health Care, a health insurer with revenues in excess of $80 billion in fiscal year 2008, from the Pittsburgh market.  Amended Complaint, ¶ 73.  Plaintiff further avers that in 2005 and 2006, United attempted to enter the Pittsburgh market as a well-capitalized company with a strong track record of success in many markets, and that United possessed the financial strength and insurance expertise to pose a "serious threat" to Highmark's dominance in the Pittsburgh market.  Amended Complaint,  ¶ 74. Plaintiff alleges that United's inability to enter the Pittsburgh market is based on the fact that as a result of the conspiracy, UPMC has refused to contract with United on competitive terms, thus blocking United's access to UPMC's two flagship hospitals, Presbyterian and Shadyside. Amended Complaint, ¶ 75.  Further, Plaintiff avers that UPMC also refused United's "overtures" to purchase the UPMC Health Plan.  Amended Complaint,  ¶ 75.  Because United is unable to offer in-network services to UPMC's facilities, it has been unable to achieve even a 10% market share in the Pittsburgh market.  Amended Complaint, ¶ 76.

As further alleged evidence of the strength of Highmark's market power, Plaintiff points to a report of an economic consulting firm, LECG, retained by the Pennsylvania Insurance Department during its review of a proposed merger between Highmark and Independence Blue Cross (IBC) (which merger did not occur).  Amended Complaint,  ¶¶ 72 and 199.  LECG's analysis indicated that Highmark has "substantial market power" in Western Pennsylvania. Amended Complaint, ¶ 199.  The report further noted that substantial barriers to the entry of new competitors, including Health America and United, existed as to entry into the Pennsylvania market generally and the Western Pennsylvania market specifically, and stated:

> Our review of the evidence in this case supports the contention that potential competitors do face entry barriers with respect to health insurance in Pennsylvania, particularly in western and southeastern Pennsylvania.  While competitors have made limited inroads against the dominant Blue providers in those areas, both IBC and Highmark remain dominant in southeastern and Western Pennsylvania, respectively.  Based on our interviews of market participants and other evidence, there are a number of barriers to entry - including the provider cost advantage enjoyed by the dominant firms in those areas and the strength of the Blue brand in those areas.  In addition, those areas have also been characterized by an extensive amount of exit or retrenchment of competitors.

Amended Complaint, ¶ 200.

### D.  Plaintiff's Allegations Re: Antitrust and Anti-competitive Conduct of Defendant UPMC and Defendant Highmark

In the introductory section of the Amended Complaint, Plaintiff makes a summary of its allegations against UPMC and Highmark, which is quoted at length[2] as follows:

"At least since 2002, Pittsburgh's dominant hospital system, UPMC, and its dominant health insurer, Highmark, have conspired to reduce competition and raise prices at the expense of

---

[2]For ease of reading, the Court has chosen not to indent and single space this lengthy quotation.

the community's employers, consumers, and patients. During that period, Highmark and UPMC have conspired to protect one another from competition. UPMC's most senior executives have openly said that they want to destroy West Penn Allegheny and have relentlessly worked to achieve a monopoly position in high-end tertiary and quaternary care services.  Highmark's senior officials have admitted repeatedly that Highmark and UPMC had an agreement whereby Highmark would withdraw its commitment to and refuse any significant financial support or assistance for West Penn Allegheny in exchange for UPMC's agreement that it would protect Highmark's near monopoly position in the health insurance market."  Amended Complaint, ¶ 2.

"UPMC agreed to protect Highmark by refusing to contract on reasonable terms with any competing health insurer or to sell its health insurance affiliate to any competing health insurer, thus relegating major national insurers such as United, Coventry, and Aetna to marginal participation (at best) in the Pittsburgh market.  In exchange, Highmark agreed to restrict UPMC's hospital primary competitor, West Penn Allegheny, by shuttering its low-cost Community Blue product, attempting to block West Penn Allegheny's efforts to refinance its debt, and paying inflated reimbursement rates to UPMC while maintaining depressed rates for UPMC's competitors, especially West Penn Allegheny.  Highmark has in turn passed on the costs of UPMC's rates to employers, consumers, and patients by charging higher premiums. Since the conspiracy's formation in 2002, and at least through 2007, UPMC and Highmark have enjoyed record profits - and an increasingly exploited Pittsburgh community has suffered skyrocketing health care costs."  Amended Complaint, ¶ 3.

The Amended Complaint alleges that Highmark ceased offering its Community Blue product when Highmark agreed with UPMC to "sunset" Community Blue within twelve months,

and Community Blue was in fact shut down in January 2004, and is now of out business.

Amended Complaint, ¶ 79.  The termination of the Community Blue product "ended health

insurance price competition in the Pittsburgh community and forced employers and families into

buying Highmark's remaining, far more expensive health insurance products."  Amended

Complaint, ¶ 79.

"One of the conspiracy's aims was to destroy West Penn Allegheny, the sole surviving

competitor to UPMC in sophisticated tertiary and quaternary care. Ever since West Penn

Allegheny rose from the ashes of the bankruptcy of the Allegheny Health, Education, and

Research Foundation ("AHERF") – an effort pushed hard by community leaders precisely to

counter the danger that a dominating UPMC would raise prices – UPMC has pursued a relentless

campaign to drive West Penn Allegheny out of business. Indeed, UPMC CEO Jeffrey Romoff

has stated publicly that competition in health care does not work and that West Penn Allegheny

has no future.  *See* Romoff Questions West Penn's Long-Term Viability, *Pittsburgh Business

Times* (October 21, 2002)."  Complaint,  ¶ 3; Amended Complaint, ¶ 4.

Later in the Amended Complaint, Plaintiff alleges that "UPMC has engaged in a

relentless campaign of anticompetitive, predatory conduct since at least 1999, and continuing

through the present day, in an attempt to monopolize the Allegheny County market for acute

inpatient hospital services and/or for tertiary and quaternary care services.  UPMC's campaign

[allegedly] has had five main prongs: (1) as described above, as part of the conspiracy with

Highmark, UPMC secured Highmark's cooperation in raising West Penn Allegheny's costs,

withdrawing from its earlier willingness to provide financial support and providing an artificially

inflated advantage in reimbursement revenues to UPMC; (2) UPMC has restricted West Penn

Allegheny's ability to cooperate with, and secure referrals from independent hospitals; (3) UPMC has tried to starve West Penn Allegheny of necessary patient referrals by raiding key admitting physicians, as well as raiding physicians such as anesthesiologists who are necessary for hospital operation; (4) UPMC has bid physician salaries to artificially inflated, supracompetitive levels; and (5) UPMC has interfered with West Penn Allegheny's bond offerings."  Amended Complaint, ¶ 129.

In addition, Plaintiff alleges in the Amended Complaint that UPMC has "used its market power to coerce third parties, including the Veterans Administration Pittsburgh Healthcare System (the "VA")," a facility staffed largely by residents from UPMC.  Amended Complaint, ¶ 130.  Plaintiff alleges that the VA had begun to avoid using UPMC doctors to perform liver transplants at its facilities because of concerns over diversion of livers intended for VA patients to UPMC patients and UPMC's pressure on the VA to have liver transplants take place at UPMC instead of the VA's own, less costly, facilities.  Amended Complaint, ¶ 131.  In 2007, one of UPMC's transplant physicians who was dissatisfied with UPMC, left UPMC with the intention of joining West Penn Allegheny's liver transplant unit after the expiration of his UPMC non-compete obligations.  The VA was considering hiring the physician to do liver transplants while he waited for his non-compete agreement to expire, a practice which plaintiff alleges had happened in the past (the VA had hired other physicians in the past with local non-competes on the basis that the VA and other local hospitals were not in competition with the VA for patients.) Amended Complaint,  ¶ 132.  In this instance, however, during his period of this physician's non-compete, UPMC complained to the VA that the doctor would be violating his non-compete agreement.  The VA chairperson then allegedly responded to UPMC that the non-compete

agreement would not cover the VA.  Amended Complaint, ¶ 132.

UPMC further allegedly threatened to remove all of their residents from the VA's facilities if the liver transplant physician was hired.  Amended Complaint, ¶¶ 132-33.  As a result of UPMC's threat, the VA decided not to hire the transplant physician and West Penn Allegheny was "forced to compensate the doctor for the term of his non-compete even though he was not permitted to perform medical procedures or lose his services."  Amended Complaint, ¶ 134.

"[U]PMC engaged in a ruthless and predatory campaign of physician raiding from 1999-2002 in an attempt to thwart the formation of West Penn Allegheny and to cripple, if not destroy, West Penn Allegheny as a viable competitor.  That campaign has continued unabated throughout the period from 2002 through the present day."  Amended Complaint, ¶ 142.

"In Summer 2002, UPMC offered a secret deal to Highmark aimed as the weakening of West Penn Allegheny: UPMC agreed to ensure Highmark's continued dominance in the health insurance sector, thus allowing Highmark to raise premiums without constraint.  In exchange, UPMC not only demanded and received huge lump sum capital injections and substantially higher payment rates, but it also demanded that Highmark join in the campaign to hobble its sole viable competitor, West Penn Allegheny."  Complaint,  ¶ 5; Amended Complaint, ¶ 5.

"Even though Highmark original supported West Penn Allegheny with a $125 million loan because it recognized the benefits of hospital competition for the community and itself, it reversed course in exchange for UPMC's agreement not to allow its health plan to compete against Highmark and to block other insurers from achieving a footfhold in Pittsburgh. As part of its conspiracy with UPMC, Highmark systematically tilted the playing field against West Penn Allegheny. Despite West Penn Allegheny's clear cost advantages over UPMC, Highmark's

agreement with UPMC led to Highmark's withdrawal of Community Blue, Highmark's low-cost insurance product that directed care to West Penn Allegheny to keep premiums down and health care affordable. *See* Highmark Pulling Plug on Lower Cost Health Plan, *Pittsburgh Post-Gazette* (March 27, 2003). As part of its conspiracy with UPMC, Highmark also kept its reimbursements to West Penn Allegheny at artificially depressed rates with the purpose of furthering UPMC's plan to drive West Penn Allegheny out of business and deny it access to the resources needed to invest in new facilities, technology, and equipment. Highmark's depressed reimbursement rates to West Penn Allegheny were in stark contrast to the excessively high rates paid to UPMC. By keeping West Penn Allegheny's rates down, Highmark was able to subsidize its overpayments to UPMC. Highmark also agreed with UPMC that Highmark would restrict its grants to West Penn Allegheny and would refuse to cooperate with any restructuring of West Penn Allegheny's finances, including Highmark's loan." Complaint, ¶6; Amended Complaint, ¶¶ 6 & 7.

After West Penn Allegheny's loan restructuring proposal was rejected in April 2005, West Penn Allegheny tried to revisit the possibility of restructuring the loan through board-to-board contacts. The Chairman of the Board of Directors of West Penn Allegheny contacted Robert Baum, the Chairman of the Board of Directors of Highmark, and the two men met on or about November 1, 2005. Amended Complaint, ¶¶ 105-06. While the two men agreed that the loan restructuring made sense, "Baum expressed concern that UPMC would retaliate either by contracting with United or by selling its health plan to United." Amended Complaint, ¶ 106.

In the summer of 2008, West Penn Allegheny's Chairman of the Board again tried to arrange a lunch with Mr. Baum; however, the meeting was canceled at the instruction of Highmark's counsel. Amended Complaint, ¶ 111. Plaintiff alleges that "[i]n 2006, Highmark

rejected another proposal to restructure the debt service on the loan to West Penn Allegheny.  Dr. Melani conceded this time, after years of misrepresentation, that Highmark's loans to UPMC and Jameson are on far more generous terms."  Amended Complaint,  ¶ 112.

"The conspiracy has taken a severe toll upon West Penn Allegheny.  Despite providing equal or better care than UPMC at a lower cost to the community, Highmark agreed to withdraw its financial support of West Penn Allegheny, including keeping its reimbursement rates depressed.  Moreover, the conspirators have artificially blocked and stunted West Penn Allegheny's natural growth as the high-quality and low-cost leader, resulting in lost patient volume, growth, and earnings to West Penn Allegheny.  Those earnings are critical to West Penn Allegheny's charitable mission to improve the extent, scope, and quality of health care available to the Pittsburgh community.  Meanwhile, as a result of the conspiracy between UPMC and Highmark, UPMC has posted profits that are dramatically disproportionate to its size. For example, for fiscal year 2006, UPMC's profits were $512 million, while West Penn Allegheny's net income was $21 million. Although UPMC is five times as large as West Penn Allegheny, its profits were 25 times those of West Penn Allegheny's.  Similarly, Highmark's surplus rose from $2.8 billion in 2005 to $3.5 billion in 2007."  Complaint,  ¶ 7; Amended Complaint ¶ 10. Plaintiff alleges that "[t]he effects of the illegal conspiracy have continued to the present day." Complaint,  ¶ 8; Amended Complaint ¶ 13.

As further proof of defendants' illegal activity, plaintiff alleges that Highmark paid inflated grants and reimbursements to UPMC that lead to UPMC's income rising from $23 million in 2002 to over $618 million in 2007.  This compared to the fact that West Penn Allegheny struggled during that same period to break even.  Amended Complaint, ¶ 126.

Plaintiff further alleges that this activity, namely the inflated reimbursements stopped in the summer of 2008; however, only due to the pressure of the Department of Justice's investigation into Highmark's and UPMC's illegal conspiracy.  Amended Complaint, ¶ 127.

### E.  Plaintiff's Allegations Re: Highmark in Particular

Plaintiff makes numerous allegations against Highmark.

Plaintiff alleges that in Summer of 2002 Highmark and UPMC formed a conspiracy to eliminate competition and create what Plaintiff terms a "super monopoly" (Amended Complaint, ¶ 58).  The allegations include that Highmark entered into a new multi-year participating provider agreement at highly favorable reimbursement rates for UPMC; that Highmark also agreed to stop providing assistance and support to West Penn Allegheny through discriminatory (i.e. lower) reimbursement and grant making; and that Highmark discontinued Community Blue, effective January 1, 2004, citing the need to cut administrative costs, after having stated in prior false advertising that a "key feature" of Community Blue was "that a group of hospitals have agreed to take additional discounts which allow us to price the product cheaper in the marketplace."  Complaint,  ¶¶ 65 and 73; Amended Complaint, ¶¶ 83 & 84.  Plaintiff further alleges that as a result of this conspiracy the amount of rate discrimination has been in excess of $100 million.  Amended Complaint, ¶ 121.

Plaintiff alleges that, upon information and belief, Highmark engaged in no "internal discussion or analysis" that led to the termination of Community Blue.  Rather, senior management of Highmark simply announced to its employees who were managing Community Blue that the product would be discontinued. Complaint,  ¶ 76; Amended Complaint, ¶ 82. According to the allegations of the Amended Complaint, Highmark's decision to end the

growing low cost Community Blue product can only be explained as being necessary to achieve

the benefits of the conspiracy with UPMC.  Complaint,  ¶ 75; Amended Complaint, ¶ 82.

Plaintiff alleges that compared to the deeply discounted Community Blue agreements

between Highmark and West Penn Allegheny, UPMC's charges are "high."  A study released by

the Pennsylvania Health Care Cost Containment Counsel in June 2007 found that, for admissions

in 2005, UPMC Presbyterian and UPMC Shadyside received an average of $34,803 for coronary

artery bypass graft surgery, while AGH received only $23,715.  The study also found that AGH

performed better than UPMC's hospitals, with a lower readmission rate.  Complaint,  ¶¶ 76 and

77; Amended Complaint, ¶¶   83 & 84.

Plaintiff further alleges that Highmark discriminated in its use of "grants" awarded to

health care providers, and cites one example that in 2005 UPMC was awarded $8 million for an

initiative to improve the implementation of information technology in health care (and waived

the $500,000.00 cap), while Plaintiff remained limited to the cap.  Complaint,  ¶ 78; Amended

Complaint,  ¶ 125.

Plaintiff avers that, upon information and belief, Highmark "improperly" denied West

Penn Allegheny proper reimbursement for emergency care services by allegedly failing to

reimburse emergency care at ER rates after Allegheny Kiske Medical Center (AKMC) closed

Citizens General Hospital and opened Citizens Ambulatory Care Center on the Citizens General

site.  Complaint,  ¶ 79, Amended Complaint, ¶ 122.

Plaintiff further avers that while a Highmark Vice President agreed that it was important

for the Citizens Ambulatory Care Center to remain open, Highmark could not provide full

reimbursement for emergency care services provided because of issues with UPMC St. Margaret

Hospital.  Amended Complaint, ¶ 123.  In place of receiving proper reimbursement, the Highmark Vice President urged AKMC to apply for a grant from Highmark to fund the operation of the Citizens Ambulatory Care Center, a grant that was rejected in its entirely.  Amended Complaint, ¶ 124.

Plaintiff alleges that Highmark publicly supported UPMC's 2006 acquisition of Mercy Hospital, an action supposedly contrary to Highmark's self-interest, as the merger allegedly strengthened UPMC's bargaining leverage and reduced hospital competition.  Complaint,  ¶ 80; Amended Complaint, ¶ 85.  UPMC's purchase of Mercy Hospital gives UPMC "*de facto*" control of "nominally independent community hospital systems" by establishing joint ventures with those hospitals including UPMC Cancer Centers, by threatening to set up satellite centers across the street from community hospitals, unless they agree to UPMC's proposal.  Complaint, ¶¶ 116-117; Amended Complaint, ¶¶ 135 & 189.

Plaintiff contends that Highmark leaked confidential information provided by West Penn Allegheny to UPMC and cites as an example that in the Fall of 2006, Highmark provided confidential financial information about West Penn Allegheny to UPMC, who in turn leaked a "distorted" version of the information to credit-rating agencies and to business media in an attempt to reduce investor confidence in West Penn Allegheny.  Complaint,  ¶ 106; Amended Complaint, ¶ 128.

Plaintiff also contends that in Fall 2005, Highmark's Board Chairman allegedly admitted point blank to West Penn Allegheny that what Highmark had done with UPMC was "probably illegal."  Complaint,  ¶ 9; Amended Complaint, ¶ 8.

**F. Plaintiff's Allegations Re: UPMC in Particular**

**1. Alleged Interference with West Penn Allegheny's Bond Offerings**

Plaintiff alleges that in January, 2007, UPMC disseminated false information to investors and potential bond purchasers of West Penn Allegheny bonds and even distributed a book of information about West Penn Allegheny's finances that was printed as if it was written by West Penn Allegheny.  Complaint, ¶¶ 107-108; Amended Complaint, ¶¶ 161- 164.  West Penn Allegheny's investment bankers were allegedly "shocked at this conduct, which they told West Penn Allegheny was a level of deceit and underhandedness beyond anything they had ever encountered."  Amended Complaint, ¶ 161.

The Amended Complaint further alleges that, upon discovery in January 2007 that UPMC had distributed its "book" of allegedly defamatory information to credit-rating agencies, West Penn Allegheny's Board Chairman called Nick Beckwith, Chairman of the Board of Directors of UPMC, and demanded that UPMC cease its "inappropriate conduct."  Amended Complaint, ¶ 162.  After allegedly substantiating that UPMC had in fact disseminated its "book" to the credit-rating agencies, Mr. Beckwith called West Penn Allegheny's Board Chairman and stated that, "this book is history."  Amended Complaint, ¶ 163.  Allegedly, Mr. Beckwith conceded that the book was "inappropriate," and "unseemly" in its mimicking of West Penn Allegheny's formatting and the style of the literature it disseminates.  Amended Complaint, ¶ 163.

**2. Alleged "Raiding" of Physicians**

Plaintiff also alleges that UPMC "raided" West Penn Allegheny physicians by raiding cardiothoracic surgeons from AGH, multiple primary care and infectious disease physicians, orthopedists, radiologists, anesthesia groups (Pennsylvania Anesthesia Providers and Western

Pennsylvania Anesthesia Associates), OB/GYN physicians, gastroenterologists on the AGH staff, and numerous other physicians and surgeons in 2002, 2003, 2005, 2006, 2008, and most recently in April 2009, with the raid of Dr. Colella, a bariatric surgeon at AGH, thereby necessitating AGH's drastic increase in salaries to levels well beyond those of the competitive market. Complaint,  ¶¶ 109-115; Amended Complaint, ¶¶ 143, 144, 151-155.

As to Dr. Colella, the Amended Complaint avers that "in an internal email to UPMC CEO Mr. Romoff, UPMC senior executive Marshall Webster wrote that '[i]f he [Colella] carries through, AGH [Allegheny General Hospital] will not have a sustainable bariatrics program unless they just merge it with WP [West Penn].'  To which Romoff replied: 'Excellent.  AGH will merge with WP bariatrics I believe."  Amended Complaint, ¶ 155.  Dr. Webster further stated in an internal UPMC email that "if AGH were able to retain Dr. Colella, UPMC will have forced AGH to incur higher costs."  Amended Complaint, ¶ 155.

Plaintiff alleges that physician raiding by UPMC guaranteed exceedingly high salaries without requiring the physicians to meet certain productivity targets, which is contrary to standard industry practices.  Plaintiff's Amended Complaint attempts to weave in allegations of the conspiracy by alleging that UPMC's conspiracy with Highmark has been "key to paying for UPMC's predatory campaign of physician raiding.  Because it has received artificially inflated reimbursement from Highmark, UPMC has had extra funds to subsidize money-losing, excessive compensation packages for physicians."  Amended Complaint,  ¶ 157.

Plaintiff further alleges that "in 2008, UPMC purchased the practice of a primary care physician on staff at West Penn Hospital.  While this physician earned approximately $120,000 per year in private practice, UPMC hired him at a salary of roughly $500,000," an amount that

was beyond what UPMC could recover from reimbursements for the physicians' services.

Amended Complaint, ¶ 159.  In further support of its claim of UPMC's predatory practices,

Plaintiff alleges in the Amended Complaint that "in 2009, UPMC offered to employ a primary

care physician on staff at AKMC for a significant salary increase while at the same time only

requiring him to maintain half or a third of his current productivity level."  Amended Complaint,

¶ 158.

### 3.  Alleged Exclusive Dealing Agreements and Joint Venture Arrangements

Plaintiff avers that the UPMC Cancer Center network has restricted West Penn

Allegheny's ability to gain referrals from community hospital oncology departments and that

"[s]ophisticated tertiary and quaternary care facilities such as AGH rely on community hospitals

for referrals of complex, difficult cases."  Amended Complaint, ¶ 138.  "The UPMC Cancer

Center network functions as a group of exclusive dealing agreements between UPMC and the

affected community hospitals.  By housing a UPMC Cancer Center, each community hospital has

ceded control over tertiary and quaternary care referrals to UPMC, which in turn refers cases

almost always to its own tertiary and quaternary care facilities at Presbyterian and Shadyside

hospitals.  West Penn Allegheny has accordingly been foreclosed from providing care to these

patients."  Amended Complaint, ¶ 139.  "Moreover, UPMC has used its Cancer Centers to block

West Penn Allegheny from developing clinical relationships with community hospitals in fields

outside of oncology."  Amended Complaint, ¶ 141.

Plaintiff further avers that UPMC has taken "*de facto*" control of independent community

hospital systems by threatening to set up rival UPMC satellite facilities adjacent to them unless

they consented to enter into "joint ventures" with those hospitals including UPMC cancer

-17-

centers, and this tactic has resulted in UPMC forming "joint ventures" with or placing a UPMC cancer center within nearly every community hospital systems (except those owned by West Penn Allegheny) in the six-county Pittsburgh metropolitan area.  Complaint,  ¶¶ 116-117; Amended Complaint, ¶¶ 135 and 189.

### 4. Alleged Anticompetitive Acquisitions

Plaintiff avers that "UPMC has grown its market power through a series of anticompetitive acquisitions."  Amended Complaint,  ¶ 189.  With the purchase of Mercy Hospital in 2006, which was the only other sophisticated tertiary care facility in Pittsburgh not owned by UPMC or West Penn Allegheny, West Penn Allegheny is now the only remaining competitor for many of the "most sophisticated and expensive hospital services."  Complaint,  ¶ 116; Amended Complaint,  ¶ 189.

### G. Plaintiff's Inconsistent Factual Allegations

West Penn Allegheny is inconsistent in describing the damages sustained as a result of the alleged conspiracy between UPMC and Highmark.  On one hand, West Penn Allegheny alleges that it suffered financial hardship and has a need for capital (Amended Complaint, ¶¶ 203, 204 & 205) while also admitting that it has experienced an increase in unrestricted cash of $54 million between June 2001 and June 2005, an increase in revenue of $362 million between 2000 and 2005 and a threefold increase in EBITDA (earnings before interest, taxes, depreciation and amortization) of $80 million between 2000 and 2005.  Amended Complaint, ¶ 206.

Plaintiff further alleges that it was able to provide a sophisticated, high level of care to its patients.  Amended Complaint, ¶ 214.  At the same time, Plaintiff alleges that it could not provide proper care to its patients because it was unable to invest in and expand its oncology,

cardiology, orthopedic and neurology programs. Amended Complaint, ¶ 210. Plaintiff further alleges that it was unable to invest in technology, thus decreasing the level of patient care. Amended Complaint, ¶ 210. In addition, Plaintiff alleges it was unable to integrate resources between its facilities at AGH and WPH, a situation that further compromised the level of patient care. Amended Complaint, ¶ 211. Finally, Plaintiff points to its inability or delay in being able to expand its facilities at Alle-Kiski Medical Center (AKMC) Emergency Department as a factor in being unable to provide adequate patient care. All of these statements are inconsistent West Penn Allegheny's allegation that it was able to provide sophisticated, high level care.

In its statement of Damages, Plaintiff further contends that none of its inefficiencies were a result of poor operating performance. Amended Complaint, ¶ 206. This, despite the fact that West Penn Allegheny admits that it provided duplicate services at its facilities at AGH and WPA, a condition that was costly and without doubt affected the financial and operational performance of West Penn Allegheny. Amended Complaint, ¶ 211.

Plaintiff also alleges that it was able to provide equal or better care than UPMC at a lower cost to the community. Complaint, ¶ 7; Amended Complaint, ¶ 10. Yet, Plaintiff later avers that its growth as the high-quality, "low-cost leader" has been stunted and its market share restricted. Complaint, ¶ 147; Amended Complaint, ¶ 202. Despite these allegations, West Penn Allegheny admits that the closure of Citizens General hospital caused such an influx of patients that it needed to expand its emergency facilities at AKMC. Amended Complaint, ¶ 212. This statement would indicate that, at least in the Alle-Kiski area, business was and is growing and its market share was and is increasing. Complaint, ¶ 147; Amended Complaint, ¶ 202.

### III.  SUMMARY OF THE CLAIMS

#### A.  Claims under Section 1 of the Sherman Act (Illegal Agreements) and Section 2 of the Sherman Act (Conspiracy to Monopolize) Against UPMC and Highmark (Counts I and II)

West Penn Allegheny alleges in Count I of the Amended Complaint that UPMC and Highmark have entered into an illegal conspiracy to protect UPMC and Highmark from competition and raise operating costs for West Penn Allegheny in violation of Section 1 of the Sherman Act.  Complaint, ¶ 151; Amended Complaint, ¶ 222.  Count II of the Amended Complaint alleges that UPMC and Highmark have entered into a conspiracy to allow each company to monopolize its respective market in violation of Section 2 of the Sherman Act. Complaint, ¶ 156; Amended Complaint, ¶ 128.  West Penn Allegheny alleges that UPMC refused to contract on competitive terms with Highmark competitors, or to grow or sell the UPMC Health Plan.  Complaint; ¶ 158, Amended Complaint, ¶ 231.  Highmark allegedly discriminated in reimbursement rates and grants in favor of UPMC, and discontinued its Community Blue product to benefit UPMC.  Complaint, ¶¶ 73-75, 159; Amended Complaint, ¶¶ 79-82, 232. Plaintiff posits that Defendants had a goal for UPMC to monopolize the market for healthcare services, and for Highmark to monopolize the market for healthcare insurance. Complaint, ¶ 156; Amended Complaint, ¶ 228.

#### B.  Claims under Section 2 of the Sherman Act (Attempt to Monopolize) Against UPMC (Count III)

Count III of the Amended Complaint alleges that UPMC attempted to monopolize the relevant markets in violation of Section 2 of the Sherman Act.  Complaint, ¶ 162; Amended Complaint, ¶ 235.  According to the Amended Complaint, UPMC acted unlawfully through

"predatory hiring and recruitment practices," Complaint ¶¶ 26-47; Amended Complaint, ¶¶ 22-25, 37-41, and through its dissemination of "false and misleading" information regarding West Penn Allegheny's finances to dissuade investors from investing in West Penn Allegheny bonds. Complaint ¶ 29; Amended Complaint, ¶ 24.

Plaintiff alleges that UPMC has attempted to monopolize the market for acute inpatient services and/or high-end tertiary and quaternary acute care inpatient services in Allegheny County; and that UPMC had a specific intent to monopolize the market, an intent that was evidenced by UPMC's CEO Jeffrey Romoff, who allegedly publicly stated his belief that competition in health care does not work.  According to the Amended Complaint, the alleged statements of UPMC executives that they want to turn AGH into a "nursing home or a parking lot" is further evidence of its intent.  Complaint, ¶ 163; Amended Complaint, ¶ 236.

The Amended Complaint further alleges that UPMC has engaged in predatory conduct in support of this goal including entering into an illegal market allocation agreement with Highmark, engaging in a nearly decade-long pattern of predatory physician raiding, and interfering with West Penn Allegheny's attempts to secure financing by setting forth false and misleading information to investors, and the anticompetitive acquisition of Mercy Hospital in 2006.  Complaint, ¶ 164; Amended Complaint, ¶237.

The Amended Complaint also alleges that there is "a dangerous probability that UPMC will achieve monopoly power. . . [s]hould West Penn Allegheny falter or weaken significantly." Complaint, ¶ 165; Amended Complaint, ¶ 239.

### C.  Claims under State Law Against UPMC (Counts IV and V)

Counts IV and V of the Amended Complaint allege two state law claims against UPMC –
namely, "employee raiding" and unfair competition, and tortious interference with existing and
prospective business relations – based on the same allegations underlying its federal antitrust
claims.  Complaint, ¶¶ 168-74; Amended Complaint, ¶ 242-48.

The "employee raiding" component is based upon the allegations set forth hereinabove
regarding UPMC's raiding of West Penn Allegheny physicians with the alleged intent of
"crippling" West Penn Allegheny as a competitor.  The Amended Complaint listed numerous
physicians raids beginning in 2002 (Complaint  ¶ 109; Amended Complaint, ¶ 143), and
continuing in 2003, 2005, 2006, 2008 and most recently in April of 2009, with Dr. Colella.
Complaint,  ¶ 107-119; Amended Complaint, ¶¶ 135-37, 143, 144, 151-55, 161, 164.  West Penn
Allegheny alleges that all of the "raided" physicians were offered exorbitant artificially inflated
compensation, an act that was done with the intent of driving West Penn Allegheny out of
business.  Complaint,  ¶ 174; Amended Complaint, ¶ 248.

Plaintiff alleges that UPMC interfered with the terms of a series of participator provider
agreements between West Penn Allegheny and Highmark, by pressuring Highmark to provide
discriminatory lower reimbursement rates to West Penn Allegheny, by threatening to expand or
sell its health insurance arm, or contract with a Highmark competitor.  Amended Complaint,
¶ 252.

Plaintiff further alleges that UPMC has tortiously interfered with plaintiff's prospective
business relationships with bond investors in Spring, 2007, by making false statements to
potential investors about Plaintiff's finances and circulating an allegedly "defamatory fake

financial report designed to appear as if written by West Penn Allegheny," without privilege or justification, and that West Penn Allegheny has been damaged by UPMC's conduct.  Complaint, ¶¶ 181-184; Amended Complaint,  ¶¶ 255-258.

## IV.  SUMMARY OF DAMAGE ALLEGATIONS AND PRAYER FOR RELIEF

### A.  Plaintiff's Allegations Re: Damages[3]

According to the Amended Complaint, Defendants' illegal and predatory conduct has inflicted "severe damage" upon West Penn Allegheny.  Complaint,  ¶ 146; Amended Complaint, ¶ 201.

West Penn Allegheny alleges that the conspiracy between UPMC and Highmark has artificially stunted the growth of West Penn Allegheny and its market share has been unduly restricted.   Without the existence of the conspiracy, West Penn Allegheny posits that its "market share would be substantially higher and it would have earned additional profit - - profits which it could have reinvested back into its operations to improve the quality of health care in the community and to further its charitable mission."  Complaint,  ¶ 147; Amended Complaint, ¶ 202.

"As described above, the conspirators attacked West Penn Allegheny by starving it of the capital needed to grow and to expand. This was achieved by inflating West Penn Allegheny's financing and other costs and keeping reimbursement paid to West Penn Allegheny at levels far below that paid to UPMC."  Amended Complaint,  ¶ 203.

---

[3]Because many of the following averments on damages are new to the Amended Complaint, the Court will quote portions of the new averments at length.

"Significant capital investment is a prerequisite to competing in the market for acute care inpatient services. Capital investment is necessary to modernize and expand already existing hospital facilities and programs and to develop new high-end/high-return tertiary and quaternary programs that generate additional market share and profits."  Amended Complaint,  ¶ 204.

"West Penn Allegheny has repeatedly expressed its acute need for capital to Highmark in meetings from 2004 forward in connection with its debt restructuring proposals. In response, Highmark acknowledged West Penn Allegheny's acute need for capital investment but refused to help, citing concern that UPMC would respond by contracting with United." Amended Complaint,  ¶ 205.

"West Penn Allegheny's need for capital was not the result of poor operating performance.  Following its formation in August 2000, West Penn Allegheny made significant improvements in liquidity, revenues and profits:

a. West Penn Allegheny's unrestricted cash increased from $185 million in June 2001 to $239 million in June 2005.

b. West Penn Allegheny's revenue grew from $1.011 billion in 2000 to $1.373 billion in 2005.

c. West Penn Allegheny's EBITDA (earnings before interest, taxes, depreciation and amortization) increased threefold from 2000 to 2005, from just over $40 million to over $120 million."  Amended Complaint,  ¶ 206

"West Penn Allegheny's need for capital was also not the result of inefficiency. West Penn Allegheny operated efficiently when compared to other teaching hospitals. According to the

-24-

Council of Teaching Hospitals (COTH) 2004 Annual Report, West Penn Allegheny performed
significantly better than other teaching hospitals when measuring the number of Full-time
Employees (FTEs) per each 1,000 Adjusted Discharges. Allegheny General Hospital and West
Penn Hospital measured approximately 51.0 and 47.7 FTEs per each 1,000 Discharges,
respectively, while the COTH mean was 60.8 FTEs per each 1,000 Discharges."  Amended
Complaint,  ¶ 207.

 "Rather, West Penn Allegheny's acute need for capital was the result of the agreement
between Highmark and UPMC to shutter West Penn Allegheny through artificially depressed
reimbursement rates and repeated denials to consent to any debt restructuring proposals.  By way
of example, in 2004, Highmark Managed Care Revenue per Discharge was approximately $5,353
and $5,218 for Allegheny General Hospital and West Penn Hospital, respectively.  According to
the COTH 2004 Annual Report, Commercial Managed Care Revenue per Discharge for teaching
hospitals on average was $9,836."  Amended Complaint,  ¶ 208.

 "But for the illegal conspiracy West Penn Allegheny would have received millions of
dollars in additional reimbursement from Highmark.  West Penn Allegheny's rates have been
artificially depressed during the conspiracy to further UPMC's goal of destroying its key
competitor and to help Highmark offset the inflated rates paid to UPMC.  In a competitive
market Highmark would have paid UPMC far less and West Penn Allegheny more, with an end
result of an overall lower health care cost to employers and individuals." Amended Complaint,
¶ 209.

 "As a result, [West Penn Allegheny] lacked the necessary capital to invest in and expand
their oncology, cardiology, orthopedics, and neurology programs, among others.  [West Penn

Allegheny's] inability to invest in these and other programs and in technology significantly restrained its ability to compete with UPMC in market for acute care inpatient services." Amended Complaint, ¶ 210.

"The lack of capital also delayed other critical projects.  Until Highmark, under pressure from the Department of Justice, increased reimbursement to West Penn Allegheny in Summer 2008, West Penn Allegheny lacked the capital to fully integrate the services provided by WPH and AGH, eliminating costly duplication and improving the cost and quality of healthcare services to the Pittsburgh community."  Amended Complaint, ¶ 211.

"The conspiracy forced delays in improvements to physical facilities.  For example, with the closure of Citizens General, AKC experienced an increase in volume in its Emergency Department.  Owing to lack of funds, though, the commencement of the planned expansion of the AKMC Emergency Department was delayed from 2003 until 2009."  Amended Complaint, ¶ 212.

"The lack of capital for investment caused West Penn Allegheny to lose market share and inpatient admissions volume.  The capital starvation caused by the conspiracy artificially constrained West Penn Allegheny's capacity, as it could not expand its service lines, programs, and physical plants.  Without expanded services and facilities, West Penn Allegheny was limited in the number of patients to whom it could provide care and in its ability to act as a constraint on UPMC's unfettered ability to control the healthcare market."  Amended Complaint, ¶ 213.

"Despite UPMC and Highmark's illegal conduct, West Penn Allegheny has always provided sophisticated, high-level care to the Pittsburgh community and continues to do so.  But the conspiracy has artificially stunted West Penn Allegheny's otherwise natural growth as the

more efficient and lower-cost tertiary and quaternary service provider."  Amended Complaint, ¶ 214.

"UPMC's other predatory, anticompetitive conduct has also inflicted significant harm upon West Penn Allegheny."  Amended Complaint, ¶ 215.

"By cutting West Penn Allegheny off from referrals from independent community hospitals, UPMC has caused West Penn Allegheny to lose inpatient admissions volume and market share."  Amended Complaint, ¶ 216.

"By improperly raiding key admitting physicians from West Penn Allegheny, UPMC has diverted those physicians' patients away from West Penn Allegheny's facilities and to UPMC's facilities.  This has caused West Penn Allegheny to lose inpatient admissions volume and market share."  Amended Complaint, ¶ 217.

"The improper raids on West Penn Allegheny's anesthesiology and radiology physicians have forced West Penn Allegheny to incur artificially elevated costs to maintain these services as West Penn Allegheny was forced to raise compensation to these physicians.  As explained in detail above, the raising of West Penn Allegheny's costs resulted in West Penn Allegheny having less capital to invest in its business, which in turn led to loss of market share."  Amended Complaint, ¶ 218.

"Similarly, by bidding physician salaries to supracompetitive levels, UPMC has artificially increased West Penn Allegheny's costs."  Amended Complaint, ¶ 219.

"By improperly interfering in West Penn Allegheny's attempts to sell its bonds to the investing public, UPMC artificially reduced demand for West Penn Allegheny's securities, which in turn caused West Penn Allegheny to pay higher financing costs, which in turn led to loss of

market share." Amended Complaint,  ¶ 220.

### B.  Plaintiff's Prayer for Relief

Since at the oral argument on the Original Motions to Dismiss and in this Memorandum

Opinion the Court focuses on the Prayer for Relief, the Court quotes the entirety of the Prayer for

Relief as follows:

"1.  That UPMC and Highmark be enjoined from further predatory and anticompetitive

conduct, as alleged herein;

2.  That Highmark be ordered to end  any discrimination in reimbursement (both direct

and indirect) between UPMC and West Penn Allegheny;[4]

3. That UPMC be ordered to divest its health insurance affiliate;[5]

4. That UPMC be ordered to cease interfering with community hospitals' ability to refer

patients to West Penn Allegheny facilities and to make independent contracting decisions with

third-party payors;[6]

---

[4]In the Original Complaint, the Prayer for Relief also included "that Highmark *be ordered to contract with West Penn Allegheny* on fair and equitable terms, including the end of any discrimination in reimbursement (both direct and indirect) between UPMC and West Penn Allegheny."  Complaint,  Prayer for Relief,  ¶ 2.  Under either Prayer for Relief, West Penn Allegheny is asking the Court to order Highmark to pay more funds to West Penn Allegheny which would increase, not decrease, the cost to consumers. *See infra*, Discussion (Section VII, B(2) - - Failure to Allege Antitrust Injury regarding Reimbursement Rates).

[5]The Original Complaint also contained language in the Prayer for Relief seeking the Court to order UPMC "to discontinue its joint ventures with independent community hospitals." Complaint, Prayer for Relief,  ¶ 3.

[6]The aforementioned Prayer for Relief seems to be the only addition to the Prayer for Relief as set forth in the Original Complaint.  However, the practical effect of new ¶ 4 is in large part the same as the deleted language (from Original Complaint, Prayer for Relief,  ¶ 3) that UPMC be ordered to "discontinue its joint ventures with independent community hospitals."

5. That West Penn Allegheny recover compensatory and treble damages;

6. That West Penn Allegheny recover punitive damages;

7. That West Penn Allegheny recover its costs for this suit, including

reasonable attorneys' fees, as provided by law; and

8. That the Court grant West Penn Allegheny such additional, further and different relief

as may be deemed just and proper."

Complaint, Prayer for Relief,  ¶¶ 1-7; Amended Complaint, Prayer for Relief, ¶ 1-8.

## V.  PROCEDURAL HISTORY

Plaintiff, West Penn Allegheny, commenced this action on April 21, 2009, with the filing

of its Complaint.  Doc. no. 1.   This Court set an initial case management conference for May 26,

2009, but plaintiff filed a motion to continue or to excuse chief trial counsel's attendance at the

case management conference.  Doc. no. 16.  On April 30, 2009, the Court, by text order, granted

plaintiff's motion to the extent it requested a continuance of the initial case management

conference.  The Court rescheduled the initial case management conference for July 30, 2009.

On June 11, 2009, defendant UPMC filed a motion to dismiss and supporting

documentation (doc. nos. 38, 39, 40) and defendant Highmark filed a motion to dismiss Counts I

and II of the Complaint with supporting documentation (doc. nos. 44-48).  Based upon a joint

motion for extension of time to file or otherwise plead, with accompanying agreed-upon dates,

the Court ordered responses to the motions to dismiss for July 8, 2009, with replies due by

July 15, 2009.  Doc. no. 22.  Plaintiff filed its response to the motions to dismiss on July 8, 2009

(doc. no. 53), and on July 15, 2009, Defendants filed its replies thereto (doc. nos. 53 and 54 ).

On July 23, 2009, plaintiff filed a sur-reply (doc. no 62), after seeking leave of Court.

A case management conference was held on July 30, 2009, at which the Court heard extensive oral argument on the pending motions to dismiss the Complaint.  At the July 30, 2009 conference, the Court stayed this case pending a ruling on the instant motions to dismiss, and allowed Plaintiff an opportunity to amend its Complaint.

Based upon the agreed-upon schedule as set forth at the Initial Case Management Conference, on August 28, 2009, Plaintiff filed an Amended Complaint (doc. no. 66), and on September 18, 2009, Defendants filed its renewed motions to dismiss and supporting documents (doc. nos. 78 and 82).  Plaintiff filed a response to the motions to dismiss on October 2, 2009 (doc. no. 86), Defendants filed replies thereto on October 9, 2009 (doc. no. 92 and 93), and a sur-reply was filed by Plaintiff on October 16, 2009 (doc. no. 96).

The issues have now been fully briefed and are ripe for disposition.

## VI.  LEGAL STANDARD

### A.  General Standard of Review

In light of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S.544 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)(quoting *Twombly*, 550 U.S. at 570). While *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), allowed dismissal of a claim only if "no set of facts" could support it, under *Twombly,* and most recently, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 2009 WL 1361536 (May 18, 2009), a claim for relief under Rule 12(b)(6) now "requires more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."

*Twombly*, 550 U.S. at 555; *Iqbal*, 129 S.Ct. at 1950.[7]

In *Iqbal*, the Supreme Court held that a claim is facially plausible when its factual content allows the court to draw a reasonable inference that the defendants are liable for the misconduct alleged. *Marangos v. Swett*, 2009 WL 1803264, *2 (3d Cir. Jan. 25, 2009), citing *Iqbal*, 129 S.Ct. 1937, 2009 WL 1361536, *12. The plausibility standard in *Iqbal* "asks for more than a sheer possibility that a defendant has acted unlawfully." *Swett*, quoting *Iqbal,* at *2. While well-pleaded factual content is accepted as true for purposes of whether the complaint states a plausible claim for relief, legal conclusions couched as factual allegations or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to an assumption of truth. *Swett*, quoting *Iqbal*, at *13. "Where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1949 quoting Fed. R. Civ. P. 8(a)(2).

In order to satisfy the requirement of Fed. R. Civ. P. 8(a)(2) that a plaintiff include a "short and plain statement of the claim showing that the pleader is entitled to relief," a plaintiff must aver sufficient factual allegations which "nudge" its claims "across the line from

---

[7]Most recently, in *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit further elucidated the standard of review post *Twombly* and *Iqbal*. In *Fowler*, the Court of Appeals for the Third Circuit, reiterated that a district court should conduct a two-part analysis when reviewing a motion to dismiss for failure to state a claim. First, the factual and legal elements of the claim should be separated and the district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions contained therein. Second, the district court must then determine, after drawing on its judicial experience and common sense, whether the facts alleged in the complaint are sufficient to show that plaintiff has a "plausible claim for relief." 578 F.3d 203, 210-211, *citing Iqbal*, 129 S. Ct. 1949, 1950.

conceivable to plausible." *Iqbal*, at 1951.

In considering a Rule 12(b)(6) motion, a court accepts all of the plaintiff's allegations as true and construes all inferences in the light most favorable to the non-moving party. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008)(citing *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). However, a court will not accept bald assertions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations, no matter how many pages the Complaint runs. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n. 8 (3d Cir. 1997). A court is not required to consider legal conclusions; rather, it should determine whether the plaintiff should be permitted to offer evidence in support of the allegations. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000).

Therefore, a plaintiff must put forth sufficient facts that, when taken as true, suggest the required elements of a particular legal theory. *See Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315 (3d Cir. 2008) (citing *Phillips*, 515 F.3d at 224). However, this standard does not impose a heightened burden on the claimant above that already required by Rule 8, but instead calls for fair notice of the factual basis of a claim while "rais[ing] a reasonable expectation that discovery will reveal evidence of the necessary element." *Weaver v. UPMC*, Civil Action No. 08-411, 2008 U.S. Dist. LEXIS 57988, at * 7 (W.D. Pa. July 30, 2008)(citing *Phillips*, 515 F.3d at 234; and *Twombly*, 550 U.S.. at 555).

## B.  "Gatekeeper Function" of the Court

Importantly, the failure to state a claim standard of Rule 12(b)(6) also seeks to promote judicial economy by eliminating unwarranted discovery and factfinding. *Twombly*, at 559-560.

In *Twombly*, a case which also involved allegations of an antitrust conspiracy under the Sherman Act, the United States Supreme Court, while addressing the plausibility standard on a motion to dismiss for failure to state a claim, explained that it is important to remember the practical aspects of the cost of litigation and noted that proceeding to antitrust discovery can be expensive. *Twombly*, at 558-560.

Indeed, as the Court in *Twombly* unequivocally stated, "when the allegations in a complaint however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, at 558 (citations omitted)(internal quotations omitted).

The Supreme Court in *Twombly* went on to list numerous cases over the last 20 years that have recognized what this Court would describe as the need to function as a "gatekeeper" in complex cases, including antitrust litigation.

First, in *Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983), the United States Supreme Court specifically declared that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, at 558.

Next, the United States Court of Appeals for the Seventh Circuit in *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984), applied the same analysis to antitrust litigation, as it stated that "[t]he cost of modern federal antitrust litigation and the increasing caseload of federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, at 558.

Further, in *Asahi Glass v. Pentech Pharmaceuticals, Inc.* 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003)(Posner, J., sitting by designation), the United States District Court for the Northern District of Illinois reiterated that "[s]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Twombly*, at 558.

The Court in *Twombly* cited numerous law reviews, manuals for complex litigation and other memorandum for the proposition that the costs of discovery in antitrust cases and other complex litigation is exorbitantly high, and as further justification for its position that the Court must serve a gatekeeper function.

With regard to the factual scenario in *Twombly*, the Supreme Court explained that given that plaintiffs represented a putative class of at least 90 percent of all subscribers to local telephone or high speed internet, in an action against America's largest tele-communications firms for unspecified instances of antitrust violations that allegedly occurred over a seven year period, the potential expense involved in the discovery process was "obvious." *Twombly* at 559.

The Court in *Twombly*, explained that the problem of discovery abuse cannot be alleviated by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries."  Rather, in the context of conspiracy claims brought under Section 1 of the Sherman Act, "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence to support a Section 1 claim.'" *Twombly*, at 559-560 (citations omitted).

-34-

Most recently, the analysis and reasoning set forth in *Twombly* regarding the extraordinary costs associated with antitrust discovery was cited in *Tam Travel, et al. v. Delta Airlines (In re: Travel Agent Commision Antitrust Litigation)* __ F.3d __, 2009 WL3151315*, No. 07-4464 (6th Cir. October 2, 2009), where the United States Court of Appeals for the Sixth Circuit further stated:

> A district court's early assessment of the sufficiency of a [Section] 1 claim under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c) addresses the dilemma of the extensive litigation costs associated with prosecuting and defending antitrust lawsuits.  As the *Twombly* Court acknowledged, 'the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.

*Tam Travel, et al.*, at *10 (citations omitted).

Given the recent acknowledgments by the United States Supreme Court in *Twombly*, and most recently by the United States Court of Appeals for the Sixth Circuit, in *Tam Travel*, the importance of the Court's role in acting as a gatekeeper, especially in antitrust cases, cannot be understated.  The Court has a duty to conduct a thorough and early assessment of these antitrust allegations under Fed. R. Civ. P. 12(b)(6) and employ the corresponding and newly established standards of review, while being cognizant of the enormous costs of proceeding through discovery to *all* parties in this case, and the consequential effects of such an endeavor on the business operations of *all* parties, including their employees.  Being ever cognizant of the practical and economic implications of permitting this case to proceed through the discovery process, and applying the appropriate plausibility standard to the factual allegations of this case, the Court will proceed to carefully scrutinize the allegations of the Amended Complaint and

arguments contained in the Renewed Motions to Dismiss and Memoranda of Law, and responses/replies/sur-replies related thereto.

## VII.  DISCUSSION

### A.  Motions to Dismiss

### 1.  Defendant Highmark

Highmark in its Renewed Motion to Dismiss (doc. nos. 82) and supporting memoranda of law (doc. nos. 83 and 93) relies upon the United States Supreme Court's decisions in the *Twombly* and *Iqbal* cases, as follows:

> The Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, ___U.S. ___ (2009), expanding upon *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), requires that WPAHS set forth claims and facts that satisfy each element of a cause of action. *See Iqbal*, 129 S. Ct. at 1947. In this case, this requirement includes pleading facts sufficient to satisfy the antitrust injury requirement applicable to Counts I and II. *See, e.g., NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) (*en banc*). Because WPAHS has failed to satisfy the antitrust injury requirement, Counts I and II of the Amended Complaint should be dismissed.

Doc. No. 82 at 2.

Highmark's Original Motion to Dismiss (which is referenced in the supporting memorandum of law to the Renewed Motion to Dismiss) provides a more thorough argument regarding the applicability of *Twombly* and *Iqbal,* which bares repeating:

> Like the typical conspiracy theorist, Plaintiff [West Penn Allegheny] concocts a story from incomplete and ambiguous information and from excerpts of statements, applies speculative thinking and draws conclusory inferences, all the while ignoring equally plausible contrary inferences and any facts that derail its theory. As the Supreme Court's rulings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), make clear, a factually skimpy and implausible conspiracy claim like this must be dismissed.

-36-

The Supreme Court's *Iqbal* decision reinforces the principle that all federal complaints need facts supporting a plausible claim, not just conclusory statements or suggestions of the "possibility of misconduct." *Iqbal*, 129 S. Ct. at 1950. And as *Twombly* made clear, to survive a motion to dismiss on an antitrust conspiracy claim, plaintiffs must plead sufficient facts demonstrating a meeting of the minds and those facts must tend to rule out the possibility that the defendants were acting independently. *Twombly*, 550 U.S. at 554. [West Pen Allegheny] has failed to plead any such facts.

Moreover, despite Highmark's continuing support for [West Penn Allegheny] throughout the past decade, [West Penn Allegheny] now wishes to rewrite history, as well as the contracts it negotiated with Highmark. It seeks another bailout, this time through a lawsuit. [West Penn Allegheny's] attempted use of the antitrust laws as a weapon to force Highmark to pay [West Penn Allegheny] even higher rates, and on par with the same organization it contends has significant market power in the hospital services market, is truly cynical and directly contrary to the purpose of the antitrust laws. The relief sought here – increased payments to the alleged supracompetitive UPMC level – is inconsistent with the "antitrust injury" these laws were designed to prevent.

Doc. no. 45 at 7.

## 2.  Defendant UPMC

Defendant UPMC argues in its Renewed Motion to Dismiss (doc. no. 78) and supporting memoranda of law (doc. nos. 80 and 92) that the Amended Complaint fails to state a claim upon which relief can be granted.  FRCP 12(b)(6); doc. no. 78 at 1.  In particular, UPMC reiterates (see also Original Motion to Dismiss and supporting Memorandum of Law at doc. nos. 38 and 39) that:

Antitrust discovery is expensive and protracted.  That is why the Supreme Court, in both *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), expressly affirmed the district courts' responsibility to analyze a plaintiff's complaint rigorously. . . first, the Court should identify pleadings that 'because they are no more than conclusions, are not entitled to the assumption of truth;' and, second, if the factual allegations are not conclusory, the Court should 'determine whether [the allegations] plausibly give rise to an entitlement to relief.' 129 S. Ct. At

1950; *see also McCullough v. Zimmer, Inc.*, No. 08 cv-1123, 2009 WL 775402 at *4 (W.D. Pa. March 18, 2009).

Thus, to avoid dismissal a plaintiff "must put forth sufficient facts that, when taken as true, suggest the required elements of a particular legal theory." *McCullough*, 2009 WL 775402 at *4 (citations omitted). This obligation requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Iqbal*, 129 S.Ct. At 1950. The Court is permitted to "draw on its judicial experience and common sense" to determine if a complaint states a plausible claim. Id.

[West Penn Allegheny's] pleading fails these basic requirements. *See McCullough*, 2009 WL 775402 at *4. Consequently, [West Penn Allegheny's] Amended Complaint should be dismissed in its entirety.

## B. Analysis of Antitrust Injury

Defendants UPMC and Highmark argue that Plaintiff's antitrust claims should be dismissed for failure to allege antitrust injury because (1) the decision to discontinue Community Blue, (2) the agreement as to reimbursement rates, (3) the decision not to refinance Plaintiff's debt was not unlawful nor did it cause any antitrust injury to Plaintiff; and, (4) Plaintiff has not alleged harm to the overall market share of hospital services in Western Pennsylvania. Doc. no. 80 at 7-19; doc. no. 83 at 2-12. Plaintiff counters that it has sufficiently alleged that Defendants' allegedly anticompetitive conduct caused an antitrust injury because it directly led to a decrease in competition for and output of health care services in Western Pennsylvania. Doc. no. 86 at 22-28. UPMC responds that any injuries Plaintiff suffered resulted from lawful conduct and do not amount to an antitrust injury. Doc. no. 92 at 2-7. Highmark reiterates that whatever injuries Plaintiff may have suffered from this alleged conduct, it cannot be characterized as an antitrust injury. Doc. no. 93 at 1-7. For the following reasons, the Court finds that Plaintiff has not

sufficiently alleged an injury that the antitrust laws were designed to protect.[8]

Stating a claim under Section 1 of the Sherman Act requires a showing "that the plaintiffs were injured as a proximate result of that conspiracy." *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008). A plaintiff's injury must be an antitrust injury, or "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Injury should reflect anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* An injury "will not qualify as an 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)(citations omitted). "[D]etermining whether antitrust injury is present necessarily involves examining whether there is a causal connection between the violation alleged and the injury." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1999).

"The antitrust laws have been enacted for 'the protection of *competition*, not *competitors*." *Id.* at 338 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis in original). In other words, "because 'antitrust law aims to protect competition, not competitors, [a court] must analyze the antitrust injury form the point of view of the consumer.'" *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)(quoting *Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours and Co.*, 826 F.3d 1235, 1241 (3d Cir. 1987)). "'An

---

[8]The Court also notes that from time-to-time throughout the Amended Complaint, Plaintiff has tried to allege "antitrust injury" by referencing alleged harm to consumers, thereby tacitly acknowledging the potential deficiencies of its other allegations setting forth "antitrust injury".

antitrust plaintiff must prove that the challenged conduct affected the prices, quantity, or quality

of goods and services,' not just his own welfare."  *Id.* (quoting *Tunis Bros. Co., Inc. v. Ford*

*Motor Co.*, 925 F.2d 715, 728 (3d Cir. 1991); *see also* II AREEDA & HOVENKAMP, ANTITRUST

LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 362a. (Revised ed.

1995) ("The [antitrust injury requirement] forces . . . courts to connect the alleged injury to the

purposes of the antitrust laws.").[9]

### 1.  Plaintiff Suffered No Antitrust Injury from Discontinuation of the Community Blue Program

### a.  Plaintiff does not Allege that it Suffered any Antitrust Injury from the Discontinuation of Community Blue

Throughout its Amended Complaint, Plaintiff alleges that as part of the alleged

conspiracy, Highmark discontinued the Community Blue product.  Complaint,  ¶¶ 71- 77;

Amended Complaint at ¶¶ 77-84.  According to Plaintiff, this action combined with UPMC's

alleged agreement to stop competing against Highmark with a low-priced health insurance

product, effectively "ended health insurance price competition in the Pittsburgh community and

forced employers and families into buying Highmark's remaining, far more expensive health

insurance products."  Complaint,  ¶ 73; Amended Complaint ¶ 79.  Plaintiff complains that the

decision to eliminate the lower-cost Community Blue product raises costs for consumers of

health insurance because Highmark can pass off UPMC's allegedly high charges to the consumer

---

[9]Injuries to other parties do not provide a basis for a more remote victim to bring an antitrust action.  *Assoc. Gen. Contractors of Cali., Inc. v. Cali. State Council of Carpenters*, 459 U.S. 519, 537-44. (1983).  "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . .to perform the office of private attorney general."  *Id.* at 542.

without fear that the consumer will turn to a lower-cost alternative.  Complaint, ¶ 75-77;
Amended Complaint, ¶¶ 82-84.

Plaintiff fails to aver how it was harmed by the alleged agreement to discontinue the
Community Blue product.  Plaintiff claims that the elimination of Community Blue resulted in
increased costs for consumers in the health insurance market, namely individuals and employers
who cannot turn to other, lower-cost insurers "because of UPMC and Highmark's agreement to
exclude rival insurers from the Pittsburgh market."  Complaint, ¶ 77; Amended Complaint, ¶ 84.
Plaintiff, however, does not allege that it is a competitor or consumer in the health insurance
market that would be forced to pay these higher premiums.  Any injury Plaintiff suffered as a
result of this agreement is too indirect and remote given the existence of a class of price-
conscious consumers and employers who are more properly situated to vindicate the public
interest because they are the ones who allegedly cannot turn to lower-cost alternatives for health
insurance.  Plaintiff cannot act as "private attorney general" for these consumers of health
insurance products.  *See Assoc. Gen.*, 459 U.S. at 542; *see also Illinois Brick Co. v. Illinois,* 431
U.S. 720, 760-62 (1977) (holding that an indirect purchaser cannot maintain an antitrust suit
because of the existence of more direct victims and the danger of duplicative recovery against
defendants).

### b.  The Alleged Agreement to Discontinue Community Blue does not amount to an Unreasonable Restraint of Trade

Plaintiff also does not address in its Amended Complaint how the agreement to
discontinue the Community Blue product amounted to an unreasonable restraint on trade.
According to Plaintiff, the result of eliminating Community Blue was higher insurance premiums

for individuals and employers.  Amended Complaint, ¶¶ 79, 84.  However, Plaintiff only makes one vague allegation as to how this conduct is unlawful and restrained trade: "Highmark's decision to end the then-growing, low-cost Community Blue product, which gave Highmark a competitive advantage over the UPMC Health plan and other health insurers in pursuing the business of cost-conscious employers, can only be explained as necessary to achieve the benefits of the conspiracy with UPMC."  Complaint,  ¶ 75; Amended Complaint, ¶ 82.  Plaintiff fails to allege any agreement between UPMC and Highmark as to the premiums Highmark would charge for its other plans.  Highmark remains free to lower its premiums in any manner it chooses.  Moreover, the single act of discontinuing the Community Blue plan has only a minimal effect on competition, if any.  Therefore, the alleged agreement to eliminate one plan does not, without more, amount to any restraint on trade, much less an unreasonable one.  *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005)("without a 'restraint,' there is no 'restraint of trade'").  Plaintiff cannot allege an antitrust injury when any injury it may have suffered is caused by conduct that is not anticompetitive.

### c.    Conclusion

Accepting Plaintiff's allegations in its Amended Complaint as true, Plaintiff has failed to allege an antitrust injury flowing from the alleged agreement between UPMC and Highmark to discontinue the Community Blue product absent allegations of any injury-in-fact it suffered as a result of such conduct and how discontinuing said product amounts to an unreasonable restraint on trade.

### 2.  Plaintiff Suffered No Antitrust Injury from Defendants' Alleged Agreements Relating to Reimbursement Rates

Defendants argue that Plaintiff has not suffered an antitrust injury related to the allegedly discriminatory reimbursement rates Highmark paid to UPMC pursuant to their agreement.  Doc. no. 80 at 11-14; doc. no. 83 at 4-9.  Plaintiff responds that Highmark's artificially high reimbursement rate to UPMC is one of the mechanisms used to stifle competition in the health care services market.  Doc. no. 86 at 25.  Defendants respond that their agreement was not illegal, and that Plaintiff's requested relief is not beneficial to the consumer of health care and health insurance services.  Doc. no. 92 at 5-7; doc. no. 93 at 3-6.

As the United States Court of Appeals for the Third Circuit has emphasized, the antitrust laws are designed to protect the consumer, not the competitor from harm.  *Alberta Gas*, 826 F.2d at 1241.  "Courts have carefully scrutinized enforcement efforts by competitors because their interests are not necessarily congruent with the consumer's stake in the competition."  *Id.* at 1239; *see also Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996)("Over and over, we stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business.").

### a.  Higher Payments to UPMC and Lost Profits do not Constitute an Antitrust Injury

The crux of Plaintiff's argument is that Highmark forced down prices it paid to Plaintiff during the period of the conspiracy, and but for the alleged conspiracy between UPMC and Highmark, Plaintiff would have received millions of dollars in additional reimbursement from Highmark.  Amended Complaint, ¶ 209.  In *Alberta Gas*, 826 F.2d at 1241, the plaintiff, a seller

of methanol, contended that it "lost sales and profits when competition for the sale of hundreds of millions of gallons of additional methanol" was eliminated due to defendant's acquisition of another oil company.  *Id.*  There, the Court of Appeals held that the plaintiff, as a competitor, "is in no position to claim a compensable injury from Du Pont's elimination of a potential increase in output."  *Id.* (citing *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).  In other words, lost sales and profits did not amount to an antitrust injury.

In the present case, UPMC had good reason to negotiate higher reimbursement rates from Highmark because UPMC provided Highmark with a higher volume of patients than Plaintiff. *See* Doc. no. 80 at 12.  Plaintiff itself alleged that UMPC had more than doubled its own market share.  Complaint,  ¶ 135; Amended Complaint, ¶ 185.  The higher reimbursement rates are not indicative of an injury to competition, especially as Plaintiff remained profitable during the period of the conspiracy.  Doc. no. 83 at 8; see West Penn Allegheny Financial and Operating Information, p. a-37 -a-48 (of which this Court will take judicial notice).  *See In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314 1331 (3d Cir. 2002)(upholding district court's decision to take judicial notice of documents filed with the SEC but not included in the complaint). Plaintiff's reliance on *Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999) is inapposite.  This case holds that the alleged price discrimination is only unlawful if it is "part of an agreement in restraint of trade" and if that agreement has a "substantial effect on competition in the market." *Id.* at 248-49.  Once again, Plaintiff merely alleged effects on itself, not the relevant market, i.e. the health care services industry.  Merely alleging that it would have been *more* profitable during the alleged period of conspiracy does not amount to an injury that antitrust laws were designed to protect.

### b.  The Relief Requested by Plaintiff does not Represent the Best Interests of Consumers

Defendants argue that Plaintiff's requested relief of ending any discrimination in reimbursement between UPMC and West Penn Allegheny, doc. no. 66, *Prayer for Relief*, ¶ 2, will inflict the very harm on consumers against which the antitrust laws are designed to protect. Doc. no. 93 at 3-5.  Plaintiff responds that the depressed reimbursement rates are stifling competition and, in doing so, harming consumers.

The Court agrees with the Defendants that Plaintiff's requested relief is incongruent with the interests of the consumers, the true benefactors of the antitrust laws.  In *Alberta Gas*, 826 F.2d at 1243, the Court of Appeals stated that "[f]rom the consumer's standpoint, the development that Alberta anticipated and the basis for its claim – an increase in methanol price – would prove distinctly disadvantageous."  *Id.*  Completely dissolving any price discrimination between the reimbursement rates paid to UPMC and Plaintiff, thereby driving up Plaintiff's profit margins, likely will cause an increase in the price consumers have to pay for health insurance and health care.

Viewing Plaintiff's alleged injury of lost profits from the point of view of the consumer, as the law directs this Court to do, Plaintiff has not alleged an injury which the antitrust laws are designed to protect because of the incongruity between the interests of Plaintiff and the interests of the consumer of health care services and health insurance services in Western Pennsylvania.

### 3.  Highmark's Decision Not to Refinance Plaintiff's Debt is Not an Antitrust Injury

Highmark argues that its refusal to refinance Plaintiff's debt does not amount to an antitrust injury because Plaintiff could seek other means of refinancing.  Doc. no. 83 at 9-12.

Plaintiff responds that Highmark had a veto power over its decision to seek financing elsewhere. Doc. no. 86 at 26-28.

There is no antitrust violation when a firm denies an entity financing where such financing can be obtained elsewhere. *United States Steel Corp., et al., v. Fortner Enterprises, Inc.*, 429 U.S. 610, 621-22 (1977)(*"Fortner II"*).  In *Fortner II*, the Supreme Court held that a creditor's "willing[ness] to accept a lesser profit to incur greater risks than its competitors . . . will not give rise to any inference of economic power in the credit market." *Id.*.  Similarly, Highmark's initial willingness to take on the high risk of Plaintiff's debts did not establish that Highmark had any power in the credit market.  Put simply, Highmark is not a bank, despite the fact that Plaintiff wants to treat them as one, nor did it hold a monopoly over Plaintiff's ability to get financing.

As for the alleged "veto power" held by Highmark, *see* doc. no. 86 at 28, Plaintiff makes no averments of any such veto power in the Amended Complaint.  In its brief, Plaintiff refers the Court to ¶¶ 100-112, 114 of the Amended Complaint.  A close reading of these paragraphs reveals no facts that allow the Court to infer that Highmark held any sort of veto power to prevent Plaintiff from obtaining financing.

Accordingly, Plaintiff has failed to allege an antitrust injury arising from Highmark's refusal to refinance its debt.

### 4.  Plaintiff has not Alleged any Harm to Competition in the Western Pennsylvania Health Care Services Market Due to Its Decrease in Market Share

Defendants argue that Plaintiff's alleged loss of market share in the Western Pennsylvania health services market causes no harm to competition for or output of health care services in

-46-

Western Pennsylvania.  Doc. no. 92 at 7; doc. no. 93 at 1.  Plaintiff argues that the alleged

conspiracy between UPMC and Highmark decreased output in the hospital services market in

Western Pennsylvania.  Doc. no. 86 at 22-24.  Plaintiff alleges numerous restraints on its own

output, including a lack of capital, "capital starvation," and a loss of market share.  Amended

Complaint, ¶¶ 212-213.

      An antitrust plaintiff "must prove that the challenged conduct affected the prices, quantity

or quality of goods or services, not just his own welfare."  *Mathews*, 87 F.3d at 641.  Shifts in

market share between two competitors alone is not indicative of injury to competition.  *See Pool*

*Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001)(citing *Cargill Inc. v Monfort of*

*Colorado, Inc.*, 479 U.S. 104, 116 (1986)).

      Here, Plaintiff does not attribute this capital starvation, decrease in its own services or

decrease in market share to any reduction in competition in the health care services market as a

whole.  Plaintiff merely alleges harm to its output of services.  *See, e.g.* Doc. 66 at ¶ 213 ("The

capital starvation caused by the conspiracy artificially constrained *West Penn Allegheny's*

*capacity*, as it could not expand its service lines, programs, or physical plants.")(emphasis

added).  By only alleging a decrease in its own market share or capacity, Plaintiff has failed to

state an antitrust injury, absent any allegations that Defendants' conduct reduced competition,

either in the form of reduced output or quality or increased services, in the health care services

market *as a whole*.

## C. Analysis of the Application of Section 1 (Agreement) of the Sherman Act and *Twombly*/*Iqbal* to the Allegations in the Complaint (Count I)

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." *In Re Flat Glass Antitrust Litigation*, 385 F.3d 350, 356 (3d Cir. 2004) quoting 15 U.S.C. § 1. Yet, despite the broad language of the Act, Section 1 only prohibits contracts, combinations, or conspiracies that unreasonably restrain trade. *Id.* While certain restraints of trade are *per se* unreasonable, others require a more searching analysis under the rule of reason.[10]

A claim under Section 1 of the Sherman Act requires the following showing from a plaintiff: (1) concerted action on the part of the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action. *McCullough v. Zimmer*, 2009 WL 775402 (W.D. Pa. March 18, 2009), citing *Untracht v. Fikiri*, 454 F. Supp. 2d 289, 311 (W.D. Pa. 2006),

The existence of an agreement, however, is "[t]he very essence of a [S]ection 1 claim." *Flat Glass*, 385 F.3d at 356. In construing the words of the Sherman Act, Courts have routinely required a showing of "some form of concerted action." *Id.* at 356. "In other words, there must be a 'unity of purpose or a common design and understanding or a meeting of the minds,' or 'a conscious commitment to a common scheme.'" *Id*. at 357 (other citations omitted). "Unilateral

---

[10]As set forth in *In Re Flat Glass*, an agreement to fix prices is a *per se* violation of the Sherman Act. 385 F.3d 350, 362 (3d Cir. 2004). Plaintiff argues that because UPMC and Highmark are "horizontal competitors" in the market for health care financing and administration for private employers and individuals, this situation constitutes a "*per se* unlawful market allocation agreement." Plaintiff, however, argues alternatively, that the agreement is unlawful under the rule of reason. See Complaint, ¶¶ 152-153; Amended Complaint, ¶¶ 224-225.

activity, no matter what its motivation, cannot give rise to a Section 1 violation." *Rossi v. Standard Roofing*, *Inc.*,  156 F.3d 452, 465 (3d Cir. 1998).

The most critical question, as recently addressed by the United States Supreme Court in *Twombly*, is whether the challenged anti-competitive conduct arises from independent decision, or from an agreement. *See Twombly*, 550 U.S. 544.  The Supreme Court in *Twombly*, explained that while a showing of "parallel 'business behavior is admissible circumstantial evidence from which' agreement may be inferred, it falls shorts of conclusively establishing agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.* at 545, (citing *Theatre Enterprise, Inc. v. Paramount Film Dist. Corp.*, 346 U.S. at 537, 540 (1954)).  In addition to abrogating the long standing standard of review on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) set forth in *Conley v. Gibson*, 355 U.S. 41, and requiring a complaint to set forth facts which raise allegations "beyond the speculative level," the Supreme Court in *Twombly* specifically applied its new "plausibility" standards to an anti-trust action.  *See also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009).

The Court in *Twombly* stated that "it makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of a conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id*. at 556.  The Court went on to explain that "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Id.

Significantly, the Court in *Twombly* specifically addressed the need to take into consideration the practical implications of allowing a deficient complaint to advance through discovery in an anti-trust case.  The Court noted that exorbitant expenses during the discovery phase of antitrust litigation counsel in favor of dismissing cases with no "'reasonably founded hopes that the [discovery] process will reveal relevant evidence.'" *Id*. at 559-560.[11]

In support of Plaintiff's Section 1 claim at Count 1 of the Amended Complaint against UPMC and Highmark, Plaintiff alleges that in the summer of 2002, when the Defendants entered into a multi-year provider/insurer network participation contract, these "strange bed fellows," with a well-documented adversarial history (which was even referenced in the Complaint at ¶¶ 51, 54 and 56; Amended Complaint at ¶¶ 50-55),  allegedly entered into an agreement to allocate markets and eliminate plaintiff as a competitor of UPMC.[12]

---

[11]The Court hereby incorporates the Section VI(B) regarding the "Gatekeeper Function of the Court."

[12]In support of its (Original) Motion to Dismiss, Defendant UPMC has filed numerous newspaper articles documenting the adversarial relationship of the Defendants, and one article describing the efforts of Plaintiff in hiring "dozens of star physicians" from UPMC.  Defendant UPMC asks this Court to take judicial notice of these published articles as were referenced in the Complaint without converting the motions to dismiss into motions for summary judgment.  Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).  *In re NAHC, Inc. Securities Litigation,* 306 F3d 1314, 1331 (3d. Cir. 2002).  The Court will take judicial notice of the full contents of these articles, including the Investor Conference Call Presentation, as well as the contractual exhibits attached to Highmark's motion to dismiss.  The Court will not convert said motions into motions for summary judgment.

West Penn Allegheny argues that defendants agreed or conspired to restrain trade in direct violation of Section 1 of the Sherman Act by "protecting and reinforcing one another's market power."  Complaint, ¶ 151; Amended Complaint, ¶ 222.  Plaintiff alleges that UPMC agreed to "block the entry or expansion of rival health insurers in exchange for Highmark's agreement to favor UPMC with discriminatory reimbursement rates and grants - and no diminution in patient volume."  Complaint, ¶ 151; Amended Complaint, ¶ 222.   In exchange, according to the Amended Complaint, "Highmark has agreed to protect UPMC from competition and to raise the costs for operation of UPMC's primary competitor, West Penn Allegheny."  Complaint, ¶ 151; Amended Complaint, ¶ 222.

## 1.  Allegations of Conspiracy as to UPMC

The Amended Complaint sets forth three ways in which UPMC allegedly agreed to "protect" Highmark from competition in the health insurance sector.  First, UPMC allegedly agreed "not to grow or market the UPMC Health Plan, including an agreement not to pursue large group contracts that have been Highmark's traditional mainstay."  Complaint, ¶ 68; Amended Complaint, ¶ 65.  Second, UPMC "agreed not to sell the UPMC Health Plan to any actual or potential competitor of Highmark" Complaint, ¶ 68, Amended Complaint, ¶ 69.  And, third, UPMC agreed with Highmark that UPMC would "refuse to contract at competitive rates with non-Highmark health insurance plans."  Complaint, ¶ 68, Amended Complaint, ¶ 70.

While the Amended Complaint is long on innuendo and frequently repeats the buzz word that defendants "conspired" and acted in concert to violate Section 1 (and Section 2) of the Sherman Act, the Complaint falls short on any plausible facts to support its bald allegations.  Plaintiff has not alleged any facts which evidence a concerted action, a "meeting of the minds" or

a "conscious commitment to a common scheme."  *Flat Glass*, 385 F.3d at 356 (citations

omitted).  Rather, plaintiff's allegations lack specificity and speak in more general terms of a

conspiracy that was allegedly hatched in 2002 when the new contract between Highmark and

UPMC was negotiated and went into effect.

For instance, West Penn Allegheny makes bald assertions that in the "Summer of 2002,"

Highmark agreed with UPMC's "proposal to eliminate competition and create a 'super

monopoly.'" Complaint,  ¶ 65; Amended Complaint,  ¶ 58.  West Penn Allegheny, however, fails

to plead any facts supporting the conclusion that Defendants ever communicated with each other

to form this alleged agreement other than broad allegations that there were "frequent meetings"

between Highmark executives and UPMC executives.   Amended Compliant  ¶ 58.

The Amended Complaint also fails to allege specifically which members of the UPMC

and Highmark executive management allegedly made this agreement, only that there were

"frequent meetings between Highmark executives, including at least Ken Melani, and UPMC

executives, including at least UPMC Executive Vice President John Paul."  Amended Complaint,

¶ 58.  While plaintiff makes much of the alleged offer of a "truce" by UPMC CEO Romoff in its

response to the motion to dismiss, which was acknowledged in the 2001 Merger Litigation as

evidence of the adversarial relationship between UPMC and Highmark, the Court does not find

that this alleged offer of "truce" during litigation supports any contention that the Defendants

acted in concert or have since formed a conspiracy.

Like the Complaint which was held to be insufficient to set forth a cause of action under

Section 1 of the Sherman Act in *Twombly*, the Amended Complaint in this case fails to provide

any notice as to the time, place or person involved in the concerted action, other than general

references to the Summer of 2002 when the new contract was signed between UPMC and

Highmark, and general references to Highmark executives and UPMC executives, whose

"discussions [allegedly] led to the formation of a broad, and illegal, agreement between

Highmark and UPMC to restrain health care competition in the Pittsburgh community."

Amended Complaint, ¶ 58.

As Defendant UPMC pointed out, and this Court agrees, the Court of Appeals for the

Second Circuit's opinion in *In re Elevator Antitrust Litig*. 502 F.3d 47 (2d Cir. 2007), illustrates

the deficiencies of the Amended Complaint (and Complaint) filed by West Penn Allegheny.  In

that case, the Court of Appeals for the Second Circuit affirmed the dismissal of Section 1 and 2

conspiracy claims on the basis that the complaint provided no more detail about the conspiracy

than that the defendants "[p]articipated in meetings in the United States and Europe to discuss

pricing and market division," *Id*. at 51 n. 5.  Unlike the present case, the complaint in *Elevator*

*Antitrust* actually identified the locations of the meeting, but the Court of Appeals for the Second

Circuit still found the allegations insufficient. The Court of Appeals stated that using "basically

every type of conspiratorial activity that one could imagine . . . in entirely general terms without

any specification of any particular activities by any particular defendant is nothing more than a

list of theoretical possibilities, which one could postulate without knowing any facts whatever."

*Id.* at 50-51.

While Plaintiff invites this Court to countenance a list of theoretical possibilities to

suggest the forming of a conspiracy under Section 1 of the Sherman Act, the Court may not

permit a merely theoretical explanation for business conduct to support the inference of an

unlawful conspiracy.  See *Iqbal*, 129 S.Ct. at 1952 (between an "obvious alternative explanation"

for business conduct and the inference of an unlawful conspiracy, the unlawful conspiracy "is not a plausible conclusion.").

As the Court in *Twombly* stated, allegations of parallel conduct and bare assertions of a conspiracy are not sufficient to set forth a "plausible" claim under the Sherman Act.  At most, Plaintiff's allegations set forth examples of parallel conduct with speculations as to the existence of a conspiracy.

Here, West Penn Allegheny's statements of conclusory allegations of agreement without some degree of factual specificity amounts to nothing more than statements of suspicion which do not advance or "nudge" plaintiff's claims "across the line from conceivable to plausible." *Twombly,* at 570.

Rather, just as the United States Court of Appeals for the Sixth Circuit stated in *Tam Travel, Inc*., No. 07-4464 (6th Cir. October 2, 2009), a recent price-fixing case also brought under Section 1 of the Sherman Act, where the Court of Appeals for the Sixth Circuit held was properly dismissed for failure to state a claim under *Twombly*, plaintiff's use of the words "conspiracy" and "agreement" throughout the Amended Complaint, is nothing more than a legal conclusion "masquerading" as a factual allegation.   *Tam Travel, Inc*., No. 07-4464 at *11.

## 2.  Allegations of Conspiracy as to Highmark

In assessing Plaintiff's claims of a conspiracy under Section 1 (and Section 2) of the Sherman Act in the context of the *Twombly* decision, this Court must also consider the plausibility of the agreement alleged by looking at the conduct alleged when viewed in light of "common economic experience."  *Twombly*, at 565.

### a.  West Penn Allegheny's Claims Regarding Reimbursement Rates

West Penn Allegheny alleges that as a result of the conspiracy which was hatched in the Summer of 2002, Highmark "kept its reimbursements to West Penn Allegheny at artificially depressed reimbursement rates with the purpose of furthering UPMC's plan to drive West Penn Allegheny out of business and deny it access to the resources needed to invest in new facilities, technology, and equipment."  Complaint,  ¶ 6; Amended Complaint,  ¶ 7.

The Amended Complaint does not set forth any facts supporting these conclusory statements that an agreement was reached to limit reimbursements to West Penn Allegheny.  As rehearsed, speculative assertions are not entitled to a presumption of truth.  *Twombly*, 550 U.S. at 557.

Despite its acknowledgment that "[t]he loss of a key hospital competitor in Pittsburgh would dramatically increase UPMC's negotiating leverage over Highmark, forcing Highmark to offer increased compensation to UPMC" (Complaint,  ¶ 48; Amended Complaint,  ¶ 42), West Penn Allegheny argues that Highmark agreed to reduce competition by eliminating West Penn Allegheny.  The facts set forth in the Amended Complaint and the contractual documents referenced and attached as exhibits to the original motions to dismiss contradicts West Penn Allegheny's theory[13]:

- Highmark would have lost $125 million it loaned to West Penn Allegheny in August

---

[13]This Court will take judicial notice of these written agreements without converting the motion to dismiss into a motion for summary judgment.  *See In Re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("A document forms the basis of a claim if the document is integral to or explicitly relied upon in the complaint.  The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document.")

2000;

- West Penn Allegheny's reimbursement rates were fixed in a contract in August 1999

through June 30, 2006;

- Highmark re-negotiated the contracts with West Penn Allegheny in June 2002 at

higher rates and at an extended term through June 30, 2008;

- Highmark awarded grants to West Penn Allegheny of at least $42 million and $1.5

million after the alleged conspiracy commenced; Highmark further amended West Penn

Allegheny's contracts to increase particular rates several times from 2002 through 2008; and

- Highmark signed a new five-year facility agreement in June 2008, which further

increased West Penn Allegheny's reimbursement.

Furthermore, the purpose of Highmark's $43.5 million in grants to West Penn Allegheny

was for physician recruitment and facility improvements.  See Doc. no. 48, App. Exh. 8 and 20[14].

Plaintiff's claim that Highmark conspired with UPMC to "deny [West Penn Allegheny] access to

resources needed to invest in new facilities, technology, and equipment," (Complaint, ¶ 6;

Amended Complaint, ¶ 7) on the face of the Amended Complaint and its incorporated facts, is

not accurate.  Additionally, any amendment to the terms of the contracts after the Summer of

2002 increased, rather than decreased, West Penn Allegheny's reimbursement rates.  See Doc.

no. 48, App. Exh. 7, 7A, 9-15, and 9A-15A.  Therefore, West Penn Allegheny's theory that it

_____

[14]Said exhibits were previously filed with this Court in the original round of motions to dismiss, and have been incorporated by reference into the renewed motion to dismiss (see doc. no. 82, ¶ 12).  Furthermore, the Court stated on the record at the arguments on the original motions to dismiss that the parties need not re-brief the same issues raised in the original motions to dismiss (see doc. no. 85, at p. 21).  The Court therefore has relied upon the some of the arguments raised in the original round of briefing, to the extent the arguments remain applicable to the allegations in the Amended Complaint.

was forced after the start of the alleged conspiracy in the Summer of 2002, to accept depressed

reimbursement rates lacks the sort of "plausibility" necessary to overcome a challenge on a

motion to dismiss for failure to state a claim.

As stated above, Plaintiff must allege facts which tend to exclude the possibility of

independent self-interested conduct. *Twombly*, at 552-53, 557.  "[W]ithout that further

circumstance pointing towards a meeting of the minds, an account of a defendant's commercial

efforts stays in neutral territory."  *Id*. at 557.

Independent of any alleged agreement with UPMC, it is economically logical for

Highmark to want to pay as little as reasonably possible for West Penn Allegheny's services, and

the seeking of lower rates from hospitals on behalf of its customers is consistent with

Highmark's business interest.  For these reasons, the facts alleged by West Penn Allegheny

regarding reimbursement rates do not show a conspiracy between UPMC and Highmark; rather,

the facts are more consistent with independent action by Highmark.

**b.  Highmark's Alleged Denial of West Penn Allegheny's Refinancing Requests**

West Penn Allegheny also argues that "in the years since 2002, Highmark repeatedly

obstructed West Penn Allegheny's efforts to refinance its subordinated loan from Highmark,

even though Highmark would incur no cost or minimal additional costs under the refinancing

proposals."  Complaint, ¶ 94; Amended Complaint, ¶ 97.  However, under *Twombly*, the

relevant inquiry is not whether refinancing would have been neutral or have a minimal cost to

Highmark, but rather, whether refinancing would have been beneficial to Highmark and its

refusal to do so was contrary to Highmark's business interest.  *Twombly*, at 552 (facts must tend

to exclude possibility of independent self-interested conduct).  Instead, Highmark's refusals to

further assist West Penn Allegheny through modifications to the existing loan is fully consistent with Highmark's self-interest in making sure the loan would be repaid at its agreed terms.

Furthermore, West Penn Allegheny's allegation that Highmark denied the refinancing requests because it was concerned about retaliation by UPMC, do not evidence an agreement, a common scheme, or a meeting of the minds.  Taken as true for purposes of the motion to dismiss, West Penn Allegheny's allegations that Highmark allegedly discussed UPMC's threats openly with West Penn Allegheny (Complaint,  ¶¶ 100-101; Amended Complaint,  ¶ 103-104) are nothing more than threats and do not give any evidence of an agreement.  (See *Hackman v. Dickerson Realtors, Inc.*, 520 F.Supp. 2d 953, 965 (N.D. Ill. 2007)(dismissing conspiracy claim and stating that a "defendant must do more than 'encourage' other defendants in order to be liable under the Sherman Act.").  Additionally, Highmark was under no obligation to change the terms of the $125 million loan or to participate in West Penn Allegheny's refinancing and its decision not to do so, without more, does not support a claim of conspiracy under the facts alleged.

### c. West Penn Allegheny's Insurer Entry Theory

West Penn Allegheny also alleges that "UPMC's refusal to contract at competitive rates with any other health insurer can only be explained by its illegal conspiracy with Highmark." Complaint,  ¶ 71; Amended Complaint, ¶ 77.  Again, applying *Twombly*, this allegation is purely speculative and states a conclusion, not facts.

### d. West Penn Allegheny's Community Blue Allegations

As set forth hereinabove, West Penn Allegheny's allegations regarding Highmark's termination of the Community Blue product are similarly conclusory.  Paragraph 79 of the

Amended Complaint merely states "As a part of the conspiracy, Highmark discontinued the

Community Blue product,  Highmark agreed with UPMC to 'sunset' Community Blue within

twelve months, by switching each employer group when its current Community Blue contract

expired.  Community Blue was in fact shut down by January 2004, and is now out of business.".

Again, these allegations do not come close to evidencing any agreement by Defendants to

eliminate Community Blue (the facts do not allege the "who, what, where, why and when" of the

alleged agreement to discontinue Community Blue, *see Iqbal*, 129 S. Ct. at 1949), and the

allegations fail to include any facts that would rule out an independent decision by Highmark to

withdraw Community Blue from the market; rather West Penn Allegheny uses the term

"conspiracy" to "masquerade" these legal conclusions as factual averments.  *Tam Travel, et al.*,

No. 07-4464, at * 11 (6th Cir. October 2, 2009).

According to the Amended Complaint, as evidence of an agreement with UPMC, West

Penn Allegheny contends that Dr. Melani stated that Community Blue "did not save employers

money," after having stated otherwise on a prior occasion.  Complaint,  ¶ 73; Amended

Complaint,  ¶ 80.  However, a full reading of the Post-Gazette article states,

> Highmark's new chief executive, Dr. Ken Melani, earlier this month told
> members of the Pittsburgh Business Group on Health that Community Blue
> will be discontinued as part of a planned overhaul of Highmark's lineup of
> health plans that will reduce the number of offerings in an effort to cut
> administrative costs.
>
> He told the group, whose members are largely employee benefits managers for
> the region's big corporations, that contracting with small networks of hospitals
> really wasn't providing savings any more.

Doc. no. 44-29, App. Exh. 21.

According to this report, Dr. Melani made no reference as to whether the Community Blue product saved employers money, and West Penn Allegheny has asserted no fact that would tend to show that these concerns were pretextual or were otherwise invalid.  West Penn Allegheny has pleaded no facts demonstrating that Highmark's decision to terminate Community Blue was contrary to its independent business interest or that its decision to do so implicates any agreement or meeting of the minds between Highmark and UPMC.

### e.  Alleged Statements by Highmark's Chairman

Finally, the alleged statement by Robert Baum, the Chairman of the Board of Directors of Highmark, during a tour of Allegheny General Hospital which occurred before a lunch in the hospital board room, that Highmark could not assist West Penn Allegheny by contracting with a competitor of UPMC and that Highmark's conduct was "probably illegal." Complaint,  ¶ 103; Amended Complaint,  ¶ 109.  The Court does not find this statement, without more, to be indicative of a conspiracy in restraint of trade.  At most, this statement, made by a non-lawyer who was asserting an alleged legal conclusion, evidences this individual's perception about how UPMC might react if Highmark helped West Penn Allegheny by refinancing the loan, rather than showing evidence of an agreement or conspiracy between UPMC and Highmark not to refinance plaintiff's loan.  While West Penn Allegheny argues that the offhanded or stray remark of Robert Baum constitutes direct evidence of a common scheme or concerted action, the Court finds that this comment does nothing to show any agreement.  In fact, it evidences the opposite; that he felt hamstrung by UPMC, not that there was a "meeting of the minds." (Mr. Baum allegedly also "expressed concern that UPMC would retaliate either by contracting with United or by selling its

health plan to United." Amended Complaint, ¶ 106)[15]

### D.  Analysis of the Application of Section 2 (Conspiracy) of the Sherman Act to the Allegations of the Complaint (Count II)

Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize shall be guilty of a felony." 15 U.S.C. § 2.

To establish a successful claim under Section 2 of the Sherman Act for attempted monopolization, plaintiff must present concrete evidence that (1) defendants [conspired] to engage in predatory conduct or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir.1996).  Like a Section 1 claim, a Section 2 conspiracy to monopolize claim requires evidence proving the existence of a conspiracy. *Gordon v. Lewistown*, 423 F.3d 184, 207, n. 16 (3d Cir. 2005).

"[P]laintiff's alleging [attempted] monopolization under [Section] 2 must produce [specific] intent evidence." *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir.1995). "Specific intent is the intent to accomplish the forbidden objective, an intent that goes beyond the mere intent to do the act. Intent may be inferred by anticompetitive practices or proven by direct evidence." *Great W. Directories, Inc. v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1385 (5th Cir.1995), withdrawn and superseded in part, 74 F.3d 613 (5th Cir.1996).  In

---

[15]Further, while Plaintiff makes much of the alleged offer of a "truce" (Complaint, ¶ 63-64; Amended Complaint, ¶ 56-57) by UPMC CEO Romoff, which was acknowledged in the 2001 Merger Litigation to the adversarial relationship between UPMC and Highmark in its response to the Renewed Motion to Dismiss, the Court does not find this offer of truce during litigation illustrates that the Defendants acted in concert.  See Doc. no. 86 at 10.

establishing specific intent, "a mere intention to prevail over rivals or improve market position is insufficient.  Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not predominantly motivated by legitimate business aims." *Pennsylvania Dental*, 745 F.2d at 260-61 (citations omitted).

Just as Plaintiff's claim under Section 1 requires a showing of concerted action, a conspiracy to monopolize claim under Section 2 of the Sherman Act also requires a showing of conspiracy, either through direct or circumstantial evidence of an agreement to conspire.  For the exact same reasons as set forth immediately hereinabove under Section 1 of the Sherman Act, West Penn Allegheny has failed to adequately allege any conspiracy or meeting of the minds of the defendants in support of its claim under Section 2 of the Sherman Act.  At most, Plaintiff has alleged parallel actions on the part of the individual Defendants with bare allegations of a conspiracy.  For the same reasons as set forth hereinabove, which the Court will not reiterate, the allegations set forth by Plaintiff do not adequately allege that Defendants conspired to monopolize the health care and health insurance markets under Section 2 of the Sherman Act.

**E.  Analysis of the Attempt to Monopolize Claims Against UPMC Alone (Count III)**

In addition to a conspiracy to monopolize claim, West Penn Allegheny also brings a Section 2, attempt to monopolize claim, at Count III of the Amended Complaint.  In support thereof, West Penn Allegheny alleges four acts of alleged predatory conduct against UPMC.

West Penn Allegheny argues that UPMC: (1) entered into "an illegal market allocation agreement with Highmark, coercing community hospitals into refusing to refer patients to West Penn Allegheny;" (2) "engag[ed] in a nearly decade-long pattern of predatory physician raiding;"

(3) "interfer[ed] with West Penn Allegheny's attempts to secure financing for its operations"; and, in its Amended Complaint, it adds, (4) "the anticompetitive acquisition of Mercy Hospital in 2006."   Complaint, ¶ 164; Amended Complaint, ¶ 237.

### 1.  Conspiracy/Market Allocation

The Court has already addressed Plaintiff's contentions regarding an illegal market allocation agreement with Highmark, and has found that no conspiracy or agreement to form an illegal market allocation arrangement has been properly alleged.

### 2.  Predatory Hiring

The next question is whether the hiring of physicians from West Penn Allegheny over the last several years is sufficient to set forth a claim of attempted monopolization.

As set forth hereinabove, in order to establish a successful claim under Section 2 of the Sherman Act for attempted monopolization, plaintiff must present concrete evidence that (1) defendant attempted to engage in predatory conduct or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir.1996).

"[P]laintiffs alleging [attempted] monopolization under [Section] 2 must produce intent evidence." *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir.1995). "Specific intent is the intent to accomplish the forbidden objective, an intent that goes beyond the mere intent to do the act. Intent may be inferred by anticompetitive practices or proven by direct evidence." *Great W. Directories, Inc. v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1385 (5th Cir.1995), withdrawn and superseded in part, 74 F.3d 613 (5th Cir.1996). In establishing specific intent, "a mere intention to prevail over rivals or improve market position is insufficient. Even an

intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not predominantly motivated by legitimate business aims." *Pennsylvania Dental*, 745 F.2d at 260-61 (citations omitted).

It is not sufficient to allege only that UPMC possessed market power or attempted to gain monopoly power. West Penn Allegheny must also allege facts that show that UPMC engaged in anticompetitive exclusionary conduct.[16] Exclusionary or predatory conduct is conduct that "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." *Taylor Pub. Co. v. Jostens, Inc.* 216 F.3d 465, 475 (5th Cir. 2000).

In order to determine whether conduct that it is exclusionary, the Court must look at the proffered business justification for the act. Where "the conduct has no rational business purpose other than its adverse effects on competitors, an inference that is exclusionary is supported." *Id*. (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999)). "Unlawful predatory hiring occurs when talent is acquired not for the purposes of using that talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990). See also *Indep. Enter. Group v. Nat'l Basketball Ass'n*, 853 F.Supp. 333, 339 (C.D. Cal. 1994)( "A monopolist cannot be sued for predatory hiring of employees unless they are hired solely to keep them from a rival.").

The United States Supreme Court in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993), concluded that hiring talent from a rival is not exclusionary "even if it does weaken

---

[16]The terms "predatory" and "exclusionary" are used interchangeably to refer to conduct which can support an attempted monopolization claim under Section 2 of the Sherman Act. See *Jostens, Inc*., 216 F.3d 465, 476, fn 2.

actual or potential rivals and strengthen a monopolist . . . [because] there is a high social and personal interest in maintaining a freely functioning market for talent."  (Other citations omitted).

West Penn Allegheny's claim for predatory or exclusionary hiring fails this test.  West Penn Allegheny fails to allege any facts which could support a conclusion that UPMC hired plaintiff's physicians solely for the purposes of denying West Penn Allegheny of its services, either individually or in the aggregate.  Rather, Plaintiff makes a bare assertion that UPMC had "the intent to cripple" West Penn Allegheny and that UPMC overpaid for the physicians.

Plaintiff has not made any allegation that UPMC had no use for the physicians it hired who were formerly employed at West Penn Allegheny or that the physicians were hired at a salary that would have produced actual losses at UPMC.  Further, Plaintiff's new allegations that UPMC tried to "steal" West Penn Allegheny's anesthesiologists and radiologists (Amended Complaint, ¶¶ 145, 149), does not evidence that UPMC was successful or again, that UPMC had no use for the anesthesiologists and radiologists, only that it would not be profitable.  *Universal Analytics v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990)("clear nonuse" must be alleged).

Furthermore, from the face of the Amended Complaint and a newspaper article cited in plaintiff's Amended Complaint of which this Court has taken judicial notice, West Penn Allegheny has also engaged in the same type of hiring of UPMC's "star" physicians.  In an article entitled, "UPMC Health Plan Grow Amid Feuding," it states that UPMC has "lost dozens of its star physicians to [West Penn Allegheny] . . . ."  Further, as recently as July 8, 2009, in an Investor Conference Call, again an item of which this Court has taken judicial notice, West Penn Allegheny boasted its continued recruitment of many key physicians from UPMC.  The fact that

both West Penn Allegheny and UPMC continue to engage in a bitterly fought battle for talent (although it appears that UPMC has an "edge" at this point) is evidence of a well-functioning market - - it is not a cognizable claim for predatory or exclusionary hiring practices.

### 3. Defamation

Plaintiff's allegations that Defendant UPMC set forth alleged defamatory statements to investors in an attempt to dissuade investors from offering financing to West Penn Allegheny do not demonstrate an anti-trust violation. Several circuit courts have held that false and defamatory statements never constitute a violation of the antitrust laws, or at a minimum that there is a presumption that such conduct does not constitute an antitrust violation. See *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005)("False statements about a rival's goods do not curtail output in either the short or long run"); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich*, 108 F.3d 1147, 1152 (9th Cir. 1997)("We would go further and suggest that claims [based on false statements about rivals] should presumptively be ignored.")(citations omitted).

Courts have taken two approaches to claims for attempted monopolization based upon defamatory statements. One approach, followed by the Seventh Circuit, *Sanderson v. Culligan Int'l Co.*, 415 F.3d at 623, is that false and defamatory statements never constitute a violation of the antitrust laws. The second approach, followed by the Court of Appeals for the Ninth Circuit and other courts, is to permit defamation-based claims to go forward only where the plaintiff can show that the statements at issue are: "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods of time, and (6) not readily susceptible to neutralization or other

-66-

offset by rivals."  ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW

DEVELOPMENTS 300 (6TH ed.. 2007)(distilling the elements as set forth in case law).

Plaintiff relies upon the Court of Appeals for the Eighth Circuit's decision in

*International Travel Arrangers v. Western Airlines*, 623 F.2d 1255 (8th Cir. 1980), and the Court

of Appeals for the Third Circuit's bare citation in *LePage's Inc. v. 3M,* 324 F.3D 141, 153 *(3d*

*Cir. 2003),* of that decision for the correct but out of place proposition that unfair tortious

conduct can be held to violate Section 2.

However, in *Santana Products, Inc. v. Bobrick Washroom Equipment*, Inc., 401 F.3d 123

(3d Cir. 2005), a decision after *LePage's*, the Court of Appeals for the Third Circuit addressed

whether a false marketing campaign against a competitor could constitute an antitrust violation

(albeit under Section 1 of the Sherman Act).  In *Santana*, plaintiff alleged that the defendant

misled consumers into believing that the plaintiff's products did not meet building code

requirements and posed a fire hazard.  The Third Circuit found that "deception, reprehensible as

it is, can be of no consequence so far as the Sherman Act is concerned."  *Id.* at 132.  Because

there was no demonstration of a restraint on trade, the Court of Appeals held that there was no

antitrust violation.  *Id.* at 134, 135.

So to here, the Court finds that West Penn Allegheny was free to dispute UPMC's

alleged deceptive and defamatory statement and the investors were free to decide whether to

invest in West Penn Allegheny bonds.  Moreover, while plaintiff makes much of the fact that

UPMC Chairman of the Board of Director, Nick Beckwith, allegedly acknowledged that

UPMC's book was "inappropriate" and the format was "unseemly," (Amended Complaint,  ¶

163) that does not equate to an antitrust violation.

Contrary to Plaintiff's argument, the Court finds the facts in *International Travelers Arrangers*, to be distinguishable from the instant case.  In that case, a travel organizer of group travel charters brought suit against an airline that had conducted a fraudulent advertising campaign against the travel charters through newspaper articles, radio advertisements and correspondence to travel agents.  623 F.2d at 1269.  The Court of Appeals for the Eighth Circuit held that the defendant violated Section 2 of the Sherman Act because the airline held a monopoly over the Twin Cities/Las Vegas flight route and exercised its monopoly power over that route to eliminate a competitive threat.  *Id.*

The Court finds that the allegations of defamation against UPMC are dissimilar to the allegations in *International Travel Arrangers* because West Penn Allegheny alleges that UPMC defamed West Penn Allegheny by delaying its ability to obtain financing.  Amended Complaint, ¶ 164.  As Defendant UPMC points out, UPMC has no monopoly power in the bond financing market.

### 4.  Acquisition of Mercy Hospital

In its Amended Complaint, West Penn Allegheny adds an averment that the anticompetitive acquisition of Mercy Hospital in 2006 allegedly further supports its claim for attempted monopolization under Section 2 of the Sherman Act.  The Court agrees with UPMC (as set forth in doc. no. 55 - - a Reply Brief in the Original Motion to Dismiss) that even if UPMC's acquisition of Mercy Hospital and the joint ventures did violate Section 2, West Penn Allegheny's claim would fail because it lacks antitrust standing to bring this claim.  Competitors may only challenge mergers where they create a probability of predatory conduct that would not have been possible without the merger.  *See Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 113-

19 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-489 (1977).  No

such allegation was made in the Amended Complaint.  Here, as UPMC's competitor, West Penn

Allegheny stood to benefit from UPMC's claimed ability to raise prices, and accordingly, West

Penn Allegheny lacks standing to challenge the merger transactions at issue.  *See Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (U.S. 1986) (See also, Section VII(B)

on Antitrust Injury).

**F.  Analysis of Damage Claims and the Practical Implications of the Prayer for Relief**

In addition to the recovery of compensatory, treble damages, punitive damages, and

attorneys' fees and costs, West Penn Allegheny asks this Court to:

- (1) enjoin the defendants from "further predatory and anticompetitive conduct";

- (2) order Highmark "to end of any discrimination in reimbursement (both direct and

indirect) between UPMC and West  Penn Allegheny"[17];

- (3) order UPMC "to divest its health insurance affiliate"[18];

- (4) order UPMC "to cease interfering with community' hospitals' ability to refer

patients to West Penn Allegheny facilities and to make independent contracting decisions with

third-party payors"[19].

_____

[17]In the Original Complaint, the Prayer for Relief also included "that Highmark *be ordered to contract with West Penn Allegheny* on fair and equitable terms, including the end of any discrimination in reimbursement (both direct and indirect) between UPMC and West Penn Allegheny."  Complaint,  Prayer for Relief,  ¶ 2.

[18]The Original Complaint also contained language in the Prayer for Relief seeking the Court to order UPMC "to discontinue its joint ventures with independent community hospitals." Complaint, Prayer for Relief,  ¶ 3.

[19]The aforementioned Prayer for Relief seems to be the only addition to the Prayer for Relief as set forth in the Original Complaint.  However, this additional Prayer for Relief in

At least with regard to these four prayers for relief, the practical implications of these requests would be for this Court to improperly play the role of price regulator and to act as a "central planner," by "identifying the proper price, quantity, and other terms of dealing."  See *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 129 S.Ct. 1109, 1121 (2009), citing *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP,* 540 U.S. 398, 408 (2004) ( "[c]ourts are ill-suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.")**.**

The implementation of these four prayers for relief would be practically and logistically challenging, if not impossible.  The Court would be required to become intimately involved with the terms of the contract between Highmark and West Penn Allegheny and would essentially be required to preside over the contractual negotiations between Highmark and West Penn Allegheny, and to police the actions of UPMC, Highmark, and West Penn Allegheny for many years into the future to make sure that the parties do not engage in predatory or anticompetitive conduct.  The Court would also be required to order that the reimbursement rates be the same for West Penn Allegheny and UPMC, which, in reality, means that West Penn Allegheny is asking this Court to order Highmark to pay higher rates to West Penn Allegheny, an action the Court has already stated (in Antitrust Injury, Discussion Section VII(B)(3)(b)) would actually hurt, not help, the consumer.

The Court knows of no recent anti-trust case which has resulted in a Court's day-to-day regulating of the contractual negotiations and business relations of the parties.  Moreover, the

---

essence seeks the same form of relief as contained above in footnote number 18 hereinabove (that UPMC "discontinue its joint ventures with independent community hospitals.")

relief requested by West Penn Allegheny seeks the fixing of all prices at the higher rate allegedly received by an entity with alleged monopoly power - - a result which would be contrary to the purpose of antitrust laws.  *See Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 96 (3d Cir. 1986) (dismissing plaintiff's complaint and finding that reduced profits of plaintiff were not caused by the alleged anticompetitive nature of defendants' agreement and, as such did not constitute antitrust injury) (no antitrust injury where plaintiffs were seeking "greater compensation at a level resulting from the anticompetitive conduct they were seeking to condemn," which is "an economic consequence to which the antitrust law are indifferent").

Furthermore, as to the third and fourth prayers for relief, that the Court order UPMC (1) "to divest its health insurance affiliate"; and (2) order UPMC "to cease interfering with community' hospitals' ability to refer patients to West Penn Allegheny facilities and to make independent contracting decisions with third-party payors," the Court cannot imagine the logistical problems with the Court's overseeing of such a magnanimous task and the potential negative impact upon especially consumers in rural areas.

These prayers for relief, when analyzed for their practical effect, further demonstrate that the alleged "antitrust injuries" are not cognizable "antitrust" injuries as set forth more fully above.

## G.  Statute of Limitations

Contrary to the arguments of Defendants, the Court, however, finds that West Penn Allegheny has sufficiently plead "continuation" of the alleged wrongdoing within the limitations period.  Thus, the Court denies the Renewed Motions to Dismiss as the Statute of Limitations defense.

-71-

### H.  State Court Claims of Employee Raiding and Unfair Competition
### (against UPMC) (Count IV) and Tortious Interference with Existing
### and Prospective Business Relations (against UPMC) (Count V)

Because Plaintiff's federal law claims have been dismissed, the Court must decide

whether to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

Section 1367 of Title 28 of the United States Code provides that a district court may exercise

supplemental jurisdiction over state law claims if they form the same case and controversy as the

federal claims.  28 U.S.C. § 1367(a).  However, a district court may decline to exercise

jurisdiction over the supplemental claims if "the district court has dismissed all claims over

which it has original jurisdiction."  28 U.S.C. § 1367(c).  While this rule appears to be

permissive, the United States Court of Appeals for the Third Circuit has held that a "district court

must decline to decide the pendent state claims unless considerations of judicial economy,

convenience, and fairness to the parties provide an affirmative justification for doing so."

*Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

Given the early stage of these proceedings, prior to significant discovery, economy

concerns are not implicated, and it would not be unfair to decline to exercise jurisdiction over the

state law claims.  Further, the state court claims are typically and regularly handled in state court

and, of course, would involve the application of state law.  The Court will decline to exercise its

jurisdiction over the remaining state law claims, and will dismiss said claims without prejudice.

Pursuant to 42 Pa. C.S.A. § 5103(b), Plaintiff may pursue its claims in state court.  *See also*, 28

U.S.C. § 1267(d)(federal tolling statute).

## VIII.  CONCLUSION

For the foregoing reasons, Defendants' Renewed Motions to Dismiss, doc. nos. 78 and 82, pursuant to Federal Rule of Civil Procedure 12(b)(6) are **GRANTED**, and the case is hereby dismissed with prejudice.  Plaintiff will not be granted leave to file a Third Complaint because amendment in this case would be futile.  *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (noting that futility is a ground for denying leave to amend a complaint).

An appropriate order follows.


**SO ORDERED** this 29th day of October, 2009.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:     All Registered ECF Counsel and Parties