**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WEST PENN ALLEGHENY HEALTH
SYSTEM, INC.,

                Plaintiff,

      v.

UPMC,

           Defendant.

09cv0480

**ELECTRONICALLY FILED**

**<u>MEMORANDUM OPINION AND ORDER OF COURT
RE: SEALING/UNSEALING OF DOC. NOS. 132 AND 133</u>**

Before the Court are two Motions. One Motion, filed by the Plaintiff, West Penn

Allegheny Health System ("West Penn Allegheny" or "WPAHS"), requests that this Court

permanently seal a document, commonly referred to as the "Affiliation Agreement" (as well as

its related Schedules and Exhibits), to which Plaintiff and a former Defendant in this lawsuit,

Highmark, Inc. ("Highmark") are parties. See doc. no. 127. The second Motion, filed by an

intervenor, PG Publishing Co., seeks to unseal the same Affiliation Agreement (and related

Schedules and Exhibits) which this Court temporarily sealed pending further briefing by the

parties. See doc. no. 140. This Opinion and subsequent Order of Court address both Motions.

First, despite the numerous representations by West Penn Allegheny and Highmark that

their ninety-two page Affiliation Agreement (filed under seal with this Court's permission at doc.

no. 132) and the related four hundred and twenty-four pages of Schedules and Exhibits (filed

under seal at doc. no. 133) are "Privileged and Confidential" and "Highly Confidential – Outside

Counsel/Experts Only"[1] and are so marked on each page,[2] this Court's detailed examination of each of the five hundred and sixteen pages revealed that nearly all of said information already exists in the public domain through: (1) Highmark's own website,[3] (2) frequent West Penn Allegheny/Highmark news conferences and news releases, (3) easy internet searches, (4) publicly available governmental filings of West Penn Allegheny and Highmark, (5) governmental websites, and (6) West Penn Allegheny's and Highmark's own advertisements. Simply stated, to date, West Penn Allegheny and Highmark have released specific financial and other purportedly confidential business information through their own websites, advertisements, and news releases, which is contained in the sealed documents at doc. nos. 132 and 133 and alleged to be "Highly Confidential."

Secondly, based on the law applicable to the facts presented in the excellent briefs submitted by the parties to this action and the intervenors, Highmark and PG Publishing Co., this Court has determined that the entire ninety-two page Affiliation Agreement and most of the attached four hundred and twenty-four pages of Schedules and Exhibits should not be sealed (except for certain specific information described below and set forth in the accompanying Order); but instead, said materials should be published on the docket and thereby made part of the public record.

---

[1] See doc. no. 127-1, filed by West Penn Allegheny, at 2: "[H]ighly sensitive, confidential information about West Penn Allegheny's existing business organizations as well as the Affiliation Agreements planned integrated healthcare system." See doc. no. 156, filed by Highmark, at 3: ". . . Highmark's highly sensitive and confidential business information . . . ." See the numerous related Affidavits which parrot the same language. Compare to recently filed doc. No. 173.

[2] See doc. nos. 132 and 133.

[3] https://www.highmark.com/hmk2/about/newsroom/2011/hmwp/forma.pdf; see also www.postgazette.com, 11/08/11 at 4:32 PM, Breaking News, by Steve Twedt.

## I.     Factual and Procedural History

Although this Court writes primarily for the parties and intervenors, the facts relevant to this decision shall be recited.

On April 21, 2009, Plaintiff, West Penn Allegheny sued Defendants, University of Pittsburgh Medical Center ("UPMC") and Highmark, primarily alleging that since 2002, UPMC ("Pittsburgh's dominant hospital system"), and Highmark (Pittsburgh's "dominant health insurer"), conspired to reduce competition and raise prices at the expense of the community's employers, consumers, and patients. Doc. no. 1, ¶ 2.

In furtherance of this alleged conspiracy, West Penn Allegheny claimed that Highmark "agreed to . . . pay inflated reimbursement rates to UPMC while depressing rates for UPMC's competitors, especially . . . West Penn Allegheny." *Id.*   West Penn Allegheny also claimed that Highmark passed on the costs of the alleged inflated UPMC rates "to employers, consumers, and patients by charging higher premiums." *Id.*   One of the goals of this alleged conspiracy was to "destroy West Penn Allegheny, the sole surviving competitor to UPMC in sophisticated tertiary and quaternary care."[4] *Id.* at ¶ 3.

West Penn Allegheny's Complaint asserted several causes of action.  Counts I and II asserted that UPMC and Highmark violated Sections 1 and 2 of the Sherman Act.  More specifically, in these first two counts, West Penn Allegheny alleges that UPMC and Highmark formed an illegal agreement with one another "to restrain trade by protecting and reinforcing one another's market power" and created two monopolies in Allegheny County – one for UPMC (an acute inpatient and/or high-end tertiary and quaternary acute inpatient services monopoly) and

---

[4] Tertiary care is defined as "highly specialized medical care usually over an extended period of time that involves advanced and complex procedures and treatments performed by medical specialists in state-of-the-art facilities." <u>Merriam Webster</u>.  Quaternary care is a more specialized extension of tertiary care.

one for Highmark (a health care financing and administration for private employers and individuals monopoly). *Id.* at ¶¶ 151, 156.

Count III alleged a Sherman Act violation against UPMC solely for its alleged "attempted monopolization" for acute inpatient and/or high-end tertiary and quaternary acute inpatient services. Counts IV and V averred state-based tort claims alleging that UPMC engaged in "employee raiding"/unfair competition and tortuously interfered with West Penn Allegheny's existing and prospective contractual relations with physicians and with Highmark. *Id.* at ¶¶ 168-171, 173-184.

Motions to Dismiss the Complaint were filed by both Defendants, and this Court granted those Motions on October 29, 2009. Doc. No. 98. West Penn Allegheny timely appealed this Court's decision. On November 29, 2010, the United States Court of Appeals for the Third Circuit reversed in part and vacated in part this Court's decision, remanding the matter. Doc. Nos. 102, 103. In January of 2011, UPMC requested a stay from this Court in order to appeal the decision of the Court of Appeals with the United States Supreme Court. Doc. No. 107. On January 31, 2011, this Court granted UPMC's stay request, but lifted the stay on October 18, 2011, when the Supreme Court denied UPMC's Petitions for Writ of Certiorari. Doc. No. 119, Text Order of October 18, 2011.

On October 31, 2011, West Penn Allegheny filed a Notice of Voluntary Dismissal as to Highmark, and on November 1, 2011, this Court approved the Dismissal of Highmark as a defendant to this lawsuit. See doc. nos. 123 and 125. (Importantly, while Highmark has been dismissed from this case, the antitrust class action, captioned *Royal Mile Company, Inc. et al. v. UPMC et al.,* No. 2:10 cv 1609 against UPMC and Highmark, based in part upon allegations similar to Counts I and II in this case, continues.)

In early November of 2011, the boards of directors at Highmark and West Penn Allegheny formally entered into what has become commonly known as an "Affiliation Agreement." One of the main terms of this Agreement was for Highmark to provide millions of dollars in funding to West Penn Allegheny.[5] Highmark's first installment of its cash infusion to West Penn Allegheny occurred in June of 2011, close in time to the when contract negotiations between Highmark and UPMC broke down.[6]

In light of the Supreme Court's refusal to issue a Writ of Certiorari to UPMC, as well as West Penn Allegheny's voluntary dismissal of Highmark and the new alliance between the two, on November 8, 2011, this Court ordered the remaining parties to this action to file a joint status report. See November 8, 2011 Text Order. As part of that report, the Court ordered that West Penn Allegheny address the legal implications of its "recent agreement" (*i.e.*, the Affiliation Agreement) with Highmark and ordered that the Agreement itself be submitted as part of the report. *Id*.

In response to this Order, West Penn Allegheny filed a motion under seal at doc. no. 127, requesting that the Court allow the Affiliation Agreement along with the voluminous Schedules and Exhibits attached to the Affiliation Agreement, to be filed under seal because they

---

[5] On November 9, 2011, the Pittsburgh Post Gazette at post-gazette.com, published an online article which included a link to a document filed with the Insurance Department of the Commonwealth of Pennsylvania. See "Highmark lays out plan to resurrect West Penn" which included a link to https://www.highmark.com/hmk2/about/newsroom/2011/hmwp/forma.pdf. Page seven of the document located at this address, read, "Under the terms of the Affiliation Agreement Highmark has agreed to provide funding to [West Penn Allegheny] in an aggregate amount not to exceed $400 million . . . ."

[6] The UPMC's contract with Highmark has a term of ten years which will be fulfilled in June of 2012. See https://www.highmark.com/hmk2/about/newsroom/2011/hmwp/forma.pdf at p. 66. Likewise, negotiations for a new UPMC-Highmark contract were terminated (at least for a period of time) by UPMC because of Highmark's recent affiliation with West Penn Allegheny. See *Id*. But see Pittsburgh Post-Gazette article "*Highmark, UPMC reach temporary contract agreement*" dated Thursday, December 22, 2011, http://www.post-gazette.com/pg/11356/1198673-100-0.stm#ixzz1hN575uPGhttp://www.post-gazette.com/pg/11356/1198673-100-0.stm. Based on this article, Highmark is now in a position where it will be negotiating contracts/reimbursement rates for services performed by UPMC while simultaneously working on its new affiliation and setting rates for services provided by West Penn Allegheny.

purportedly "contain[ed] highly sensitive, confidential and proprietary information that[,] if disclosed[,] would jeopardize West Penn Allegheny's business interests." See doc. no. 128, pp.1-2.

On November 17, 2011, this Court provisionally granted West Penn Allegheny's request to file the Affiliation Agreement under seal, but requested that the parties file cross-briefs on whether the seal should be permanent or should be lifted. See doc. no. 131.

In compliance with this Order, on November 18, 2011, West Penn Allegheny filed the Affiliation Agreement (under seal at doc. no. 132) and the Affiliation Agreement's Schedules and Exhibits (under seal at doc. no. 133). On November 18, 2011, former Defendant, Highmark, filed a Motion to Intervene "for the limited purpose of protecting its proprietary business interest in the confidential treatment of the Affiliation Agreement." Doc. no. 136.

After granting Highmark's Motion to Intervene (doc. no. 139), PG Publishing Co. filed a Motion to Intervene and Unseal the Record – meaning the Affiliation Agreement and its attached Schedules and Exhibits. See doc no. 140. On November 28, 2011, this Court granted the portion of PG Publishing's Motion allowing it to intervene, but deferred ruling on the portion of its Motion seeking to unseal the Affiliation Agreement, along with its Schedules and Exhibits, until all briefing on this matter was complete. See Text Order dated November 28, 2011.

To date, West Penn Allegheny has filed its brief arguing the Affiliation Agreement and the attached Schedules and Exhibits (doc. nos. 132 and 133) should be permanently sealed. See West Penn Allegheny's brief at doc. no. 157. Highmark, as intervenor and a party to the Affiliation Agreement, similarly filed a Brief arguing in favor of a permanent seal on the Affiliation Agreement and the attached Schedules and Exhibits. See Highmark's brief at doc. no. 156. Defendant UPMC filed its brief (under seal) urging this Court to lift the seal and

publicly disclose the contents of the Affiliation Agreement and the attached Schedules and Exhibits.  See UPMC's brief (filed under seal) at doc. no. 163.  And, as noted above, intervenor PG Publishing Co. also filed briefs arguing in favor of lifting the seal on the documents.  See doc. nos. 140 and 174.

## II.     Standard of Review

A party seeking the closure of a hearing or the sealing of part of the judicial record "bears the burden of showing that the material is the kind of information that courts will protect" and that "disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001), citing *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) and *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir. 1984).  The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption.  *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993).  In order to meet this burden, the party seeking closure must provide specificity when  delineating the injury to be prevented.  See *Publicker*, 733 F.2d at 1071.  Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient.  *In re Cendant Corp.*, 260 F.3d at 194.

## III.    Discussion

### A.     Balancing Test

It is well-settled among courts within this Circuit that there exists a common law public right of access to judicial proceedings and records.  *See Littlejohn v. BIC Corporation*, 851 F.2d 673, 677-78 (3d Cir. 1988).  The right of access doctrine extends beyond a person's ability to

attend court proceedings – it also encompasses a person's right "to inspect and copy public records and documents, including judicial records." *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157, 161 (3d Cir.1993).

Thus, judicial records are subject to the common law presumption of public access. *In re Cendant Corp.*, 260 F.3d at 192. A document is deemed to be a "judicial record" if the document is "filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *Id.*, citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994).

Although the common law right to public access is a recognized and venerated principle, courts have also recognized the accompanying principle that "the right is not absolute." *Id.*, citing *Littlejohn*, 851 F.2d at 678; *Leucadia*, 998 F.2d at 165; and *Publicker*, 733 F.2d at 1070. The presumption of public access may be rebutted. *Id.*, citing *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir. 1991).

A party wishing to obtain an order of protection must demonstrate that "good cause" exists for the order of protection. *Pansy*, 23 F.3d at 786. "Good cause" can be established by showing that disclosure will work a clearly defined and serious injury to the party seeking closure. *Id.*, citing *Publicker*, 733 F.2d at 1071.

In *Pansy*, the United States Court of Appeals for the Third Circuit recognized several, non-mandatory and non-exhaustive, factors which a court could consider to assist it when evaluating whether "good cause" exists to protect the umbrella of confidentiality. Those factors included:

> 1) whether disclosure would violate any privacy interests;
>
> 2) whether the information was being sought for a legitimate purpose or for an improper purpose;

3) whether disclosure of the information would cause a party
      embarrassment;

4) whether confidentiality was being sought over information important to
      public health and safety;

5) whether the sharing of information among litigants would promote
      fairness and efficiency;

6) whether a party benefitting from the order of confidentiality was a
      public entity or official; and

7) whether the case involves issues important to the public.

*Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483, citing *Pansy*, 23 F.3d at 787–91.

Simply stated, the Court of Appeals has, on more than one occasion, directed the district courts to balance the private versus public interests when determining whether documents should be sealed:

> Discretion should be left with the court to evaluate the competing considerations in light of the facts of individual cases. By focusing on the particular circumstances in the cases before them, courts are in the best position to prevent both the overly broad use of [confidentiality] orders and the unnecessary denial of confidentiality for information that deserves it. . . .

*Glenmede,* 56 F.3d  at 483 (citations omitted).

Here, West Penn Allegheny bears the burden of proving that the documents at issue should be protected, and argues that the public should be denied access to them.  In order to meet its burden of proof, West Penn Allegheny needed to assert specific examples of harm that would ensue upon public disclosure of the Affiliation Agreement and its Schedules and Exhibits.

### 1. The Affiliation Agreement (filed under seal at doc. no. 132)

West Penn Allegheny argued that the ". . . Affiliation Agreement contains highly sensitive, confidential information about West Penn Allegheny's existing business organizations and strategic future planning for the integrated health system contemplated by the [Affiliation] [A]greement." Doc. no. 157 at 7. This bald assertion is not sufficient to meet its burden to convince this Court that protecting the Affiliation Agreement trumps the right of the public to access. In fact, no specific harm is alleged with respect to the Agreement itself. West Penn Allegheny's failure to provide specific examples of harm which would ensue upon the disclosure of the Affiliation Agreement causes this Court to deem it a document that should be available to the public.

Next, West Penn Allegheny argues that because this Court ordered the production of the Affiliation Agreement (as well as the attached Schedules and Exhibits), these documents are not discovery documents. West Penn Allegheny then concludes that the Affiliation Agreement (as well as the attached Schedules and Exhibits) cannot be considered "judicial records," because (per West Penn Allegheny) they do not have "a role in [this] adjudication process" and thus, may not "be accessed by the public." See doc. no. 157 at p. 14. As noted above, West Penn Allegheny claims that because these documents are "neither relevant to [its] claims against UPMC nor [its] motion to amend [the Complaint], the openness typically afforded to judicial documents does not apply." *Id*.

This Court recognizes that these documents were not requested by UPMC during discovery and acknowledges that West Penn Allegheny believes these documents have no relevance in this lawsuit (and thus, per West Penn Allegheny, Federal Rule of Civil Procedure 26 would not require their production). However, this Court disagrees with West Penn Allegheny's

argument that Fed.R.Civ.P. 26 would not require the production of the Affiliation Agreement and its Schedules and Exhibits. The Court ordered the filing of the complete Affiliation Agreement (which encompassed the related Schedules and Exhibits) because of their relevancy to West Penn Allegheny's pending Motion for Leave to File a Second Amended Complaint (doc. no. 124). See this Court's Text Order dated November 8, 2011.

Additionally, the body of case law governing when a party's right to obtain a protective order trumps the public's right to access to a document is not obviated by the fact that this Court ordered production of those documents instead of UPMC requesting them. To the contrary, the fact that this Court ordered the production of these documents implies that this Court believed the documents at issue (*i.e.,* the Affiliation Agreement and its attached Schedules and Exhibits) are relevant to: (1) West Penn Allegheny's Sherman Act claim asserted against UPMC, and (2) West Penn Allegheny's Motion for Leave to File a Second Amended Complaint.

Simply put, notwithstanding the distinctions between this case and those referenced in this Opinion (namely *Littlejohn, Leucadia, Publicker, Pansy, Glenmede,* and *Cendant*), the rationale, the instructions to the district courts, and the findings set forth in *Littlejohn, Leucadia, Publicker, Pansy, Glenmede,* and *Cendant,* which established the relevant body of law, apply in the instant case.

Finally, as noted by this Court in great detail in Subpart "B." of this Opinion (below), essentially all of the information contained within the Affiliation Agreement is already available to the public via other sources. See discussion in Subpart "B." infra. Thus, this Court cannot justify the continued sealing of a document that is readily available to the public via other sources.

**2.** **The Schedules and Exhibits Attached to the Affiliation Agreement (filed under seal at doc. no. 133)**

Turning to the Schedules and Exhibits which are attached to and referenced within the Affiliation Agreement, West Penn Allegheny contended that disclosure of sixteen of these Schedules and Exhibits would provide UPMC, its principal competitor, with information that would result in specific harm to West Penn Allegheny. Doc. no. 157 at pp. 7-10. West Penn Allegheny claimed specific harm would ensue – generally, and most notably, because the information contained in the following fourteen schedules and two exhibits allegedly could be used by competitors to gain a distinct and unfair business advantage – if the following information found within these the Schedules and Exhibits was made public:

- Schedule 4.2 (b)

- Schedule 4.2(c)

- Schedule 4.3

- Schedule 4.4

- Schedule 4.8

- Schedule 4.11

- Schedule 4.13

- Schedule 4.15

- Schedule 4.15(d)

- Schedule 4.20(e)

- Schedule 4.20(g)

- Schedule 4.21(c)

- Schedule 4.22(a)

- Schedule 6.3

- Exhibit H

- Exhibit I

After reviewing each of these Schedules and Exhibits, the Court finds that only a very limited amount of specific information contained within Schedule 4.8, Schedule 4.11, Schedule 4.13, Schedule 4.15, Schedule 4.20(e), Schedule 4.20(g), Schedule 4.22(a), Schedule 6.3, and Exhibit H, should be kept sealed because these are documents which are confidential (mostly, salary and personal information as well as certain patient and pharmacy information) and could be used by competitors to gain an unfair business advantage, or cause harm to employees, patients, and/or pharmacies. See the chart prepared by the Court in Subpart "B" below for additional detail relating to these and all other portions of the Schedules and Exhibits.[7] The remainder of the Schedules and Exhbibits are not confidential and, therefore, are not entitled to remain hidden from public access.

The decision to seal only very limited portions of the Schedules and Exhibits conforms with the non-mandatory factors set forth in *Pansy*. Specifically, the portions of the Schedules and Exhibits that this Court has agreed to seal (*i.e.,* portions of Schedule 4.8, portions of Schedule 4.11, Schedule 4.13, portions of Schedule 4.15, Schedule 4.20(e), Schedule 4.20(g), portions of Schedule 4.22(a), Schedule 6.3, and Exhibit H) primarily protects information important to public health and safety, and secondarily protects information which this Court has deemed as confidential, personal, or business information. However, as to those portions of the

---

[7] This Court endeavored to review in great detail every one of the Schedules and Exhibits attached to the Affiliation Agreement (not just the sixteen argued by West Penn Allegheny nor the twenty discrete portions of the Affliation Agreement and Schedules and Exhibits argued by Highmark in their respective briefs) and, as noted below in Subpart "B." of this Opinion, outlined what each Schedule and Exhibit contains. Notably, many, if not most, of the Schedules and Exhibits contain basic information, such as the parties to a contract or agreement and/or dates relating to those contracts and agreements, but the Schedules and Exhibits do not contain the terms and conditions of the contracts or agreements, nor do they contain or attach the actual contracts or agreements.

Schedules and Exhibits that this Court has declined to permanently seal, this Court finds that no

such public health or safety concerns exist. This Court also finds that the sharing of all other

information contained in the Schedules and Exhibits would promote fairness and efficiency

between the litigants. Furthermore, because this case involves issues important to the public, the

unsealing of these documents is warranted and justifiable.

### B. Documents and Information Already Available to the Public

A protective order prevents a party from disseminating only that information obtained

through use of the discovery process. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

Thus, a party may disseminate the identical information covered by the protective order as long

as the information is gained through means independent of the court's processes. *Id.* Where a

protective order is entered and it is limited to the context of pretrial civil discovery, and it does

not restrict the dissemination of the information if gained from other sources, it does not offend

the First Amendment. *Id.* at 37.

As stated above, despite representations by West Penn Allegheny and Highmark that

their ninety-two page Affiliation Agreement (filed under seal at doc. no. 132) and the related

four hundred twenty-four page Schedules and Exhibits (filed under seal at doc. no. 133) are

"Privileged and Confidential" and "Highly Confidential – Outside Counsel/Experts Only" and

are so marked on each of the 516 pages thereof, this Court's personally-conducted, detailed

examination of each of the 516 pages revealed that practically all of said information is already

in the public domain – through Highmark's own website,[8] the numerous West Penn

Allegheny/Highmark news conferences and news releases, easy internet searches, publicly

---

[8] https://www.highmark.com/hmk2/about/newsroom/2011/hmwp/forma.pdf.

available governmental filings, governmental websites, and West Penn Allegheny's and Highmark's own advertisements. West Penn Allegheny and Highmark have released more specific financial and other alleged confidential business information in their own websites/advertisements/news releases, and presentations recorded on YouTube[tm9], than is contained in the sealed documents at doc. nos. 132 and 133.

### 1.  Doc. no. 132 – The Affiliation Agreement (92 pages)

The following is the Court's detailed analysis of the Affiliation Agreement filed under seal at document number 132 (dated as of October 31, 2001) ("execution copy") (labeled "Highly Confidential - Outside Counsel/Experts Only"):

After reviewing and comparing the alleged ninety-two page, "highly confidential," Affiliation Agreement filed under seal at document number 132, to the two hundred and thirty pages posted on Highmark's website referenced above, this Court found that nearly all of the information set forth in the Affiliation Agreement is contained within the two hundred and thirty pages of material set forth on Highmark's website. In fact, the public information contained within the two hundred and thirty pages (especially when coupled with the West Penn Allegheny/Highmark news conferences/press releases) on Highmark's website is more detailed and discloses more information (and thus provides a greater level of transparency) than the alleged highly confidential Affiliation Agreement filed and sealed at document number 132.

The two hundred and thirty pages found on Highmark's website are entitled, "Form A – Statement Regarding the Acquisition of Control of or Merger with Domestic Insurers," by UPE,

---

[9] E.g., "Highmark, WPAHS Agreement, Parts 1 through 4, on YouTube[tm], total time of approximately 58 minutes, and numerous other videos by Highmark and/or WPAHS executives.

a Pennsylvania non-profit corporation [hereinafter the "Original Form A"].[10] This document was

filed with the Insurance Department of the Commonwealth of Pennsylvania, dated November 7,

2011.

"Original Form A" provides:

- the general description and organizational chart of Highmark and its affiliates (see

  pages 4-5 with attached chart at Tab B),

- the general description and organizational chart of West Penn Allegheny (see

  pages 5-6 with attached chart at Tab D),

- an "Overview of Highmark's Strategic Vision" (at page 6 and Tab E),

- a detailed description of the "Affiliation Transaction" "to establish a new

  integrated health system" (at pages 6-9),

- details of the "Highmark's Funding Commitment (in much more specificity than

  in the so-called "Highly Confidential" doc. nos. 132 and 133) (at pages 7-9), and

- detailed financial statements and exhibits (at pages 12-13 and Tab O).

Many of the paragraphs in the Affiliation Agreement filed under seal at document

number 132 contain the same or nearly the same substantive information as that found within

Original Form A, a document easily accessible by the public on Highmark's website.  For

example, the information in Article 2 of the Affiliation Agreement at pages 13-20, entitled

"Transaction Structure and Funding Commitments," describes "UPE",[11] attaches UPE's bylaws,

and defines the payments to be made by Highmark to West Penn Allegheny.  Similarly, Original

---

[10] Form A – Statement Regarding the Acquisition of Control of or Merger with Domestic Insurers defines "UPE" as the "new nonprofit parent company" that was formed at the closing of the Affiliation Agreement between West Penn Allegheny and Highmark.  UPE is further described as the "sole corporate member within a new class of membership that will be established in Highmark".  See Form A – Statement Regarding the Acquisition of Control of or Merger with Domestic Insurers at p. 6.

[11] "UPE" is an acronym for "Ultimate Parent Entity."

Form A at pages 6-9 and related Tabs (entitled "The Affiliation Transaction") contains two

subparts (the "Basic Structure of the New Affiliation" and "Highmark's Funding Commitment")

wherein the by-laws of UPE are discussed and attached, and the payments to be made by

Highmark to West Penn Allegheny are discussed. Thus, the substance of the structure of the

"transaction" which has resulted from the affiliation West Penn Allegheny and Highmark and the

related financial commitments between the two entities are fully disclosed in Form A, the public

document.

### 2. Doc. no. 133 – Schedules to the Affiliation Agreement (424 pages)

Furthermore, several of the attached documents contained under the "Tabs" and much of

the information set forth in Original Form A are marked as "Highly Confidential" in doc. nos.

132 and 133, as follows:

1. UPE's Articles of Incorporation are available to the public on Highmark's website

   through Original Form A at pages 78-84 (Tab F). These Articles are identical to the

   UPE Articles of Incorporation filed under seal at document number 133 at pages 186-

   192 (Exhibit A), except that those filed under seal: (1) contain the actual signature of

   the incorporator (Carol A. Soltes) on the final page instead of just a blank line, (2)

   contain a date and time stamp from the "PA Dept of State," (3) provide the return

   name and address to whom the document should be returned, and (4) eliminate

   "Section 17  Effective Date."

2. UPE's Bylaws are available to the public on Highmark's website through Original

   Form A at pages 85-102 (Tab G). These bylaws are substantially similar to those

   filed under seal at document number 133 at pages 195-213 (Exhibit B), except

   Exhibit B contains additional boilerplate paragraphs: 6.8 (corporate governance and

17

nominating committee), 6.9 (audit committee), 6.10 (personnel and compensation committee), and 7.12 (applicability to predecessor companies).

3. However, UPE's Amended and Restated Bylaws, available to the public on Highmark's website through Original Form A, at pages 103-122 (Tab H) are identical to those found in sealed document 133 at Exhibit B referred to immediately above.

4. Highmark's Amended and Restated Bylaws are available to the public on Highmark's website through Original Form A at pages 17-41 (Tab A). These bylaws are substantially similar to the Second Amended and Restated Bylaws of Highmark filed under seal at document number 133 at pages 246-270 (Exhibit E).

5. However, Highmark's Second Amended and Restated Bylaws, publicly available on Highmark's website through Original Form A at pages 123-148 (Tab I), are identical to those found in sealed document 133 at Exhibit E referred to immediately above.

6. Detailed Charts of West Penn Allegheny's subsidiaries are posted on the public Highmark website at pages 62-63 (Tab D) and list the same entities as "Highly Confidential" at 2-3 (Schedule R-1 - WPAHS Subsidiaries) of doc. no. 133.

7. The Articles of Incorporation for "UPE Provider Sub" are available to the public on Highmark's website through Original Form A at pages 149-155 (Tab J). These Articles are identical to the UPE Provider Sub Articles of Incorporation filed under seal at document number 133 at pages 214-220 (Exhibit C) except that those filed under seal: (1) contain the actual signature of the incorporator (Carol A. Soltes) on the final page instead of just a blank line, (2) contain a date and time stamp from the "PA Dept of State," (3) provide the return name and address to whom the document should be returned, and (4) eliminate "Section 17  Effective Date."

8. The Bylaws of "UPE Provider Sub" are available to the public on Highmark's website through Original Form A at pages at 156-175 (Tab K). These bylaws are substantially similar to the Amended and Restated Bylaws of the "Provider Subsidiary Entity" filed under seal at document number 133 at pages at 223-244 (Exhibit D) of doc. no. 133, except Exhibit D contains additional boilerplate paragraphs: 6.8 (corporate governance and nominating committee), 6.9 (audit committee), and 6.10 (personnel and compensation committee).

9. However, Amended and Restated Bylaws of UPE Provider Sub, publicly available on Highmark's website through Original Form A at pages at 176-198 (Tab L) are identical to those found in sealed document 133 at Exhibit D referred to immediately above.

10. West Penn Allegheny's Amended and Restated Bylaws publicly available on Highmark's website through Original Form A at 199-226 (Tab M) are identical to West Penn Allegheny's Amended and Restated Bylaws filed under seal at document number 133 at pages 280-306 (Exhibit F).

11. The "Overview of Highmark's Strategic Vision" publicly available on Highmark's website through Original Form A at pages 64-77 (Tab E) sets forth Highmark's Strategic Vision and Plan in greater specificity than anything contained in the alleged in sealed documents numbers 132 and 133.

In addition to this public document/sealed document comparison review, this Court also undertook a comprehensive and exhaustive review of each Schedule and Exhibit as alluded Subpart "A" of this Opinion.

The following chart reflects the Court's detailed analysis of each Schedule and Exhibit comprising the four hundred and twenty-four pages:

| PAGE NO(S). | TITLE |
| --- | --- |
| 1 | Introduction |
| 2-3 | Schedule R-1: WPAHS Subsidiaries |
| 4-5 | Schedule R-2: WPAHS Affiliates |
| 5-6 | Schedule 2/6(a) Core Laboratory Assets of the WPAHS Parties (with asset no. and description) |
| 7-10 | Schedule 4.2(b) WPAHS Parties' Required Approvals and Notice to Governmental Authorities |
| 11-13 | Schedule 4.2(c) WPAHS Parties' Contractual Consents (including Hospital Service Agreements, Provider Agreements, Facility Agreements, and Lease Agreements) (no Agreements are attached) |
| 14-15 | Schedule 4.3 WPAHS Equity, Membership, or Similar Interests (names only) (percentage of ownership, cost basis, current market value, and other information are not included) |
| 16 | Schedule 4.4 WPAHS Parties' Third Party Rights (names only) (no terms or value are disclosed) |
| 17 | Schedule 4.5 Properties Owned, Leased or Operated by the WPAHS Parties (only references other schedules) |
| 18 | Schedule 4.7(b) WPAHS Parties' Changes in Accounting Policy or Methodology |
| 19-44 | Schedule 4.8 (1 of 2) WPAHS Parties' Material Licenses and Permits (lists only facility/address, license type, facility license number, license issue date, and license expiration date -- only said license numbers and dates are confidential, and need not be disclosed) |
| 45 | Schedule 4.8 (2 of 2) WPAHS Parties' Pending or Threatened Proceedings to Revoke Material Licenses or Permits |
| 46 | Schedule 4.9 WPAHS Parties' Exceptions to Accreditation |
| 47 | Schedule 4.10 WPAHS Parties' Government Program Participation and Reimbursement |
| 48 | Schedule 4.11 WPAHS Parties' Regulatory Compliance (items 4, 5 and 6 are deemed confidential, and need not be disclosed) |
| 49 | Schedule 4.13 WPAHS Parties' Medical Staff Matters (confidential - personnel matters - need not be disclosed) |
| 50 | Schedule 4.14(a) WPAHS Parties' Intellectual Property Royalties or Other Payments |
| 51 | Schedule 4.14(b) WPAHS Parties' Intellectual Property Infringement |

| | |
|---|---|
| 52-62 | Schedule 4.15 WPAHS Parties' Material Contracts (lists only name of the parties, type of agreement, and date -- the actual agreements/leases/etc. and the terms thereof are not attached) (obviously a list of doctors/medical providers working for/affiliated with WPAHS is publicly available -- through the efforts of WPAHS itself -- each of the names are available on WPAHS' website). Dollar amounts as to the particular list of doctors set forth in 4.15 are confidential, and said dollar amounts need not be disclosed |
| 63 | Schedule 4.15(d) WPAHS' Parties Material Contract Subject to Restrictions (lists only names of the parties, type of agreement and date - - the actual agreements are not attached, nor is the nature of any "restriction" described) |
| 64-67 | Schedule 4.18(a) WPAHS Parties' Owned Real Property |
| 68-97 | Schedule 4.18(b) WPAHS Parties' Leased Real Property (lists only date of lease, address, name of landlord, and name of tenant) (no leases are attached) (no terms of the leases are disclosed, nor any information relating to financial arrangements) |
| 98-109 | Schedule 4.18(c) WPAHS Parties' Third Party Leases (lists only date of lease, address, name of landlord, name of tenant, and start and end dates of lease) (no leases are attached) (no terms of the leases are disclosed, nor any information relating to financial arrangements) |
| 110 | Schedule 4.18(j) WPAHS Parties' Notices of ADA Non-Compliance |
| 111 | Schedule 4.20(d) WPAHS Parties' Compliance with Plans and Benefit Programs and Agreements |
| 112-114 | Schedule 4.20(e) WPAHS Parties' Employee Obligations Triggered by Transaction (confidential – personal matters, and need not be disclosed) |
| 115 | Schedule 4.20(f) WPAHS Parties' Sanctions Under Section 280G, 4999 or 409A |
| 116 | Schedule 4.20(g) WPAHS Parties' Employee Plan Liabilities Beyond COBRA (confidential – personnel matters - need not be disclosed) |
| 117-118 | Schedule 4.21(c) WPAHS Parties' Compliance with Employment Laws and Collective Bargaining Matters (lists name of hospital, covered unit, name of union, and effective date/expiration date) (all public information) (no financial terms described) |
| 119-151 | Schedule 4.22(a) WPAHS Parties' Litigation ("I. Employment – Related litigation - - lists case name, court or agency, case number, and description of claims - - no attorney evaluation, no reserve amount, and no valuation of case - - not confidential) (II. Other Litigation – not confidential, except for cases where "a request for payments has been made," but no lawsuit yet filed, since such disclosure would publish the name of the patients/doctors, before public litigation - - such information need not be disclosed) |
| 152 | Schedule 4.22(b) WPAHS Parties' Proceedings Before Governmental Authorities |
| 153 | Schedule 4.23 Tax-Exempt WPAHS Parties |
| 154-155 | Schedule 4.24 WPAHS Parties' Environmental Matters |
| 156-158 | Schedule 4.26 WPAHS Parties' Tax-Exempt Bond Matters (lists name of parties, type of document and date only - - no agreement/lease/etc. are |

| | |
|---|---|
| | attached, and no financial terms are disclosed) |
| 159-161 | Schedule 4.27 WPAHS Parties' Taxable Debt Matters (lists name of parties, type of document and date only - - no agreement/lease/etc. are attached, and no financial terms are disclosed) |
| 162 | Schedule 4.28(j) WPAHS Parties' Absence of Material Adverse Effect |
| 163-164 | Schedule 5.2(b) Highmark and UPE Parties' Approvals and Notices to Governmental Authorities |
| 165 | Schedule 5.2(c) Highmark and UPE Parties' Contractual Consents |
| 166 | Schedule 5.4(b) Highmark Changes in Accounting Policy or Methodology |
| 167 | Schedule 5.5 Highmark and UPE Parties' Regulatory Compliance (all public knowledge) |
| 168-169 | Schedule 5.6 Highmark and UPE Parties' Litigation (all public information - - no private opinion of counsel - - except standard "meritorious defenses" and "unable to predict outcome" - - no information of reserve or valuation) |
| 170-176 | Schedule 6.1(a)(1) WPAHS Parties' Due Diligence Update Timeline |
| 177 | Schedule 6.1(a)(2) WPAHS Parties' Interim Reports to Highmark |
| 178-179 | Schedule 6.1(b) Highmark and UPE Parties' Due Diligence Timeline |
| 180 | Schedule 6.2 WPAHS Parties' Exceptions to Conduct of Business |
| 181 | Schedule 6.3 WPAHS Parties' Exceptions to Negative Covenants (confidential - personal matters - need not be disclosed) |
| 182 | Schedule 6.3(g) WPAHS Parties' Agreed Capital Expenditures |
| 183-184 | Schedule 8.4 Highmark and UPE Parties' Pre-Closing Confirmations from Governmental Authorities |
| 185 | Schedule 9.4 WPAHS Parties' Pre-Closing Confirmations from Governmental Authorities |
| 186-192 | Exhibit A - Articles of Incorporation – Nonprofit (15 Pa.C S.) |
| 193-213 | Exhibit B – Amended and Restated Bylaws of Ultimate Parent Entity |
| 214-220 | Exhibit C - Articles of Incorporation – Nonprofit (15 Pa.C S.) |
| 221-244 | Exhibit D - Amended and Restated Bylaws of Provider Subsidiary Entity |
| 245-270 | Exhibit E – Second Amended and Restated Bylaws of Highmark Inc. |
| 271-279 | Exhibit F – Amended and Restated Articles of Incorporation of West Penn Allegheny Health System, Inc. |
| 280-306 | Exhibit F – Amended and Restated Bylaws of West Penn Allegheny Health System, Inc. |
| 307-312 | Exhibit F – Excerpt of Prototype Governance Document Provisions |
| 313-315 | Exhibit G – Joint Committee Charter |
| 316 -317 | Exhibit H – Term Sheet for Loan Agreements (confidential) |
| 318-350 | Exhibit I – Joint Venture Option Agreement By and Between Highmark Inc. and West Penn Allegheny Health System, Inc., dated October 31, 2011 |
| 351 | Schedule 1.1 Laboratory Facilities |
| 352 | Schedule 1.6(b) Initial Capital Contributions of Highmark and WPAHS |
| 353-354 | Schedule 2.1(c) Personal Property Included in the Laboratory Facility Assets |
| 355 | Schedule 2.1(k) Government and Third Party Payor Provider Agreements and Numbers; NPIs (none listed) |

| | |
|---|---|
| 356 | Schedule 2.1(m) Other Assets of WPAHS (none listed) |
| 357-403 | Exhibit A – Joint Venture Documents (basically blank standard formats) |
| 404 | Exhibit A – Members' Capital Contributions (percentages indicated but no dollar amounts included – left blank) |
| 405 | Exhibit B – Initial Board of Directors (blank) |
| 406-407 | Exhibit B – General Bill of Sale (basically a standard blank form) |
| 408-411 | Exhibit C – Assignment and Assumption Agreement (basically a standard blank form) |
| 412-414 | Exhibit J – Spending Policy for Perpetual Special Purpose Endowment Fund (basically a standard blank form) |
| 415-418 | Exhibit K – Letter from Ropes & Gray LLP to Highmark, Inc. (standard letter) |
| 419-424 | Exhibit L – Form of Opinion of Highmark and UPE Parties' Legal Counsel (emphasis on 'form" letter) |

As to the Schedules, West Penn Allegheny and Highmark make much of the purported confidential and highly secretive "regulatory compliance issues" (see doc. no. 127-1 at 2) and "approval process" by various governmental agencies, with timetables (see Schedule 4.2(b)), and related necessary consents or notices required by contracts (see Schedule 4.2(c)). Much (if not all) of this "approval process" is detailed by Highmark and West Penn Allegheny in their numerous newspaper articles and other public statements. Further, any good attorney familiar with acquisitions in the healthcare field could easily determine this approval pathway/timetable. (The Court notes that the actual Hospital Service Agreements, Provider Agreements, Facility Agreements, and Lease Agreements are not part of this document -- see doc. no. 133.) Moreover, while arguably information relating to Schedules 4.8 (2 of 2), 4.9, 4.14(a), 4.14(b), 4.18(j), 4.20(f), 4.22(b), 4.28, 5.4(b), 6.2, and 6.3(g) might be confidential, the Court finds that these Schedules do not contain any confidential information, since the answer to each is "None."

As to the Exhibits, the Exhibits are either: (i) documents which are already available publicly with the Pennsylvania Secretary of State or Pennsylvania Department of Insurance, (ii) generic form documents which contain only the standard articles of incorporation or standard

bylaws language, or (iii) available through Highmark/West Penn Allegheny websites.  No

financial information is contained in these Exhibits, except Exhibit H at 316-317, which contains

financial information that West Penn Allegheny and Highmark have regularly released and

disclosed in their news releases (concerning the cash infusions from Highmark to West Penn

Allegheny) and on Highmark's own website.  This Court might have found as confidential the

names of members of the Board of Directors of the new entity/parent/subsidiary (however, this

information is publicly available on Highmark's website), and the "draft" opinions of legal

counsel (Exhibits K and L) (but said draft opinions simply contain the standard – albeit

important – boilerplate language).

While West Penn Allegheny claims that the Schedules and Exhibits (doc. no. 133)

contain confidential information about "contracts with third parties," "consents" required by

certain leases/agreements, "rights to certain [West Penn Allegheny] assets" in contracts, "salary"

information, "non-compete provisions," "take-or-pay provisions," and so on (see doc. no. 157 at

6-9), again no contracts/leases/agreements are attached, and no "terms" thereof are disclosed in

doc. no. 133.  See also Highmark's doc. no. 156 at 6-8, arguing that the disclosure of the "terms"

of various agreements would cause harm to Highmark, when doc. nos. 132 and 133 do not set

forth or attach the actual language or terms.

The West Penn Allegheny website is replete with the so-called "Highly Confidential"

information from doctor's names, address, and specialties under "find a doctor" and "medical

specialists," to location of hospitals, outpatient care centers, primary care centers, and outpatient

diagnostic testing under "locations and directions."  Financial disclosures and IRS filings are also

on the West Penn Allegheny website.  See also West Penn Allegheny new CEO's interview on

KDKA-TV's Sunday Business Page re: Affiliation Agreement with Highmark, Inc., on

YouTube[tm], through West Penn Allegheny's website; and West Penn Allegheny's website page describing the financial arrangement (http://www.wpahs.org/news/newsletters/news-and-notes/july-2011/highmark-plans).  Further, although West Penn Allegheny (see doc. no. 127-1 at 2) and Highmark (see doc. no. 156 at 1, *et seq*.) claim doc. no. 132 contains "highly sensitive, confidential information" about "physicians contracts and salary information," a review of doc. nos. 132 and 133 reveal that no physician contracts are attached thereto and no specific salary of any particular physician(s) is disclosed.

Additionally, detailed quarterly financial information from 2006 through the second quarter of 2011 are available on the Highmark website.  The financial reports of the second quarter of 2011 alone is 372 pages.  This information is tied to the Highmark news release of November 1, 2011, entitled "Highmark, West Penn Allegheny boards approve definitive agreement on affiliation; announce new management and detailed next steps."  The Highmark website states that Highmark "has made a total financial commitment of up to $475 million . . . ."  The 230 page filing with the Pennsylvania Insurance Department also is attached thereto.  See also other Highmark news releases at www.highmark.com, "About Highmark," "Newsroom," "Our News 2011," and video of press conference of November 1, 2011 on YouTube[tm].

Ironically, West Penn Allegheny complains that it does not want UPMC, "West Penn's direct competitor" (see doc. no. 130 at 2), to have the so-called confidential business information.  However, Highmark does have some similar information as to UPMC, and if Highmark renews its contracts with UPMC, then Highmark will have said information of both competitors, and arguably may be able to use the UPMC information to advance the Highmark/West Penn Allegheny "affiliation."  While said information may not be exactly

25

comparing "apples with apples," in the context of this antitrust and the related class action, lifting of the seal will add an additional degree of transparency.

Further, Highmark's overview of its publicly available "Strategic Vision" also supports the public disclosure of the documents at issue (with the limited exceptions noted in Subpart "A." above) because a review of this Strategic Vision arguably demonstrates Highmark's vision to "influence" pricing/costs not only at WPAHS but also, directly or indirectly, at UPMC. Assisting the public in discerning whether such a "Vision" and implementation thereof will lead to price fixing or price "leadership," or Highmark serving as the "cost/price gate-keeper," also supports public disclosure of the alleged "Highly Confidential" documents filed under seal at document numbers 132 and 133, and furthermore, is consistent with Highmark's publicly-stated policy of more "transparency" in healthcare services. Disclosure will also permit the public to more accurately evaluate whether this Affiliation Agreement and the implementation thereof will produce "access to high-quality healthcare services built around a commercial product that will be less expensive than any product that includes UPMC at the contract rates it demanded." See Highmark's website (https://www.highmark.com/hmk2/about/newsroom/2011/hmwp /forma.pdf), Original Form A, at 66. Further, if UPMC continues its contractual relationship with Highmark, then arguably Highmark would be in control of, in whole or in part, or at least influence, pricing at the two dominant hospital systems in this region, potentially leading to further antitrust concerns. This Court cannot predict what will happen in the future. Rather, this Court simply finds that the public interest requires disclosure of this information so the public may make its own evaluations.

In summary, despite the representations by West Penn Allegheny that "regulatory compliance issues; material contracts; physician contracts and salary information; employee

contracts; pending litigation unrelated to this matter, many including detailed claim descriptions; required contractual consents; and material contracts subject to restrictions" (see doc. no. 128, at 2 and Ex. 2, ¶ 4) are "specific types of confidential information" (doc. no. 130 at 2) (which representations and documents remain on this record without amendment or correction), the review of the actual doc. nos. 132 and 133 reveals that said information is not in doc. nos. 132 and 133 (i.e., no contracts/agreements attached, no specific salary information included, and so on), or the information is already in the public domain by West Penn Allegheny or Highmark's own public relations efforts.[12]

### C.    Conclusion

West Penn Allegheny and Highmark have failed to meet their burden with respect to the Affiliation Agreement.  This Court finds after reviewing the case law relevant to this issue, West Penn Allegheny's interest in sealing the document and Highmark's interest in sealing portions of it, are outweighed by the public's right to access.  In addition, this Court also finds that much of what is contained in the Affiliation Agreement has already been disclosed to the public and is still readily available to the public vis-à-vis West Penn Allegheny's and Highmark's websites as well as through newspaper accounts and records related to same.

West Penn Allegheny and Highmark also generally failed to meet their burden with respect to the Schedules and Exhibits with a few, very specific exceptions as further detailed and

---

[12] After the Court had laboriously, over several weeks, compared line by line, and page by page, the 516 pages (*i.e.* the Affiliation Agreement and its Schedules and Exhibits) designated as "Highly Confidential," to the publicly available information, including the Original Form A, filed with the Pennsylvania Department of Insurance, Highmark informed the Court on December 22, 2011, at doc. no. 173, that at least in its view, much of the alleged "Highly Confidential" material somehow was no longer confidential and released a "New Form A" (which overlaps and re-formats much of the Affiliation Agreement and Schedules and Exhibits).  New Form A still contains redactions on approximately 115 of its 416 pages. Neither Doc. No. 173, nor the New Form A, indicates the reason(s) previously "Highly Confidential" information became non-confidential.

discussed in subpart B, above. In addition, as this Court has discussed at length and demonstrated through its charts, above, in subpart "B.," almost all of the Schedules and Exhibits are available to the public already, with a few exceptions. Those exceptions include the following:

- Schedule 4.8 (license numbers and dates only),
- Schedule 4.11 (items 4, 5, and 6 only),
- Schedule 4.13,
- Schedule 4.15 (dollar amounts only),
- Schedule 4.20(e),
- Schedule 4.20(g),
- Schedule 4.22(a) (potential lawsuits not yet filed),
- Schedule 6.3, and
- Exhibit H.

Accordingly, the portions of these Schedules and Exhibits identified immediately above are to remain under seal because this Court has found that they are, in fact, confidential, in accordance with *Pansy,* and because they have not been made available to public elsewhere.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

# ORDER OF COURT

**AND NOW,** this 29th day of December, 2011, **IT IS HEREBY ORDERED** that PG Publishing Co.'s Motion to Unseal the Record (Doc. No. 140) is **GRANTED IN PART AND DENIED IN PART**; and the Court's November 17, 2011 Order is hereby **VACATED**.

Plaintiff is hereby required to file the entirety of the Affiliation Agreement (ninety-two pages, previously filed under seal at doc. no. 132), and shall also file the entirety of the Schedules and Exhibits (four hundred twenty-four pages, previously filed under seal at doc. no. 133) with the following exceptions, on or before January 5, 2012, at 3:00P.M.:

- The license numbers and dates in Schedule 4.8 shall be redacted,

- Items 4, 5, and 6 of Schedule 4.11 shall be redacted,

- Schedule 4.13 shall be redacted in its entirety,

- The dollar amounts only in Schedule 4.15 shall be redacted,

- Schedule 4.20(e) shall be redacted in its entirety,

- Schedule 4.20(g) shall be redacted in its entirety,

- The "not-yet-filed" potential cases in schedule 4.22(a) shall be redacted,

- Schedule 6.3 shall be redacted in its entirety, and

- Exhibit H shall be redacted in its entirety.

**SO ORDERED** this 29th day of December 2011.


s/   Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:      All ECF Counsel of Record